## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

PHYSICIANS COMMITTEE FOR                      )
RESPONSIBLE MEDICINE, *et al.*,               )
                                              )
       Plaintiffs,                          )
                                              )
       v.                                   )       Civ. No. 05-1369 (RMU)
                                              )
UNITED STATES ENVIRONMENTAL                   )
PROTECTION AGENCY and STEPHEN                  )
L. JOHNSON, Administrator,                     )
United States Environmental Protection         )
Agency,                                        )
                                              )
       Defendants.                          )
_____)

### EPA'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants United States Environmental Protection Agency and Stephen L. Johnson,

Administrator, United States Environmental Protection Agency, hereby move to dismiss

Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).

Plaintiffs challenge EPA's decision not to repeal a non-binding test protocol that may be

utilized by Defendant United States Environmental Protection Agency ("EPA" or "the

Agency") in various regulatory programs to evaluate the potential effects of pesticides and

other chemicals on neurodevelopment.  As discussed in the accompanying memorandum,

Plaintiffs' Complaint is subject to dismissal with prejudice pursuant to the doctrine of

collateral estoppel because Plaintiffs' have already been determined by the United States Court

of Appeals for the District of Columbia Circuit to lack standing to challenge this test protocol.

Even if collateral estoppel does not apply, this Court does not have jurisdiction because Plaintiffs lack standing. Moreover, Plaintiffs do not challenge any final reviewable agency action, and their claims are not ripe for judicial review.

Respectfully submitted,

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources
   Division


_____/s/_____
ERIC G. HOSTETLER
D.C. Bar # 445917
Environmental Defense Section
Environment & Natural Resources
   Division
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 305-2326

Of Counsel

JEFFREY M. HERREMA
DONALD A. SADOWSKY
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

DATED: September 23, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PHYSICIANS COMMITTEE FOR           )
RESPONSIBLE MEDICINE, *et al.*,     )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )        Civ. No. 05-1369 (RMU)
                                    )
UNITED STATES ENVIRONMENTAL        )
PROTECTION AGENCY and STEPHEN      )
L. JOHNSON, Administrator,          )
United States Environmental Protection )
Agency,                             )
                                    )
        Defendants.                 )
_____)

**<u>EPA's MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    EPA's Regulation of Pesticides . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                1.    Registration of Pesticides Under FIFRA . . . . . . . . . . . . . . . . . . . . . . . . 2
                2.    Developmental Neurotoxicity Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
                3.    Establishment of Pesticide Tolerances Under the FFDCA . . . . . . . . . . . 6

        B.    The Toxic Substances Control Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   PREVIOUS LITIGATION AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    PLAINTIFFS ARE BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL
      FROM CHALLENGING THE DNT GUIDELINES . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.   PLAINTIFFS LACK STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  PLAINTIFFS DO NOT CHALLENGE FINAL AGENCY ACTION . . . . . . . . . . . . . 21

        A.  OPPTS 870.6300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        B.  The TSCA DNT Guideline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   PLAINTIFFS' CLAIMS ARE NOT RIPE FOR JUDICIAL REVIEW . . . . . . . . . . . . 24

        A.    Judicial Intervention Would Interfere With EPA's Ability to Generate
              Appropriate Data For Use in FIFRA and FFDCA Regulatory Decisions and
              Appropriate TSCA Test Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        B.    Plaintiffs Will Not Suffer Any Hardship if Review is Delayed . . . . . . . . . . . . . 27

V.    EPA TOLERANCE DECISIONS CANNOT BE REVIEWED BY THIS COURT . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TABLE OF AUTHORITIES

PAGE

FEDERAL CASES

Abbott Laboratories v. Gardner,
    387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Aerosource, Inc. v. Slater,
    142 F.3d 572 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

American Petroleum Inst. v. EPA,
    216 F.3d 50 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

American Telephone & Telegraph Co. v. EEOC,
    270 F.3d 973 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Association of American Railroads v. Surface Transportation Board,
    146 F.3d 942 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Bates v. Rumsfeld,
    271 F. Supp. 2d 54 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bennett v. Spear,
    520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Common Cause v. Federal Election Comm'n,
    108 F.3d 413 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DRG Funding Corp. v. Secretary of Housing & Urban Development,
    76 F.3d 1212 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

GAF Corp. v. United States,
    818 F.2d 901 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Grand Lodge of the Fraternal Order of Police v. Ashcroft,
    185 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Helstosky v. EPA, No. 01-1069,
    2001 WL 799950 (D.C. Cir. June 29, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 15

Independent Equipment Dealers Ass'n v. EPA,
    372 F.3d 420 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Johnson v. Ashcroft, Civ. No. 02-1745 (RMU),
    2005 WL 2064095 (D.D.C. Aug. 25, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

McLaughlin v. Bradlee,
    803 F.2d 1197 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Nasem v. Brown,
    595 F.2d 801 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

National Law Ctr. on Homelessness & Poverty v. Kantor,
    91 F.3d 178 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

New York v. EPA,
    350 F. Supp. 2d 429 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Ohio Forestry Ass'n v. Sierra Club,
    523 U.S. 726 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Public Citizen v. Office of the United States Trade Representatives,
    970 F.2d 916 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Reynolds v. United States Capitol Police Board,
    357 F. Supp. 2d 2 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
    322 F.3d 1064 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

Wyoming Outdoor Council v. United States Forest Service,
    165 F.3d 43 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FEDERAL STATUTES

Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y:

    Section 3, 7 U.S.C. § 136a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Section 3(a), 7 U.S.C. § 136a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Section 3(c)(2)(A), 7 U.S.C. § 136a(c)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Section 3(c)(2)(B), 7 U.S.C. § 136a(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

Section 3(c)(5)(D), 7 U.S.C. §136a(c)(5)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Section 4, 7 U.S.C. § 136a-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Section 4(g)(2)(C), 7 U.S.C. § 136a-1(g)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Toxic Substances Control Act (TSCA"), 15 U.S.C. §§ 2601 - 2692:

Section 2(b)(1), 15 U.S.C. § 2601(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Section 4(a), 15 U.S.C. § 2603(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Section 4(b)(1)(A), (15 U.S.C. § 2603(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Section 4(b)(1)(B),15 U.S.C. § 2603(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Section 4(b)(2)(A), 15 U.S.C. § 2603(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Section 4(b)(5), 15 U.S.C. § 2603(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Section 19(a)(1)(A), 15 U.S.C. § 2618(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27

Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301-394:

21 U.S.C. § 331(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 342(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 346a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

21 U.S.C. § 346a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 346a(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 346a(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 346a(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(b)(2)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 346a(b)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 20

21 U.S.C. § 346a(b)(2)(A)(q)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 346a(b)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(d)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(d)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(f)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 346a(f)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 346a(f)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 346a(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(g)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(g)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 346a(g)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 346a(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 26

21 U.S.C. § 346a(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

21 U.S.C. § 346a(h)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Const. Art. III § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

FEDERAL REGULATIONS

40 C.F.R. Part 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 158.35(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 158.70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

40 C.F.R. § 158.70(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18

40 C.F.R. § 158.75(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 158.108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 158.202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. Part 799, Subpart H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 799.9630 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

