# ATTACHMENT 1

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CAROL HELSTOSKY, Ph.D., PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE, and PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, | ) ) ) ) |
| Petitioners, | ) No._____ ) |
| vs. | ) ) |
| United States Environmental Protection Agency, CHRISTINE TODD WHITMAN, Administrator of the United States Environmental Protection Agency | ) ) ) ) |
| Respondents. | ) ) |

**PETITION FOR REVIEW**

Petitioners Carol Helstosky, People for the Ethical Treatment of Animals ("PETA"), and the Physicians Committee for Responsible Medicine hereby petition the court for review of a final rule of the Environmental Protection Agency (EPA) enacted on December 15, 2000, published at 65 Fed. Reg. 78746-78819 (to be codified at 40 CFR Part 799).

**INTRODUCTION**

1. Petitioners Dr. Carol Helstosky, People for the Ethical Treatment of Animals, and the Physicians Committee for Responsible Medicine challenge a regulation issued by Respondent EPA pursuant to the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq.* On December 15, 2000, EPA issued a final rule entitled "Toxic Substances Control Act Test Guidelines". 65 Fed. Reg. 78746, codified at 40 CFR Part 799 (Attached as Exhibit A). The rule purports to

2

establish seventeen new TSCA health effects test guidelines, including TSCA developmental neurotoxicity guideline (DNT) (40 CFR § 799.9630). The rule was adopted without opportunity for public notice and comment as required by section 553 of the Administrative Procedure Act (APA) (5 U.S.C. § 553). Further, the developmental neurotoxicity guideline is arbitrary and capricious and is not supported by substantial evidence in the rulemaking record in accordance with Section 19 of TSCA (15 U.S.C. § 2618).

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to TSCA Section 19, (15 U.S.C. § 2618).

## PARTIES

3. Petitioner Dr. Carol Helstosky is a resident of Denver, Colorado and is expecting the arrival of her first child. As such she is particularly concerned with adverse effects of chemicals on her developing child. In addition to being an expectant mother, Dr. Helstotsky is a longtime animal rights activist familiar with the inability of animal tests to adequately predict adverse impacts of chemical substances on humans. (See Declaration of Carol Helstosky attached as Exhibit B)

4. Petitioner People for the Ethical Treatment of Animals (PETA) is an IRC § 501(c)(3) qualified non-profit corporation. Headquartered in Norfolk, Virginia, it has more than 700,000 individual members and is the largest animal rights organization in the world. PETA brings this action on its own behalf and on behalf of its members. PETA has a longstanding interest in promoting safe, effective, and relevant chemical

3

screening and testing methods that do not rely on the use of animals. PETA regularly lobbies the EPA and other federal agencies, as well as conducts member and public outreach and education, regarding the inadequacies of animal testing for determining risk to humans and the need to more effectively protect the public by developing and validating non-animal test methods and restricting the use of chemicals known to be harmful. PETA educates its members and the public about the evidence demonstrating that animal tests used to assess risk are often of questionable relevance to assess risk to humans. PETA does this not only to accomplish its goals of reducing animal suffering but also to demonstrate that animal tests do not necessarily educate regulators about human health risks nor promote human health. PETA contracts with and utilizes senior scientists who work on the development and promotion of alternatives to animal testing, and comment on agency chemical testing proposals. (See Declaration of Mary Beth Sweetland attached as Exhibit C).

5. Petitioner Physicians Committee For Responsible Medicine (PCRM) Petitioner PCRM is a 501(c)(3) non-profit public interest health advocacy organization based in Washington D.C. and supported by over 5,000 physicians and 100,000 laypersons. As part of its mission, PCRM promotes ethical and effective medical research. PCRM brings this action on behalf of itself and its members. Since its inception in 1985, PCRM has been involved in several matters concerning the promotion of safe, effective, and ethical research, including efforts to halt experiments using genetically engineered Human Growth Hormone on healthy children, efforts to expose a whooping cough vaccine experiment on infants, and efforts to promote research using non-animal alternative test methods. (See Declaration of Neal Barnard, M.D., attached as Exhibit D.)

4

6. Respondent Environmental Protection Agency (EPA) is an agency of the United States government and is charged with the implementation and administration of the relevant provisions of the Toxic Substance Control Act. Respondent Whitman is the current EPA Administrator. In her official role, she is ultimately responsible for all EPA actions.