EPA Final Rule - Toxic Substances Control Act Test Guidelines
    50 Fed. Reg. 39,252 (Sept. 27, 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

EPA Notice - Test Guidelines; Notice of Availability,
    63 Fed. Reg. 41,845 (Aug. 5, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

EPA Final Rule - Toxic Substances Control Act Test Guidelines,
    65 Fed. Reg. 78,746 - 78,819 (Dec. 15, 2000) . . . . . . . . . . . . . . . . . . . . . . 4, 9, 10, 11, 24

EPA Proposed Rules re Pesticides; Data Requirement for Conventional Chemicals
    70 Fed. Reg. 12,276 (Mar. 11, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

**EPA's MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**INTRODUCTION**

In the instant suit, disappointed litigants attempt to relitigate claims that have already been considered and dismissed by the United States Court of Appeals for the District of Columbia Circuit for lack of standing. Plaintiffs challenge Defendant United States Environmental Protection Agency's ("EPA's" or "the Agency's") decision not to repeal a non-binding test protocol that may be utilized by EPA in various regulatory programs to evaluate the potential effects of pesticides and other chemicals on neurodevelopment. Previously, Plaintiffs Physicians Committee for Responsible Medicine ("PCRM") and People for the Ethical Treatment of Animals ("PETA") challenged this developmental neurotoxicity test protocol in an action brought in the D.C. Circuit. *See* Petition for Review, *Helstosky v. EPA*, No. 01-1069 (D.C. Cir. filed Feb. 13, 2001) (Attachment 1). The D.C. Circuit dismissed that suit for lack of standing. *See* Order, *Helstosky v. EPA,* No. 01-1069, 2001 WL 799950 (D.C. Cir. June 29, 2001) (Attachment 2). The D.C. Circuit concluded, among other things, that the challenged test protocol lacked binding effect and that Plaintiffs failed to demonstrate that the test protocol will cause a risk of harm redressable by the court. *Id*.

Following dismissal of its D.C. Circuit suit, Plaintiffs PETA and PCRM administratively petitioned EPA to "repeal" the test protocol. In a response dated January 3, 2005, EPA denied this petition. Plaintiffs now attempt to relitigate their claims by bringing the instant Complaint challenging EPA's denial of their administrative petition. The doctrine of collateral estoppel precludes Plaintiffs from relitigating previously-adjudicated issues that are necessary to the success of their current claims.

Even if collateral estoppel did not apply, this Court lacks jurisdiction. Plaintiffs still do not have standing. Furthermore, Plaintiffs fail to challenge final reviewable agency action, and

their claims are not ripe for judicial review.  In addition, to the extent Plaintiffs are implicitly

challenging EPA decisions regarding the establishment of "tolerances" setting the maximum

permissible levels of pesticide residues in food, the courts of appeals have exclusive

jurisdiction to review such decisions.  21 U.S.C. § 346a(h).

Accordingly, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Plaintiffs' Complaint

must be dismissed.

## BACKGROUND

I.      STATUTORY AND REGULATORY BACKGROUND

A.      EPA's Regulation of Pesticides

EPA regulates pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act

("FIFRA"), 7 U.S.C. §§ 136-136y, and the Federal Food, Drug, and Cosmetic Act ("FFDCA"),

21 U.S.C. §§ 301-394.  Generally, FIFRA imposes a federal licensing scheme on the sale,

distribution, and use of pesticides (*see* 7 U.S.C. § 136a), while the FFDCA regulates pesticide

residues in food (*see* 21 U.S.C. § 346a).

1.      Registration of Pesticides Under FIFRA

Section 3(a) of FIFRA, 7 U.S.C. § 136a(a), provides, with minor exceptions, that "no

person in any State may distribute or sell to any person any pesticide that is not registered" by

EPA.  For pesticides containing active ingredients first contained in a pesticide registered before

November 1, 1984, EPA must reregister the pesticide, a process that requires EPA to determine

that previously-registered pesticides meet current standards of registration.  7 U.S.C. § 136a-1.[1]

In order for EPA to register a pesticide, it must determine, based on data submitted by the

_____

[1]  Hereinafter, initial registrations and reregistrations will be referred to generally as
'registrations' unless otherwise specified.

applicant, that the pesticide, *inter alia*, "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §§ 136a(c)(5)(D), 136a-1(g)(2)(C).

FIFRA provides EPA with broad authority and discretion to specify the data and information it needs to evaluate the potential risks of a pesticide. *See* FIFRA section 3(c)(2)(A), 7 U.S.C. § 136a(c)(2)(A). In particular, FIFRA § 3(c)(2)(A) requires EPA to "publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide." *Id.*

The types and minimum amounts of data and information that the Agency requires to make risk determinations for pesticide registrations are specified in 40 C.F.R. Part 158.[2] The Part 158 data requirements are intended to generate data and information necessary to address concerns pertaining to the identity, composition, potential adverse effects and environmental fate of each pesticide. 40 C.F.R. § 158.202. If the information required under part 158 is not sufficient to evaluate the potential of a pesticide to cause unreasonable adverse effects, EPA may impose additional data requirements. 40 C.F.R. § 158.75(a). Further, if EPA determines that additional data are required to maintain in effect an existing pesticide registration, it has broad authority under FIFRA's "data call-in" provision to require submission of such information. 7 U.S.C. § 136a(c)(2)(B). Various kinds of toxicology data that EPA necessarily requires or conditionally requires to support a pesticide registration are set forth in a table promulgated at 40 C.F.R. § 158.340. In March 2005, EPA issued a notice of proposed rulemaking that would

---

[2] Part 158 also identifies data and information that may be used in evaluating pesticide chemical residue tolerances under the FFDCA. *See generally* 40 C.F.R. § 158.202 (discussing Agency use of part 158 data); *see also* discussion of FFDCA requirements at 6-8, *infra*.

update and revise its data requirements for pesticide registrations. 70 Fed. Reg. 12,276 (Mar. 11, 2005). EPA has not taken final action on this proposal.

The Part 158 regulations make it clear that there is no particular testing protocol that must be used to develop the data needed to support a pesticide registration or tolerance. 40 C.F.R. § 158.70. Rather, applicants are encouraged to "use the test procedure which is most suitable for evaluation of the particular ingredient, mixture, or product." 40 C.F.R. § 158.70(a). As EPA has explained:

> Under FIFRA, test guidelines are used in an interactive process between the Agency and registrants seeking registration of pesticides or food residue tolerances. Flexibility to tailor required testing to individual circumstances is critical, and the Agency has considerable discretion to determine whether submitted test results are adequate to support the requested action. Under this scheme, registrants have an intrinsic motivation to conduct well-grounded testing.

Toxic Substances Control Act Test Guidelines, 65 Fed. Reg. 78,746, 78,748 (Dec. 15, 2000).

One source for testing protocols is the Pesticide Assessment Guidelines, which are referenced in the regulations and are available through the National Technical Information Service. *See* 40 C.F.R. § 158.108 (explaining relationship between pesticide data requirements and PAGs). Other potential sources are in other EPA publications and non-EPA publications such as guidelines issued by the Organization for Economic Cooperation and Development ("OECD guidelines"). *See generally* 40 C.F.R. § 158.70. Applicants are encouraged to consult with EPA to resolve questions relating to testing protocols before undertaking extensive testing to ensure that such protocols, regardless of their source, provide the necessary data. 40 C.F.R. § 158.35(a).