### RELEVANT STATUTORY PROVISIONS THAT GIVE RISE TO PETITIONER'S CAUSE OF ACTION

7.   Responding to the dangers associated with the use of toxic chemicals, Congress in 1976 enacted the Toxic Substance Control Act, Pub. L. No. 94-469, 90 Stat. 2003 (1976). Pursuant to Section 4 of TSCA, the EPA is authorized to require testing by rule if it makes certain findings related to the substance to be tested. [1] Such rules must contain "standards for the development of test data" 15 U.S.C. 2603(b)(1)(B). The guidelines contained in the final rule challenged herein were established to "meet the regulatory needs of TSCA, particularly the needs of the TSCA section 4 testing program." 65 Fed. Reg. 78746, *et. seq.,* December 15, 2000.

8.   TSCA Section 19 (15 U.S.C. § 2618) authorizes any person to file a petition for judicial review of a rule promulgated pursuant to specified sections of TSCA with the United States Court of Appeals. The court shall hold unlawful and set aside such rule if the Court finds such rule is not supported by substantial evidence in the rulemaking record. TSCA Section 19(c)(B)(I) (15 U.S.C. § 2618(c)(B)(I).

9.   Section 553 of the APA requires publication of proposed rulemaking in the Federal Register, and obligates the EPA to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views or arguments with or without opportunity for oral presentation."

---

[1] In order to promulgate a rule requiring testing EPA must find 1) that either the chemical may pose an unreasonable risk to health or the environment, or that it is produced in substantial quantities; and 2) that there is insufficient data to understand the effects of the chemical; and 3) that testing is necessary to develop such data. TSCA Section 4(a), 15 U.S.C. § 2603(a).

10. Section 553 of the APA further requires that the publication of a substantive rule be made not less than 30 days before its effective date unless the rule grants an exemption or "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. § 553(d).

## THE EPA FINAL RULE

11. On December 15, 2000, EPA issued its final rule establishing 17 new Toxic Substances Control Act health effects test guidelines in the Code of Federal Regulations (CFR). According to the Federal Register notice, "[e]stablishment of these guidelines provides a series of standardized test procedures and is necessary to ensure enforceable test standards in test rules promulgated under section 4 of TSCA." 65 Fed. Reg. 78746, *et. seq.,* December 15, 2000. The notice further states that Defendant "is publishing this action as a final rule without prior opportunity for notice and comment because the Agency believes that providing notice and an opportunity to comment is unnecessary." Id.

## COUNT ONE

**EPA VIOLATED THE APA BY PROMULGATION OF 40 CFR § 799.9630 WITHOUT PROVIDING PUBLIC NOTICE AND AN OPPORTUNITY FOR PUBLIC COMMENT**

12. The allegations in paragraphs 1- 11 are incorporated by reference as if fully stated herein.
13. The APA requires that EPA give interested persons an opportunity to participate in rulemaking through submission of written data, views, or arguments. *See* 5 U.S.C. § 553(c). The challenged test guideline, 40 CFR §799.9630, has never been the subject of a notice of proposed rulemaking.  EPA 's promulgation of 40 CFR §799.9630 as a final rule violates the notice and comment requirements of the APA.

## COUNT TWO

**EPA VIOLATED THE APA BY ITS FAILURE TO PUBLISH 40 CFR § 799.9630 AT LEAST 30 DAYS PRIOR TO ITS EFFECTIVE DATE WITHOUT GOOD CAUSE**

6

14. The allegations in paragraphs 1- 13 are incorporated by reference as if fully stated herein.
15. In order to avail itself of the "good cause" exception to the requirement that a substantive rule be published in the Federal Register not less than 30 days before the rule's effective date, the agency must determine that compliance with the 30 day requirement is either impracticable, unnecessary or contrary to public interests. (5 U.S.C. § 553(d)).
16. EPA asserts in its Federal Register notice that there is good cause for publishing the final test guidelines without prior notice and an opportunity to comment. EPA's basis for that assertion is that the test guidelines by themselves do not have substantive effect until they are actually incorporated in a test rule promulgated under TSCA section 4, 15 U.S.C. §2603, whereupon an opportunity to comment on the incorporation of a particular test guideline into a specific rule is assured. 65 Fed Reg. 242.
17. Future opportunity to comment upon whether or not a protocol should be included in a rule in no way guarantees Petitioners the opportunity to be heard concerning whether the protocol is adequate to detect the endpoint for which it is designed. EPA erred in its determination that there exists good cause for publishing the final test guidelines as a final rule without prior notice and an opportunity to comment.