In 1991 EPA began an effort to harmonize Pesticide Assessment Guidelines available through the National Technical Information Service, guidelines published by OECD, and test

4

protocols established for use in Toxic Substance Control Act ("TSCA") rulemakings. 65 Fed. Reg. at 78,747.[3] This effort culminated in EPA's publishing its final Office of Prevention, Pesticides, and Toxic Substances harmonized guidelines in 1998 on the Internet. *See* 63 Fed. Reg. 41,845 (Aug. 5, 1998) (announcing availability of harmonized guidelines). These harmonized test guidelines are intended to be available for use in regulatory programs under FIFRA, the FFDCA, and TSCA, but the harmonized guidelines are not themselves regulatory requirements and do not impose obligations on anyone.

### 2.    Developmental Neurotoxicity Testing

Among the harmonized guidelines released by EPA in 1998 was a guideline setting forth a protocol for testing the effects of pesticides and toxic substances on development of the nervous system (a "developmental neurotoxicity test"). *See* Health Effects Test Guidelines OPPTS 870.6300 Developmental Neurotoxicity Study (Aug. 1998) ("OPPTS 870.6300") (Attachment 3).[4] Under the protocol, test substances are administered to several groups of pregnant animals during gestation and early lactation, with different dose levels being administered to each group of animals. Offspring are observed to detect neurologic and behavioral abnormalities, and an evaluation is made as to the relationship between the doses of the test substance and the presence or absence of abnormalities.

Developmental neurotoxicity data are currently not among the data required to support a pesticide registration under 40 C.F.R. § 158.340. EPA, however, has requested submission of

---

[3] *See* 8-11, *infra,* for background on TSCA.

[4] OPPTS 870.6300 is referred to in Plaintiffs' Petition and Complaint as the "FIFRA DNT." OPPTS 870.6300, however, was intended to be available for use in regulatory programs under TSCA and the FFDCA as well. *Id.* EPA has codified OPPTS 870.6300, with minor changes, at 40 C.F.R. § 799.9630 for use in TSCA testing programs. *See* 10-11, *infra.*

developmental neurotoxicity studies as appropriate on a case-by-case basis and has on occasion

called-in developmental neurotoxicity data under 7 U.S.C. § 136a(c)(2)(B) for particular

pesticides.  EPA also in March 2005 proposed to add to Part 158 a requirement that a DNT study

be submitted for certain pesticides under certain situations.  70 Fed. Reg. at 12,294-95.  EPA has

not taken any final action on this proposal.

### 3.    Establishment of Pesticide Tolerances Under the FFDCA

Section 408 of the FFDCA, 21 U.S.C. § 346a, authorizes EPA to establish by regulation

"tolerances" setting the maximum permissible levels of pesticide residues in foods.  Under the

FFDCA, food containing pesticide residues is deemed "unsafe" unless a tolerance has been set

and the pesticide residue is within the limits of the tolerance, or unless an exemption from the

tolerance has been set for the pesticide residue.  21 U.S.C. § 346a(a)(1) - (2).  An "unsafe" food

is considered "adulterated," and may not legally be moved in interstate commerce.  21 U.S.C. §§

331(a), 342(a)(2)(B), 346a(a).

FFDCA § 408(b)(2)(A)(i) allows EPA to establish regulations setting a tolerance for a

pesticide only if EPA determines that the tolerance is "safe."  21 U.S.C. § 346a(b)(2)(A)(i).

Subject to this same "safety" standard, EPA may also review and modify, revoke, or leave

unchanged a previously established tolerance.   21 U.S.C. §§ 346a(b)(2)(A)(i), (q)(1).  The term

"safe" is defined under FFDCA section 408 as meaning "that there is a reasonable certainty that

no harm will result from aggregate exposure to the pesticide chemical residue, including all

anticipated dietary exposures and all other exposures for which there is reliable information."  21

U.S.C. § 346a(b)(2)(A)(ii).

In making the safety determination for threshold effects of a pesticide chemical residue

(*i.e.*, those for which EPA is able to identify a level at which the residue will not cause harm),

EPA must apply an additional tenfold ("10X") margin of safety for infants and children unless EPA determines, "on the basis of reliable data," that a different margin of safety will be safe for infants and children.  21 U.S.C. § 346a(b)(2)(C).

Pesticide residue tolerances may only be established, modified, or revoked via regulation. 21 U.S.C. §§ 346a(d) and 346(e).  Such action may be taken in response to a petition by a member of the public or by the EPA Administrator acting on his own initiative.  21 U.S.C. §§ 346a(b)(1), 346a(c)(1), 346a(d), 346a(e).  If the Administrator acts on his own initiative to establish, modify, or revoke a tolerance or an exemption under section 408(e), the Administrator must issue a notice of proposed rulemaking and generally provide at least 60 days for public comment before issuing a final regulation.  21 U.S.C. § 346a(e)(2).  If the Administrator receives a petition from a member of the public or a pesticide registrant, the petition must be supported by full reports of tests and investigations made with respect to the safety of the pesticide chemical. *See* 21 U.S.C. § 346a(d)(2)(A).  In response to a petition, the Administrator must either (1) issue a final regulation establishing, modifying, or revoking a tolerance; (2) issue a proposed regulation under the separate provisions of section 408(e), 21 U.S.C. § 346a(e), then issue a final regulation after additional public notice and comment; or (3) issue an order denying the petition. 21 U.S.C. § 346a(d)(4)(A).

Section 408(g) of the FFDCA, 21 U.S.C. § 346a(g), provides that within 60 days after a regulation or order is issued in response to a petition under section 408(d), or pursuant to an EPA-initiated action under section 408(e)(1), any person may file objections to the regulation or order with the Administrator.  21 U.S.C. § 346a(g)(2)(A).  A public evidentiary hearing upon the objections may be held at the request of an interested person or on the Administrator's own initiative.  21 U.S.C. § 346a(g)(2)(B).  "As soon as practicable after receiving the arguments of

the parties," the Administrator must issue an order "stating the action taken upon each . . .

objection and setting forth any revision to the regulation or prior order that the Administrator has

found to be warranted." 21 U.S.C. § 346a(g)(2)(C). The Court of Appeals has exclusive

jurisdiction to review any order, or regulation that is the subject of an order, issued under 21

U.S.C. § 346a(g)(2)(C). 21 U.S.C. § 346a(h).

Pursuant to FFDCA section 408(f)(1)(A), 21 U.S.C. § 346a(f)(1)(A), if EPA determines

that additional data or information are reasonably required to support the continuation of a

tolerance or exemption, it may issue a "data call-in" notice pursuant to applicable authority

under FIFRA section 3(c)(2)(B), 7 U.S.C. § 136a(c)(2)(B), requiring registrants to submit such

data or information, or a rule requiring that testing be conducted on a substance or mixture under

section 4 of TSCA, 21 U.S.C. § 346a(f)(1)(B), to the extent that such authority is available. If

EPA is unable to obtain the necessary data under FIFRA section 3(c)(2)(B) or TSCA section 4,

EPA may publish in the Federal Register an order, requiring, *inter alia*, the submission to EPA

of the additional data or information, 21 U.S.C. § 346a(f)(1)(C). The Court of Appeals has

exclusive jurisdiction to review any such order. 21 U.S.C. § 346a(h).