## COUNT THREE

### 40 CFR § 799.9630 IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

18. The allegations in paragraphs 1- 17 are incorporated by reference as if fully stated herein.
19. The DNT guideline, 40 CFR § 799.9630, has never been subject to scientific validation to ensure that resultant test data is reliable, reproducible, or relevant. Validation is the process by which the reliability, reproducibility, and relevance of a procedure are established for a specific purpose. "*Validation and Regulatory Acceptance of Toxicological Test Methods: A Report of the Ad Hoc Interagency Coordination Committee for the Validation of Alternative Methods*, NIH Pub. No. 97-3981 (March, 1997) In the absence of appropriate scientific validation studies, EPA cannot conclude that the results of DNT studies have any bearing on the potential threat of the investigated substance to humans, particularly infants and children. As further discussed below, there is considerable doubt in the scientific community as to whether the current protocol for conducting developmental neurotoxicity studies accurately detects the effects of a toxicant on the developing nervous system, Luz Claudio et al., *Contemporary Issues in Toxicology : Testing Methods for Devlopmental Neurotoxicity of Environmental Chemicals*, 164 TOXICOLOGY AND APPLIED PHARMACOLOGY 1-14 (2000), and significant skepticism concerning whether the data generated from DNT studies in rodents are at all meaningful in assessing risk to human infants and children. *See id*.; National Research Council, *Pesticides in the Diets of Infants and Children*, 25 (Washington, DC: National Academy Press, (1993)).

7

20. The intended purpose of the DNT is to characterize a substance's effect on the nervous system that may arise in offspring from exposure of the mother during pregnancy and lactation. 40 CFR § 799.9630(2)(b)(2000). There are numerous weaknesses inherent in the DNT that cast doubt upon the veracity and meaningfulness of its results. Because rat pups are exposed to the test substance through their mothers, which relies on either transport of the substance through the placenta or through lactation, actual exposure levels in the pups is highly speculative. Claudio, et al, *supra*.

21. Further, a major component of the test intended to determine adverse effects on the nervous system is behavioral testing, which is inherently subjective, and greatly influenced by the training and experience of the individual conducting the tests. Studies that have relied upon neurobehavioral tests have been greatly hampered by extreme variability in the results obtained in different laboratories, in spite of rigorous controls of variables such as test apparatus, testing protocols, animal husbandry, acclimation times, order of administration of tests, etc. Crabbe, J.C., Wahlesten, D. and Dudek, B.C. *Genetics of mouse behavior: Interactions with laboratory environment*. 284 SCIENCE, 1670-1672 (1999). Additionally, researchers are not confident that current behavioral measures of cognition can accurately be used early in the rodent's life span, or are sufficiently sensitive to detect subtle damages in the brain. Claudio, et al, *supra*.

22. Furthermore, the vastly different gestation period of the human infant compared to the baby rodent casts additional doubt upon the efficacy of 40 CFR §799.9630. The rat pups examined in the DNT are a poor model upon which to assess risks to human infants and children because of the tremendous differences in the level of development at gestation, and the rat's much greater rate of maturation. National Research Council, *supra*.

23. 40 CFR §799.9630 is not supported by competent and substantial evidence. According, this Court should hold 40 CFR §799.9630 unlawful pursuant to 15 U.S.C. § 2618(c)(1)(B)(I).

**PRAYER FOR RELIEF**

Plaintiffs request the following relief on their claims:

1. An order declaring that 40 CFR §799.9630 is unlawful because the rule is not supported by substantial evidence in the rulemaking record and was promulgated in violation of the notice and comment provisions of the APA;
2. An injunction enjoining EPA from requiring any DNT studies be conducted pursuant to 40 CFR §799.9630 until the protocol has been properly validated and it has been lawfully promulgated as a rule under Section 553 of the APA.
3. Such other and further relief as this Court deems just and proper;
4. and reasonable attorneys' fees and costs.

Respectfully submitted,

_____

8

Marcy LaHart
Attorney for Petitioners
501 Front Street
Norfolk, VA 23510
757-622-7382
757-628-0781(Facsimile)