B.    **The Toxic Substances Control Act**

A principal purpose of the Toxic Substances Control Act ("TSCA") is to ensure that

adequate data is developed with respect to the effect of chemical substances and mixtures on

health and the environment. 15 U.S.C. § 2601(b)(1). To this end, TSCA section 4 authorizes

EPA to promulgate rules requiring testing of a substance if EPA makes certain detailed findings

regarding the potential hazards posed by the substance, or regarding the potential for exposure,

and the need for data concerning that substance. 15 U.S.C. § 2603(a).

If EPA makes the requisite TSCA section 4 findings, EPA must promulgate a rule that,
*inter alia*, identifies the substance to be tested and sets standards for developing test data
regarding the substance.  15 U.S.C. §§ 2603(b)(1)(A), (B).  These standards specify how testing
is to be conducted, the data that will be collected, and how the data will be analyzed.  65 Fed.
Reg. 78,746, 78,747 (Dec. 15, 2000).

Each section 4 test rule must "be promulgated pursuant to [the Administrative Procedure
Act]."  15 U.S.C. § 2603(b)(5).  EPA must publish the findings that support a section 4(a) testing
rule and to provide the opportunity for oral as well as written comments regarding proposed
section 4(a) rules.  *Id.*  Thus, the public has an opportunity to comment on, and seek judicial
review of, particular test protocols when and if they are incorporated into section 4 test rules.
*See* 15 U.S.C. § 2618(a)(1)(A).

EPA has broad authority and discretion to determine appropriate standards for the
development of data in specific section 4(a) test rules.  15 U.S.C. § 2603(b)(2)(A).  TSCA
provides that:

>    The health and environmental effects for which standards for the
>    development of test data may be prescribed include carcinogenesis,
>    mutagenesis, teratogenesis, behavioral disorders, cumulative or
>    synergistic effects, and any other effect that may present an
>    unreasonable risk of injury to health or the environment.  The
>    characteristics of chemical substances and mixtures for which such
>    standards may be prescribed include persistence, acute toxicity,
>    subacute toxicity, chronic toxicity, and any other characteristic
>    which may present such a risk.  The methodologies that may be
>    prescribed in such standards include epidemiologic studies, serial
>    or hierarchical tests, in vitro tests, and whole animal tests.

15 U.S.C. § 2603(b)(2)(A).

For use in TSCA section 4 rulemakings, EPA has developed a set of "test guidelines."
These "test guidelines" are a set of standardized testing protocols for studying the particular

health effects of a substance (*e.g.,* a substances's oral toxicity, its inhalation toxicity . . . ). *See* 63 Fed. Reg. 41,845 (Aug. 5, 1998); 40 C.F.R. Part 799, Subpart H. The test guidelines are not themselves section 4(a) testing rules. Rather, testing rules promulgated under section 4(a) may cross-reference the guidelines as appropriate. EPA explained this process as follows:

> [EPA] has found that most of [the Section 4(a) testing elements] can be standardized into the common set of protocols which EPA defines as "test guidelines." . . . The test rule itself can add or subtract to [sic] the requirements of the test guidelines in order to meet the unique testing circumstances for the particular chemical substance.
>
> . . . . When a section 4 test rule is promulgated, the test rule cross-references the appropriate TSCA test guideline for the bulk of the testing requirements. In this context, the public is given notice of, and an opportunity to comment on, these guidelines as they are applied in chemical-specific test rules. This approach eliminates the need to repeat the same test specifications for each substance-specific test rule since most of the specifications for testing do not change across substances. The test specifications in a guideline can be varied, when necessary, to the specific requirements of a test rule by language in the test rule itself.

65 Fed. Reg. at 78,747. Thus, the guidelines "do[] not . . . impose any obligations on anyone until the test guidelines are incorporated into a future test rule that would be proposed under TSCA Section 4." 65 Fed. Reg. at 78,746.

TSCA test guidelines were first promulgated in 1985, 50 Fed. Reg. 39,252 (Sept. 27, 1985), and were codified in 40 C.F.R. Parts 796 through 798. On December 15, 2000, EPA issued seventeen new TSCA test guidelines, which are codified in 40 C.F.R. Part 799. 65 Fed. Reg. 78,746-78,819.

One of the seventeen guidelines issued on December 15, 2000 sets forth a protocol for developmental neurotoxicity testing (the "TSCA DNT Guideline"). 40 C.F.R. § 799.9630. The TSCA DNT Guideline is adopted from and nearly identical to OPPTS 870.6300 (hereinafter the

TSCA DNT Guideline and OPPTS 870.6300 will collectively be referred to as "the DNT Guidelines").[5] The TSCA DNT Guideline is intended to be available for use in regulatory programs under TSCA, but the TSCA DNT Guideline, like OPPTS 870.6300, does not establish any regulatory requirements and does not impose obligations on anyone.

## II.     PREVIOUS LITIGATION AND PROCEDURAL BACKGROUND

On February 13, 2001, PETA and PCRM, along with Carol Helstosky, filed a petition for review in the United States Court of Appeals for the District of Columbia challenging the TSCA DNT Guideline published at 40 C.F.R. § 799.9630. *See* Attachment 1. PETA and PCRM alleged in this petition for review, *inter alia,* that the TSCA DNT Guideline was not supported by substantial evidence and that EPA's codification of the TSCA DNT Guideline violated the notice and comment requirements of the Administrative Procedure Act ("APA"). Attachment 1 ¶ 14-23. EPA moved to dismiss the petition for review. The D.C. Circuit granted EPA's motion to dismiss, finding that petitioners lacked standing. *See* Order, *Helstosky v. EPA,* No. 01-1069 2001 WL 799950 (D.C. Cir. June 29, 2001) (Attachment 2). The D.C. Circuit explained that "[p]etitioners have failed to demonstrate actual or imminent injury fairly traceable to the challenged rule and redressable by a favorable decision, as required by Article III's jurisdictional standing requirements." *Id*. at *1.

Subsequently, on October 5, 2004, EPA received a petition from PETA requesting that the Agency repeal the TSCA DNT Guideline – the same Guideline PETA had previously unsuccessfully challenged in the dismissed D.C. Circuit lawsuit. *See* Petition to Compel the U.S.

---

[5] In creating TSCA guidelines from the OPPTS harmonized guidelines, EPA made "minimal changes [consisting] of deleting references to FIFRA in the TSCA guidelines, where it was believed by the Agency to be irrelevant to the purpose of the TSCA test guideline, and to specify those provisions of the guidelines which the Agency believed must be made mandatory in order to ensure the integrity of any data produced by the test." 65 Fed. Reg. at 78,749.

EPA to Repeal its Test Guidelines for Developmental Neurotoxicity (Sept. 30, 2004) ("the

Petition") (Attachment 4).[6]  PETA, in its administrative petition, also sought repeal of OPPTS

870.6300 – the harmonized test guideline upon which the TSCA DNT Guideline is based and

that is nearly identical substantively to the TSCA DNT Guideline.  EPA denied the petition in a

response dated January 3, 2005. *See* Letter from Susan B. Hazen, Acting Assistant

Administrator, OPPTS, to Troy Seidle, and Susan L. Hall, Esq., PETA, and to Daniel Kinburn,

Esq., PCRM (Jan. 3, 2005) (hereinafter referred to as the "Response") (Attachment 5).  EPA

explained in the Response that "the DNT guidelines were issued through legally correct

procedures, and that the [DNT test] protocol is reliable, relevant, and validated for its intended

purposes."  Response at 9.[7]

On July 11, 2005, Petitioners PETA and PCRM, along with individual Plaintiffs Trulie

Ankerberg-Nobis, Robin Hummel, and Jennifer Reilly, filed the instant Complaint.  The

individual Plaintiffs are members of PETA and PCRM.  Complaint ¶¶ 15, 18, 20.  Plaintiffs'

Complaint contains two claims: (1) that EPA's denial of the Petition to "repeal" the DNT Test

Guidelines was arbitrary and capricious in violation of the APA (Complaint Count I), and (2)

---

[6] Plaintiff PCRM joined the petition by letter dated November 9, 2004.  Letter from Daniel
Kinburn, Senior Counsel, PCRM, to Charles Auer, Office Director, OPPT (Nov. 9, 2004).

[7] In a comprehensive analysis of the origin of the DNT Guidelines, their scientific basis, and
previous independent peer and public review of the Guidelines, EPA extensively rebutted
Plaintiffs' claims that the Guidelines were illegally-issued rules and that they produced data of
unproven reliability and relevance to humans.  EPA Response to Petition (Attachment 5) at 12-
34.  EPA demonstrated that the Guidelines have been validated for their intended purpose and
that they represent the best available science regarding DNT testing based on decades of research
and review in this area.  *Id*. at 17-34.  EPA further acknowledged that there are uncertainties
inherent in all toxicological testing, including DNT testing, and that in light of such uncertainties
the Agency is committed to ongoing review, and when appropriate, refinement of the guidelines.
*Id*. at 9, 34-38.  Plaintiffs' instant challenge is an inappropriate attempt to preempt this scientific
process.

that EPA violated the APA in not providing notice and an opportunity for public comment on the DNT Guidelines (Complaint Count II).

## ARGUMENT

### I.    PLAINTIFFS ARE BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL FROM CHALLENGING THE DNT GUIDELINES

The doctrine of collateral estoppel or "issue preclusion" bars the instant suit.   Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case.  *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986).  The doctrine "helps conserve judicial resources, avoid inconsistent results, engender respect for judgment of predictable and certain effect and [] prevent serial forum-shopping and piecemeal litigation." *Johnson v. Ashcroft*, Civ. No. 02-1745 (RMU), 2005 WL 2064095 at *3 (D.D.C. Aug. 25, 2005) (quoting *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981)). The doctrine of collateral estoppel bars relitigation of the same issue by parties that participated in the initial suit and their privies.  *Nasem v. Brown*, 595 F.2d 801, 805 n.9 (D.C. Cir. 1979). Privity exists between parties when "there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest." *Tahoe-Sierra Preservation Council Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1081 (9th Cir. 2002) (citations omitted).  "One of the relationships that has been deemed 'sufficiently close' to justify a finding of privity is that of an organization or unincorporated association filing suit on behalf of its members."  *Id*. at 1082.

Issue preclusion applies to questions of jurisdiction as well as to other issues.  *GAF Corp. v. United States*, 818 F.2d 901, 913 (D.C. Cir. 1987).  Specifically, the doctrine of issue preclusion prevents a party from relitigating jurisdictional issues that were considered and that

led to dismissal in an earlier suit. *Reynolds v. United States Capitol Police Board*, 357 F. Supp. 2d 2, 9 n.5 (D.D.C. 2004).[8]

Plaintiffs PETA and PCRM previously brought suit in the D.C. Circuit challenging the non-binding developmental neurotoxicity test protocol at issue in the instant suit. *See* Petition for Review, *Helstosky v. EPA* ("*Helstosky*"), No. 01-1069 (D.C. Cir.) (Attachment 1).[9]  The specific claims brought in this suit are essentially the same claims brought in *Helstosky*, and Plaintiffs' standing to bring these claims was previously adjudicated in *Helstosky*.  PETA and PCRM allege in this suit, just as they did in *Helstosky*, that EPA violated the APA by issuing DNT guidelines without providing notice and an opportunity for public comment. *Compare* Complaint, Count II and *Helstosky* Petition for Review Count I.  PETA and PCRM also allege in this suit, just as they did in *Helstosky*, that DNT guidelines should be invalidated because they are allegedly unreliable. *Compare* Complaint, Count I, and *Helstosky* Petition for Review Count II.  Moreover, PETA and PCRM premise their standing to maintain suit on the same kind of

---

[8] A dismissal of a complaint for lack of jurisdiction does not adjudicate the merits so as to make the case *res judicata* on the substance of the asserted claim.  *Id*.  However, it does adjudicate the court's jurisdiction, and the second complaint cannot relitigate the same jurisdictional issues.  *Id*.

[9] In *Helstosky*, Plaintiffs PETA and PCRM challenged solely the TSCA DNT Guideline published at 65 Fed. Reg. 78,746.  In the instant suit Plaintiffs also challenge OPPTS 870.6300. However, as noted above (*see supra* at 11), the TSCA DNT Guideline is based upon and is nearly identical in substance to OPPTS 870.6300.  Moreover, as discussed extensively in this memorandum, OPPTS 870.6300, like the TSCA Test Guideline, does not impose obligations on anyone.  Thus, to the extent Plaintiffs point to the fact that in this suit they are challenging EPA's refusal to "repeal" OPPTS 870.6300 in addition to the TSCA Test Guideline, this is a distinction without a difference for standing purposes.  Likewise, to the extent Plaintiffs point to the fact that in this suit they are challenging EPA's denial of an administrative petition and not directly challenging the Guidelines, this also is a distinction without a difference for standing purposes. Just as they cannot establish any actual or imminent injury fairly traceable to the Guidelines themselves that is redressable by this Court, they cannot establish any actual or imminent injury fairly traceable to EPA's denial of their petition to repeal the Guidelines that is redressable by this Court.

alleged injury that they relied upon as the basis for standing in *Helstosky*: the premise that the use of the DNT test protocol will wrongly indicate that certain chemicals are safe, thus resulting in a decision by EPA not to impose stricter regulations on such chemicals. *Compare* Complaint ¶¶ 13-22, 66-68, 79 and *Helstosky* Order 2001 WL 799950 (D.C. Cir. Jun. 29, 2001) (Attachment 2).

In *Helstosky*, the D.C. Circuit squarely addressed Plaintiffs' standing to bring claims challenging EPA's DNT Guidelines and determined that Plaintiffs lack standing. *Helstosky* Order, 2001 WL 799950, at *1. Specifically, the D.C. Circuit held in *Helstosky* that PETA and PCRM "failed to demonstrate actual or imminent injury fairly traceable to the challenged [Guideline] and redressable by a favorable decision, as required by Article III's jurisdictional standing requirements." *Id.* The court explained that "[t]he testing guideline merely sets forth a standardized procedure that can be cross-referenced in future rules, and has no binding effect." *Id.* The court further explained:

> Even assuming that chemical manufacturers' use of the testing protocol is traceable to the testing guidelines and redressable by a favorable decision, the alleged injury depends upon the premise that the use of the test protocol will wrongly indicate that certain chemicals are safe, which will result in a future decision by respondent not to impose stricter regulations on these chemicals, which in turn will lead to . . . continued exposure. This scenario is too attenuated to establish standing to challenge the substance of the testing guideline.

*Id.*

The doctrine of issue preclusion prevents Plaintiffs from relitigating the standing issues already decided in *Helstosky* by the D.C. Circuit. With respect to the TSCA DNT Guideline, Plaintiffs are challenging the very same DNT test protocol at issue in *Helstosky*. With respect to OPPTS 870.6300, Plaintiffs' challenge here is not materially different than its challenge to the

TSCA DNT Guideline in *Helstosky*. Substantively, the TSCA DNT Guideline and OPPTS 870.6300 are the same, and neither guideline has any binding effect on its own. Moreover, in both cases, Plaintiffs allege the same kind of injury – the premise that the use of the DNT test protocol will wrongly indicate that certain chemicals are safe, which will result in a future decision by EPA not to impose stricter regulations on such chemicals. The D.C. Circuit has already considered whether Plaintiffs have standing to challenge DNT guidelines based on this kind of injury and has already determined Plaintiffs lack standing.[10] In short, Plaintiffs have already lost this case.

## II.    PLAINTIFFS LACK STANDING

Even if the doctrine of issue preclusion were not applicable, Plaintiffs' instant Complaint would still be subject to dismissal for lack of standing, for the same reasons Plaintiffs' previous suit was dismissed. Federal court jurisdiction extends only to cases and controversies. U.S. Const. Art. III § 2. To demonstrate a case or controversy, a litigant must establish standing. The "irreducible constitutional minimum of standing" contains the following three elements: (1) that the litigant has personally "suffered an 'injury in fact,' – an invasion of a legally-protected interest, which is (a) concrete and particularized and (b) actual

---

[10] Individual Plaintiffs Trulie Ankerberg-Nobis, Robin Hummel, and Jennifer Reilly are members of PETA and PCRM. Complaint ¶¶ 15,18, 20. Their membership in and close relationship with PETA and PCRM is sufficient to bind them as parties in privity to PETA and PCRM for issue preclusion purposes. *See Tahoe-Sierra Preservation Council Inc. v. Tahoe Regional Planning Agency*, 322 F.3d at 1082 (holding individual members of an organization not named in a lawsuit may be bound by a judgment won or lost by the organization). An association "should not be able to evade preclusion continually by averring that unidentified members are not bound and bringing successive suits by claiming injury to different identified members." *Id*. at 1084 (quoting 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4456 (2002)). "If the individual members of [an organization] were not bound by the result of former litigation, the organization would be free to attack the judgment *ad infinitum* by arranging for successive actions by different sets of individual plaintiffs . . . ." *Id.*

or imminent, not "conjectural or hypothetical,"; (2) that the litigant's injury is caused by or fairly traceable to the challenged act; and (3) that the litigant's injury is redressable by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted).[11] If one of these essential elements is lacking, then the case must be dismissed for lack of subject matter jurisdiction.

The party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. at 561. Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority. *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). In deciding a Rule 12(b)(1) motion, the court is not limited to the allegations in the complaint but may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case. *Bates v. Rumsfeld*, 271 F. Supp. 2d 54, 60 (D.D.C. 2002). In deciding a 12(b)(1) motion, a plaintiff's factual allegations in the complaint will bear closer scrutiny than in resolving a 12(b)(6) motion for failure to state a claim. *Id*. at 59-60.

Plaintiffs lack standing. Plaintiffs allege that they or their members' children will be exposed to a greater risk of exposure to hazardous pesticide chemicals as a result of EPA's DNT Guidelines. *See* Complaint ¶¶ 9-21.[12] Specifically, Plaintiffs allege that they (or their members)

─────────────────────

[11]/An organizational plaintiff suing on behalf of its members must show that its members meet these threshold requirements for standing. *Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 417 (D.C. Cir. 1997) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

[12] Although individual Plaintiffs Trulie Ankerberg-Nobis, Robin Hummel, and Jennifer Reilly
(continued...)

will be exposed to unsafe levels of pesticides because EPA will rely on testing conducted

pursuant to the Guidelines as a basis for establishing tolerances for pesticides less stringent than

tolerances EPA might otherwise have established.  *See id*.  This alleged injury is speculative.  As

an initial matter, EPA's DNT Guidelines do not establish any requirements or impose any

obligations on anyone.  Pesticide manufacturers may elect to perform developmental

neurotoxicity testing in accordance with DNT Guidelines to support a pesticide registration or

tolerance, but nothing in EPA's regulations requires manufacturers to perform developmental

neurotoxicity ("DNT") testing, much less perform DNT testing entirely consistent with the DNT

Guidelines.[13]  On the contrary, EPA's regulations make clear that there is no particular testing

protocol that must be used to provide data needed to support a pesticide tolerance, and that

manufacturers are encouraged to "use the test procedure which is most suitable for evaluation of

the particular ingredient, mixture, or product."  40 C.F.R. § 158.70(a).  *See* discussion at 3-4,

*supra*.  Thus, EPA's DNT Guidelines are just one source for a testing protocol that a

manufacturer can, but need not necessarily, utilize to support a pesticide tolerance.[14]

---

[12]/(...continued)
did not participate in *Helstosky*, their alleged injury (exposure to a greater risk of exposure to hazardous pesticide chemicals), is the same injury allegedly incurred by members of Plaintiffs PCRM and PETA – the Plaintiffs who did participate in *Helstosky*.

[13]/ On March 11, 2005, EPA proposed to update and revise its data requirements for the registration of conventional pesticides to require, among other things, DNT testing.  *See* 70 Fed. Reg. at 12,345.  EPA is considering public comments on this rule, and as of this date has not issued a final rule.  Plaintiffs do not purport to challenge EPA's proposed rule which, in any event, is not a final agency action and not reviewable at this time.

[14]/ Plaintiffs allege that DNT testing consistent with OPPTS 870.6300 has been required in EPA regulatory actions under FIFRA relating to particular pesticides.  *See* Complaint ¶¶ 69-71.  But as with the TSCA DNT Guideline addressed in *Helstosky*, OPPTS 870.6300 merely sets forth a standardized test protocol that can be cross-referenced in future regulatory actions.  OPPTS 870.6300 has no binding effect in and of itself.  *See* discussion of finality at 21-24, *infra*.  To the
(continued...)

18

Plaintiffs additionally do not demonstrate that DNT guidelines will cause any injury, even if they are utilized. Plaintiffs essentially ask the Court to speculate that: (1) manufacturers will conduct and submit testing entirely consistent with the DNT Guidelines to support a pesticide tolerance under section 408 of the FFDCA, (2) the testing will show that the pesticide chemical in question will not cause harm to nervous system development, (3) EPA will rely upon this testing among other available data and set a tolerance for the pesticide chemical that is greater than the tolerance EPA would have set in the absence of any DNT testing, and (4) Plaintiffs (or Plaintiffs' members) will be exposed to the pesticide chemical in question at an unsafe level.

This scenario is much too attenuated to establish standing. *See National Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 182 (D.C. Cir. 1996) (rejecting as conjectural the assertion that the Census Bureau's alleged undercount of homeless persons would lead the government to provide less support for the homeless) (cited in *Helstosky* Order at 1); *American Petroleum Inst. v. EPA*, 216 F.3d 50, 66-68 (D.C. Cir. 2000) (holding petitioners lacked standing to raise procedural claim because they did not sufficiently show link between the challenged agency decision and the alleged risk to petitioners of harmful chemical exposure) (cited in *Helstosky* Order at 2).

First, Plaintiffs' allegation that developmental neurotoxicity testing for a particular chemical that has yet to even be conducted or submitted to EPA will prove unreliable is speculative. Second, Plaintiffs' allegation that EPA will establish a less stringent tolerance for a pesticide based on consideration of DNT testing is speculative. Indeed, Plaintiffs' alleged injury

---

[14]/(...continued)
extent Plaintiffs challenge particular regulatory actions, their claims are not ripe. *See* discussion of ripeness at 24-27, *infra*.

rests on the fallacy that DNT testing is used exclusively to reduce the stringency of pesticide

regulation when DNT testing may, in fact, be used to *increase* the stringency of regulation.

Plaintiffs specifically contend that EPA will rely on DNT testing as a basis to depart from the

otherwise applicable tenfold ("10X") margin of safety for infants and children in establishing

FFDCA tolerances (*i.e.*, maximum permissible levels of pesticide residue in food).  *See*, *e.g.*,

Complaint ¶ 1.  While DNT testing may be considered in establishing FFDCA tolerances and

determining whether to deviate from the default tenfold margin of safety, DNT testing is used for

other purposes as well, including in determining whether pesticides should be registered under

FIFRA (*see* discussion of FIFRA registrations at 2-4, *supra*), and in TSCA for purposes that

have no bearing on pesticides (*see* discussion of TSCA at 8-10, *supra*).  Whether DNT testing is

used under the FFDCA, FIFRA, or TSCA, DNT testing may indicate that exposure to a chemical

substance at certain levels will have adverse effects on development– adverse effects that would

not be reflected by any other available testing.  Thus, DNT testing may provide the basis for

more stringent regulation of a chemical substance than would occur absent the testing.

Accordingly, the assertion that testing under the DNT Guidelines will have the net effect of

increasing the amount of pesticide exposure, or the amount of risk that Plaintiffs are exposed to,

is entirely speculative.

Third, Plaintiffs inappropriately ask the Court to presume that EPA in future FFDCA

section 408 proceedings will fail to apply properly statutory standards.  EPA can set a tolerance

for a pesticide only if EPA determines that the tolerance is "safe," meaning "that there is a

reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical

residue, including all anticipated dietary exposures and all other exposures for which there is

reliable information." 21 U.S.C. § 346a(b)(2)(A)(ii).  Essentially, Plaintiffs ask the Court to

presume in advance that EPA in future FFDCA section 408 tolerance proceedings will unreasonably interpret DNT testing data and make unsound decisions as to what level of a pesticide residue on foods is "safe."   Agency actions are entitled, however, to a presumption of regularity – particularly agency actions that have not even been taken. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

Beyond failing to identify any concrete and particularized injury, Plaintiffs' do not identify any injury that is redressable by this Court.  Even assuming, solely for the sake of argument, that this Court were to direct EPA to "repeal" EPA's non-binding DNT guidelines, manufacturers could still submit, and EPA could still consider, DNT testing performed consistent with the guidelines in future section 408 proceedings.   Further, as explained above, even if such a repeal were to reduce the amount of DNT testing, it is speculative that the net effect would be a reduction of, rather than an increase in, the risk that plaintiffs are exposed to.

## III.    PLAINTIFFS DO NOT CHALLENGE FINAL AGENCY ACTION

This Court also lacks jurisdiction to consider Plaintiffs' Complaint because Plaintiffs do not seek to challenge any final reviewable agency action.  Judicial review of the conduct of an administrative agency is limited to review of final agency action. *American Telephone & Telegraph Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001).  The absence of final agency action is a jurisdictional defect that bars a court from considering a claim.   *See DRG Funding Corp. v. Secretary of Housing & Urban Development*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (if agency action is not final, court cannot reach merits of dispute); *Public Citizen v. Office of the United States Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992) (finality is a jurisdictional requirement, and its absence precludes consideration of merits of a claim).

The Supreme Court has established that two conditions must be satisfied for agency action to be final. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). First, the action "must mark the 'consummation' of the agency's decisionmaking process." Second, the action "must be one by which 'rights or obligations have been determined,' . . . or from which 'legal consequences will flow.'" *Id.* (citations omitted). Both prongs of the *Bennett v. Spear* test must be met. *See Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 426-28 (D.C. Cir. 2004) (dismissing challenge to final EPA interpretation that had no "concrete impact").

As discussed further below, EPA's issuance of DNT Guidelines – both OPPTS 870.6300 and the TSCA Guideline – did not determine any rights or obligations, or have any legal consequences. Likewise, EPA's action denying PETA's petition to "repeal" these guidelines did not affect any rights or obligations, because these guidelines never created any rights or obligations in the first place. That is, Plaintiffs cannot convert non-final EPA guidelines into final EPA action by asking for a response to a petition to repeal the guidelines and challenging EPA's response. *See Aerosource, Inc. v. Slater*, 142 F.3d 572, 579 (3d Cir. 1998) ("After all, if a court treated the denial of an application to reconsider an action which is not itself a final order as a final order, then a petitioner simply by asking for reconsideration could convert a nonfinal agency action into a final order. Of course, this should not be permitted.") (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 243 (1980)).

### A.   OPPTS 870.6300

Neither EPA's release of OPPTS 870.6300 in 1998, nor its 2005 response to Plaintiffs' petition declining to "repeal" OPPTS 870.6300 determined any rights or obligations or presented any legal consequences. OPPTS 870.6300 sets forth a protocol that can, but need not be, used for testing the effects of pesticides or other toxic substances on nervous system development.

EPA's regulations currently do not require DNT testing to support registration of a pesticide, and further make clear that even in cases where a particular kind of data is required, there is no particular testing protocol that must be used to generate such data. 40 C.F.R. § 158.70. Thus, although OPPTS 870.6300, like other similar OPPTS guidelines released by EPA, is available for use in regulatory programs under FIFRA and the FFDCA, the guideline itself does not create any regulatory requirements and does not impose obligations on anyone. In any decision EPA makes regarding eligibility for a pesticide registration, tolerance, or tolerance exemption, the standards that EPA applies are those in FIFRA, the FFDCA and regulations, not those found in OPPTS 870.6300. Pesticide registrants are free to use any testing approach they choose, so long as the test results enable EPA to make relevant findings.

Furthermore, even assuming, for the sake of argument, that OPPTS 870.6330, constituted final agency action, Plaintiffs' claim that EPA promulgated OPPTS 870.6330 without following requisite administrative procedures would be barred by the applicable statute of limitations. OPPTS 870.6300 was issued in 1998. The general federal statute of limitations, 28 U.S.C. § 2401, bars any civil action against the United States unless the Complaint is filed within six years after the right of action first accrues. Plaintiffs' Complaint was filed more than six years after OPPTS 870.6300 was first issued, and any right of action first accrued.

**B. The TSCA DNT Guideline**

Similarly, neither the TSCA DNT Guideline nor EPA's decision not to "repeal" the Guideline in response to Plaintiffs' petition create any rights or obligations or present any legal consequences. As EPA explained upon publishing the TSCA DNT Guideline in the Federal Register:

> Codification of this series of TSCA test guidelines does not by itself impose obligations upon any person. Obligations are only

23

imposed when these guidelines are cross-referenced in a test rule promulgated under section 4 of TSCA."

65 Fed. Reg. at 78,746; *see also id.* at 78,750 (test guidelines have "no substantive effect on any person until and unless the test guidelines are incorporated in a test rule promulgated under TSCA section 4.").

It is the actual cross-referencing of a guideline in a final section 4(a) testing rule (a process that is subject to extensive public comment) that imposes any obligations or dictates anyone's conduct. Moreover, only when a section 4(a) rule becomes final can one say exactly what those obligations are. A testing rule may "add [to] or subtract [from] the requirements of the test guidelines in order to meet the unique testing circumstances for the particular chemical substance." 65 Fed. Reg. at 78,747.

In short, neither the DNT Guidelines nor EPA's denial of Plaintiffs' petition to repeal these Guidelines, determined any rights or obligations. Plaintiffs' claims therefore do not meet the second prong of the *Bennett v. Spear* test. Because Plaintiffs have not identified any judicially reviewable final agency action, Plaintiffs' claims must be dismissed.

## IV.    PLAINTIFFS' CLAIMS ARE NOT RIPE FOR JUDICIAL REVIEW

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over policies" as well as "protect[ing] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). A ripeness inquiry involves two issues: "he fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43, 48 (D.C. Cir. 1999). The issues raised in this suit are not yet fit for

judicial review, and Plaintiffs will suffer no hardship if review is delayed. Plaintiffs' Complaint

should therefore also be dismissed as unripe.

> **A.    Judicial Intervention Would Interfere With EPA's Ability to Generate Appropriate Data For Use in FIFRA and FFDCA Regulatory Decisions and Appropriate TSCA Test Rules**

Reviewing Plaintiffs' challenge to the DNT Guidelines at this juncture would require the

Court to conduct an abstract analysis without any factual context. Many of the alleged

deficiencies in the Guidelines set forth by Plaintiffs are specific to particular chemicals or other

test aspects. *See*, *e.g.*, Complaint ¶ 45 (alleging deficiencies with respect to lead, PCBs, and

radiation); Complaint ¶ 48 (alleging problems with "gavage" test administration, which is only

one of several potential methods for oral dosing). Furthermore, Plaintiffs themselves stress the

"flexibility" afforded by the DNT Guidelines. *See* Complaint ¶¶ 40, 53. Thus, even if Plaintiffs'

criticisms of DNT testing as applied in certain circumstances were correct (which EPA disputes),

it would not follow that the DNT Guidelines cannot produce reliable and relevant results in other

individual circumstances. A court reviewing the record of an actual EPA decision involving

DNT testing would be in a position to evaluate the validity of conclusions EPA drew from such

testing in light of the relevant statutory and regulatory standards. In contrast, Plaintiffs ask this

Court to conduct a facial review of these complex technical guidelines, without knowing:

(a) what chemical was being tested; (b) why that chemical was being tested; (c) what other

testing protocols are available or have been followed for that chemical; (d) how the DNT

Guidelines have been applied and whether they have been departed from or supplemented, and

(e) how EPA responded to any comments submitted by the public or those required to conduct

testing. Federal courts generally decline to interfere with agency processes under such

circumstances.

> Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories*, 387 U.S. at 148-49.

Given that the DNT Guidelines will not be used in a vacuum, it is inappropriate to ask the Court to review them in a vacuum. As the Supreme Court reasoned in *Ohio Forestry*, judicial review should not take place "without benefit of the focus that a particular . . . proposal could provide," or where future revisions or modifications may render review unnecessary. *Ohio Forestry*, 523 U.S. at 736; *see also Association of American Railroads v. Surface Transportation Board*, 146 F.3d 942, 946 (D.C. Cir. 1998) (reviewing rate-setting guidelines before they were actually applied "would amount to judicial interference" before administrative decision was formalized).

**B.    Plaintiffs Will Not Suffer Any Hardship if Review is Delayed**

Plaintiffs will also not suffer any hardship if review is delayed. Plaintiffs claim that the DNT Guidelines are unreliable and may not accurately predict a chemical substances' effects. *See* Complaint at ¶¶ 37-60. Plaintiffs' further claim that EPA will improperly interpret the significance of developmental neurotoxicity testing and rely on this testing in future regulatory proceedings in a manner that leads to exposure to unsafe levels of chemicals. However, as set forth in the discussion on standing above (*see* discussion at 16-21, *supra*), Plaintiffs' clams of injury are theoretical and speculative. To the extent EPA actually relies upon the DNT Guidelines to take final regulatory action establishing a pesticide tolerance, and Plaintiffs believe the tolerance is unsafe, Plaintiffs have a means for judicial review under the FFDCA. *See* 21

26

U.S.C. § 346a(h).  Likewise, to the extent EPA actually takes final regulatory action requiring

DNT testing under TSCA, Plaintiffs have a means to review the final TSCA rule requiring

testing.  *See* 15 U.S.C. § 2618(a)(1)(A).

## V.    EPA TOLERANCE DECISIONS CANNOT BE REVIEWED BY THIS COURT

The thrust of Plaintiffs' Complaint and alleged injury is that EPA has in the past

inappropriately relied upon, or will in the future inappropriately rely upon, DNT testing in

making particular pesticide tolerance decisions such that these decisions will not comport with

the FFDCA's "reasonable certainty of no harm" standard.  Challenges to EPA tolerance

decisions, however, must be brought under the procedures established in the FFDCA.  *See* 21

U.S.C. § 346a(h)(5) (providing that "[a]ny issue as to which review is or was obtainable under

[this judicial review provision] *shall not be the subject of judicial review under any other*

*provision of law*") (emphasis added).  Judicial review of EPA tolerance decisions must further be

brought in the courts of appeals.  21 U.S.C. § 346a(h)(1).  *See also New York v. EPA*, 350 F.

Supp. 2d 429, 437-446 (S.D.N.Y. 2004) (holding FFDCA judicial review provision precludes

judicial review in district court of EPA determinations regarding pesticide residue tolerances).

Thus, to the extent Plaintiffs' Complaint constitutes a challenge to the validity of a present or

future tolerance decision, the action is barred by 21 U.S.C. § 346a(h)(1), and this Court does not

have jurisdiction to consider Plaintiffs' Complaint.

## **CONCLUSION**

For the reasons set forth above, EPA's motion to dismiss Plaintiffs' Complaint should be

granted.

Respectfully submitted,

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources
    Division


_____/s/_____
ERIC G. HOSTETLER
D.C. Bar # 445917
Environmental Defense Section
Environment & Natural Resources
    Division
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 305-2326

Of Counsel

JEFFREY M. HERREMA
DONALD A. SADOWSKY
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

DATED: September 23, 2005