**ATTACHMENT 5 (Part 1)**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JAN - 3 2005

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

Mr. Troy Seidle
Ms. Susan L. Hall, Esq.
People for the Ethical Treatment of Animals
501 Front Street
Norfolk, VA 23510

Mr. Daniel Kinburn, Esq.
Physicians Committee for Responsible Medicine
5100 Wisconsin Avenue, NW, Suite 400
Washington, DC 20016

Re:    Petition to Compel the U.S. EPA to Repeal its Test Guidelines for Developmental
       Neurotoxicity

Dear Mr. Seidle, Ms. Hall, and Mr. Kinburn:

    Thank you for your petition, dated September 30, 2004, requesting that EPA repeal two
test guidelines for developing data on developmental neurotoxicity. The Agency has carefully
considered your request, and hereby denies the petition for the reasons provided in the enclosed
response.

                                        Sincerely,

                                        Susan B. Hazen
                                        Acting Assistant Administrator

Enclosure

**RESPONSE TO "PETITION TO COMPEL THE U.S. EPA
TO REPEAL ITS TEST GUIDELINES FOR DEVELOPMENTAL NEUROTOXICITY"**

## I.    Introduction

On October 5, 2004, EPA received a petition from People for the Ethical Treatment of Animals (PETA)[1] requesting that the Agency "repeal" two guidelines for developmental neurotoxicity (DNT) testing.[2]   See *Petition to Compel the U.S. EPA to Repeal its Test Guidelines for Developmental Neurotoxicity* (Sep. 30, 2004).   Petitioners assert that the petition was filed under the Administrative Procedure Act (APA), 5 U.S.C. §553(e), and section 21 of the Toxic Substances Control Act (TSCA), 15 U.S.C. §2620.  For the reasons stated below, EPA is denying the petition.

The petitioners have asked the Agency to withdraw both the TSCA and FIFRA DNT guidelines.  The petition principally argues that the guidelines should be withdrawn because (1) they produce data of unproven reliability and relevance to humans, and therefore constitute unsound science, and (2) they were adopted without notice and comment in violation of section 553(b) of the Administrative Procedure Act (APA).

## II.    Background

### A.    The Toxic Substances Control Act (TSCA)

In enacting TSCA, Congress declared it the policy of the United States that adequate data should be developed with respect to the effect of chemical substances and mixtures on health and the environment.  15 U.S.C. § 2601(b)(1).  To that end, Congress authorized EPA under section 4 of TSCA to promulgate test rules to develop data with respect to health and environmental effects of chemical substances or mixtures that are "relevant to a determination that the manufacture, distribution in commerce, processing, use, or disposal of such substance[s] or mixture[s], or that any combination of such activities, does or does not present an unreasonable risk of injury to health or the environment."  Id. § 2603(a).  Each test rule must include standards for the development of test data for such substances or mixtures.  Id. § 2603(b)(1)(B).  These

---

[1]By letter dated November 9, 2004, Physicians Committee for Responsible Medicine (PCRM) joined the petition. Letter from Daniel Kinburn, Senior Counsel, PCRM, to Charles Auer, Office Director, OPPT  (Nov. 9, 2004).

[2]These two guidelines are the Office of Prevention, Pesticides and Toxic Substances (OPPTS) 870.6300 Developmental Neurotoxicity Study (EPA-712-C-98-239 (1998)), hereafter referred to as the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) DNT guideline, and the Toxic Substances Control Act (TSCA) DNT guideline, codified at 40 C.F.R. § 799.9630, which was adapted (with only slight modifications) from the FIFRA DNT guideline.

standards specify how a study is to be conducted, the data that will be collected, and how the data will be analyzed. 65 FR 78746, 78747 (Dec. 15, 2000). Further, Congress explicitly bestowed upon the Agency broad authority and discretion to determine appropriate standards for the development of data in individual test rules:

> The health and environmental effects for which standards for the development of test data may be prescribed include carcinogenesis, mutagenesis, teratogenesis, behavioral disorders, cumulative or synergistic effects, and any other effect that may present an unreasonable risk of injury to health or the environment. The characteristics of chemical substances and mixtures for which such standards may be prescribed include persistence, acute toxicity, subacute toxicity, chronic toxicity, and any other characteristic which may present such a risk. The methodologies that may be prescribed in such standards include epidemiologic studies, serial or hierarchical tests, in vitro tests, and whole animal tests.

Id. § 2603(b)(2)(A).

EPA has integrated these elements of a test standard into a set of endpoint-specific test guidelines that are codified at 40 C.F.R. part 799. In general, these test guidelines were developed by EPA with broad public participation and significant involvement of the scientific community. 65 FR 78746, 78750 (December 15, 2000). Although it is codified, the TSCA DNT guideline has no legal effect on any person until EPA requires testing pursuant to a section 4 test rule.[3] The purpose of publishing a TSCA test guideline is to make available a standard protocol that can be incorporated, with or without changes, into a test rule under section 4 of TSCA.

## B. The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)

Section 3(a) of FIFRA generally prohibits the distribution and sale in the United States of pesticides not registered by EPA. 7 U.S.C. § 136a(a). In order to obtain the initial registration of a pesticide, an applicant must demonstrate, among other things, that the pesticide "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5). Persons seeking conditional registrations or amendments to existing registrations must also provide information relevant to a determination that the pesticide will not cause unreasonable adverse effects on the environment. 7 U.S.C. § 136a(c)(7). In general, the term 'unreasonable adverse effects on the environment' means (1) any unreasonable risk to man or the environment, taking into account certain factors specified by statute, or (2) a human dietary risk from pesticide residues that is inconsistent with the standard for a food tolerance or exemption established under

---

[3] Although the TSCA DNT was codified for use in section 4 test rules, DNT testing can also be required in other TSCA regulatory actions such as section 4 enforceable consent agreements or section 5(e) consent orders.

section 408 of FFDCA.[4]  7 U.S.C. § 136(bb).  For pesticides containing active ingredients first contained in a pesticide registered before November 1, 1984, EPA must "reregister" the pesticide - a process that requires EPA to determine that previously-registered pesticides meet current standards of registration.  See  FIFRA § 4, 7 U.S.C. § 136a-1.

Like TSCA, FIFRA provides EPA with broad authority and discretion to specify the information it needs to evaluate the potential risks of a pesticide.  7 U.S.C. § 136a(c)(2)(A).  The types and minimum amounts of data and information that the Agency requires to make risk determinations pertaining to registrations, reregistrations and amendments to existing registrations[5] are specified in 40 C.F.R. part 158.  Part 158 also identifies data and information that may be used in evaluating pesticide chemical residue tolerances and exemptions.  See generally, 40 C.F.R. § 158.202 (discussing Agency use of part 158 data).  If the information required under part 158 is not sufficient to evaluate the potential of a pesticide to cause unreasonable adverse effects on man or the environment, the regulations authorize EPA to require additional data.  40 C.F.R. §158.75(a).  Further, if EPA determines that additional data are required to maintain in effect an existing pesticide registration, it has broad authority to issue a FIFRA DCI notice to require such information.  See 7 U.S.C. § 136a(c)(2)(B).

Although part 158 specifies the types and minimum amounts of data and information required to evaluate potential risks from pesticides, the regulations also make it abundantly clear that there is no particular testing protocol that must be used to provide the required data.  40 C.F.R. § 158.70.  Rather, applicants are encouraged to "use the test procedure which is most suitable for evaluation of the particular ingredient, mixture, or product."  40 C.F.R. § 158.70(a).

---

[4]Section 408 of FFDCA as amended, authorizes EPA to establish, modify, or revoke tolerances (maximum allowable levels of pesticide residues on food and feed commodities) and exemptions from such tolerances for pesticide chemical residues in food.  21 U.S.C. §§ 346a(b), (c).  In general, EPA may establish or leave in place a tolerance only if it determines it is safe.  See 21 U.S.C. §§ 346a(b)(2)(D), (E).  EPA must revoke or modify a tolerance if it determines that it is not safe.  21 U.S.C. § 346a(b)(2)(A)(i).  In making the safety determination for threshold effects of a pesticide chemical residue (i.e., those for which EPA is able to identify a level at which the residue will not cause harm), EPA must generally apply an additional tenfold (10X) margin of safety for infants and children.  21 U.S.C. § 346a(b)(2)(C).  EPA may use a different margin of safety for infants and children "only if, on the basis of reliable data, such margin will be safe for infants and children."  Id.  If EPA determines that additional data or information are reasonably required to support the continuation of a tolerance or exemption, it may issue a data call-in" (DCI) under section 3(c)(2)(B) of FIFRA requiring registrants to submit such data or information, or publish a notice under section 408(f) of FFDCA, 21 U.S.C. § 346a(f), requiring submission of data in order to maintain the tolerance or exemption. There is no statutory mandate in TSCA to apply a 10X factor similar to that mandated in the FFDCA.

[5] Hereafter, initial registrations, reregistrations, and amendments to existing registrations will be referred to generally as 'registrations' unless otherwise specified.

Potential sources for protocols may be found in other EPA publications such as the OPPTS harmonized guidelines (e.g., the FIFRA DNT guideline), or in non-agency publications such as Organization for Economic Cooperation and Development (OECD) testing guidelines. Applicants are encouraged to consult with EPA to resolve questions relating to testing protocols before undertaking extensive testing to ensure that such protocols, regardless of their source, provide the necessary data.  40 C.F.R. § 158.35(a).

C.    EPA Test Guidelines

EPA has developed a set of common, standardized protocols, known as test guidelines, organized by testing endpoint.  The TSCA test guidelines were first promulgated in 1985, 50 FR 39252 (September 27, 1985), and were established in 40 C.F.R. parts 795 through 798.  The Agency has over time amended and improved these guidelines, 52 FR 19072 (May 20, 1987), and in some cases revoked those guidelines which had not been cross-referenced in any test rules.  60 FR 31917, (June 19, 1995).  The Office of Pesticides Programs (OPP) established a separate, free-standing series of FIFRA test guidelines which were made available in publications of the National Technical Information Service (NTIS).

In 1991, EPA began an effort to blend the testing guidance and procedures in TSCA and FIFRA guidelines, as well as guidelines published by OECD.  The product of this effort would be one set of guidelines which would be thus blended or "harmonized."

The OPPTS harmonized test guidelines for health effects endpoints (including developmental neurotoxicity) were first drafted by EPA scientists for specific testing endpoints. These drafts were reviewed by other EPA experts (as well as experts from other agencies) and, in some instances,  presented at domestic and international colloquia in order to solicit the views of recognized experts and the regulated community.[6]  The draft harmonized guidelines were also made available on the Internet as public drafts and a notice was published in the Federal Register of June 20, 1996 (61 FR 31522) announcing their availability and soliciting public comment. After considering the comments, EPA published the final OPPTS harmonized guidelines for the health effects endpoints on the Internet and announced their availability to the public in the Federal Register of August 5, 1998 (63 FR 41845).

D.    The DNT Guideline

The DNT test guideline provides a standardized test method designed to evaluate deficits in neurological function due to pre-natal and early post-natal exposure to environmental chemicals.      The study design is intended to develop data on the potential functional and morphological hazards to the nervous system which may arise in the offspring from exposure of the mother during pregnancy and lactation (US EPA, 1998). Offspring are exposed to chemicals,

---

[6]It is EPA's practice that all test guidelines cited in part 158 be reviewed by the FIFRA Science Advisory Panel (the panel is discussed in more detail below).

via the maternal circulation and/or milk, during *in utero* and early postnatal development for 25 days and are assessed for evidence of deficits in functional development including measures of reflex ontogeny, motor activity, motor function, sensory function, and learning and memory.

The offspring are also subjected to extensive neuropathological examination. Brain weight is recorded and qualitative neuropathological examination is conducted, particularly emphasizing structural changes indicative of developmental insult. Morphometric analysis is also recommended. These developmental endpoints are all measures of alterations in neurological morphology and function and are representative of problems in neurological function in humans due to pre-natal and post-natal exposures to chemical agents.

Because it is well established that the developing nervous system can be vulnerable to chemical insult, EPA has required, on a case-by-case basis, registrants of a number of pesticide active ingredients and manufacturers of other chemicals to conduct DNT testing. EPA has used the data from these DNT studies to evaluate the potential for the test substances to cause toxic effects in developing organisms and, in those cases where such effects represent the critical response for risk assessment, to establish Reference Dose (RfD) levels, as, for example, for the pesticide active ingredients, lindane and flufenacet. (An RfD is a level of exposure at which EPA would not expect to see adverse effects in humans. EPA may set different RfDs for different routes of exposure (e.g. oral, dermal, inhalation) or different durations of exposure (e.g., one-day, short term, intermediate, long term, or lifetime).) In developing an RfD, EPA evaluates the available body of toxicological studies on the chemical. RfDs are then developed as needed for different routes and durations of exposure considering the most sensitive endpoint for each route/duration. EPA then compares the estimated exposure to a substance with the appropriate RfD to determine whether the chemical may pose a risk of concern.

1.    History

The current DNT guideline has been developed over the course of many years. Scientific publications in this area began to appear in the early 1960s, and in the past 40 years, many investigators conducted studies to evaluate the potential for physical, pharmaceutical, and environmental agents to affect behavior after prenatal and early postnatal exposure. Several of the test procedures developed in those early studies underwent validation in a large inter-laboratory effort, the Collaborative Behavioral Teratology Study (CBTS; Buelke-Sam et al., 1985). At the time (1978  1984), the CBTS was the largest study  ever undertaken to examine the intra- and inter-laboratory reliability and sensitivity of several behavioral test methods. The CBTS effort involved a comparison of the effects of methylmercury and amphetamine exposure using a standardized protocol in 6 different laboratories. The study also examined the effects of a number of other variables, including which tests had been administered to the animals, whether pups from the same litter responded more or less like their litter mates than pups from other litters, and the effects of pup gender on response to testing. The results of the CBTS research showed that replicability of data among laboratories using a standardized protocol was excellent, and that both positive effects (e.g., with methylmercury exposure), and the lack of effects (e.g.,

after low-level amphetamine exposure) were replicable. The CBTS also demonstrated that the standardized protocols were sufficiently sensitive; no more than a 5-20% change from control values was required to detect an effect.

The earliest EPA version of the guideline was developed as a screening protocol (40 C.F.R. 795.250) in relation to the TSCA section 4 test rules for triethylene glycol monomethyl ether, 54 FR 13472 (April 3, 1989) and diethylene glycol butyl ether/acetate. 53 FR 5932 (February 26, 1988). This protocol incorporated a number of the behavioral measures that were judged as most reliable and sensitive from the CBTS, and received extensive scientific review. Public comments were solicited by EPA and received on the proposed test rules and test methods in 1986, 51 FR 17883 (May 15, 1986) and 51 FR 27880 (August 4, 1986) respectively), at a public meeting (October, 1986), and (received) on the final test rules and test methods. See, e.g., 53 FR 5932 (February 26, 1988). The study design proposed for these specific chemical test rules became the basis for a draft refined DNT screening study guideline.

The standardized study design, as well as specific issues and questions, were presented before the FIFRA Scientific Advisory Panel (SAP)[7] in October 1987 (52 FR 36460, September 29, 1987) and September 1989 (54 FR 35387, August 25, 1989). Prior to each of these meetings, the guidelines were made available for public review and comment.

Between the time of the 1987 and 1989 SAP reviews of the DNT protocol (i.e., April 1989), the Agency held a workshop entitled "Qualitative and Quantitative Comparability of Human and Animal Developmental Neurotoxicity" (often referred to as "the Williamsburg Workshop") to provide further scientific input into the design of the DNT protocol and to evaluate its appropriateness for use in risk assessment. Experts reviewed animal and human data on seven agents or classes of agents that are known to cause developmental neurotoxicity in humans. Scientists from government, industry, public interest groups, and academia attended the workshop, and were assigned to one of four work groups which addressed the following issues: 1) comparability of measures of developmental neurotoxicity in humans and laboratory animals; 2) test methods in developmental neurotoxicity; 3) quantitative evaluation of developmental neurotoxicity data; and 4) triggers for developmental neurotoxicity testing. In addition, the groups were asked to address the ability of the DNT test protocol to detect agents known to cause

---

[7]The SAP is a Federal advisory committee established under section 25(d) of FIFRA, 7 U.S.C. §136w(d), and operating in accordance with the Federal Advisory Committee Act. 5 U.S.C. App. 1. The Panel serves as the primary scientific peer review mechanism for OPPTS and provides scientific advice, information and recommendations to the EPA Administrator on pesticides and pesticide-related issues. The SAP consists of seven permanent members; EPA selects additional ad hoc panelists for their expertise to assist the permanent members in addressing issues before the SAP for specific meetings. The SAP draws panelists from academia, government, advocacy groups, and industry, and routinely attracts scientists who are world renowned in their fields. All SAP members must comply with federal ethics requirements for special government employees.

developmental toxicity in humans. The workshop participants concluded that the proposed DNT guideline would detect the potential for developmental neurotoxic effects of each of the agents evaluated (Kimmel, Rees, and Francis, 1990).

The Agency's DNT guideline (series 83-6) was finalized in March 1991, at which time responses to numerous SAP and public comments previously received on the guideline were fully addressed (US EPA, 1991a). The Agency again presented the DNT guideline to the FIFRA SAP for review in 1996 as one of many guidelines revised during the process of harmonizing EPA's guidelines internally and with those of the Organization for Economic Cooperation and Development (OECD), when available.[8] 61 FR 31522 (June 20, 1996). Review and comment by the general public was solicited at the same time that the availability of the guideline was announced for the SAP meeting. Since the revised DNT guideline only included clarifying changes and did not differ significantly from the 1991 version, the SAP chose not to comment on it. In culmination of this harmonization process, the DNT guideline was issued as OPPTS 870.6300 (63 FR 41845, August 5, 1998). It was indicated that this guideline could be used as a stand-alone study, as a followup to the standard developmental toxicity (OPPTS 870.3700) and/or adult neurotoxicity study (OPPTS 870.6200), or in combination with the two-generation reproduction study (OPPTS 870.3800) with assessment of the offspring conducted on the second ($F_2$) generation.

In addition to the numerous opportunities for public review and comment, and for scientific peer review, that have been associated with the process of DNT guideline development, as described, the Agency has publicly announced the availability of the guideline, and solicited comments when DNT testing was included in test rules under TSCA section 4 pertaining to isopropanol, 54 FR 43258 (Oct. 23, 1989), and commercial hexane 53 FR 3382 (Feb. 5, 1988). Further, since the DNT guideline was issued in 1991, a number of additional opportunities for public review and comment on the DNT guideline have arisen as a result of consideration of related scientific issues. This included FIFRA SAP consideration of the following topics: 1) a retrospective analysis of DNT studies submitted to OPPTS, December 1998, 63 FR 63472 (Nov. 13, 1998), 2) the application of the FFDCA10X safety factor and the need for DNT testing to fully characterize risk to children under FIFRA and for TSCA purposes, 64 FR 24150 (May 5, 1999), and 3) the use of the DNT in implementing FFDCA, 64 FR 37002 (July 8, 1999). The SAP's endorsement of use of the DNT protocol is discussed below, in the discussion of validation.

2.    Continuing Scientific Review

The Office of Pesticide Programs (OPP) suggested several modifications to the DNT guideline when it issued  Data Call In (DCI) notices for organophosphate pesticides in 1999. Specifically, these included extension of the offspring dosing period through to the age of weaning, demonstration that the pups are receiving the test substance when only the mother is

---

[8]OECD has not yet finalized a DNT guideline.

treated (or adjusting the methods to ensure that this occurs), increasing the number of offspring evaluated neuropthologically, and collecting single and repeated-dose cholinesterase activity data. Of these, the modification with the most potential impact on study design and conduct was the extension of the dosing period. An extended dosing period, however, raises several related issues, specifically in the areas of pharmacokinetic or toxicokinetic data needs, behavioral testing, and neuropathological evaluation   To address these topics, the International Life Sciences Institute (ILSI), in cooperation with EPA, established a working group of scientists from government, industry, and academia, to assemble and evaluate the available science. The conclusions of the working group were presented in a public workshop held in Washington, DC on October 24-25, 2000, and were published in the peer reviewed literature (Cory-Slechta et al., Dorman et al., Garman et al., Mileson and Ferenc, 2001). The working group agreed that the current developmental neurotoxicity testing paradigm was based upon solid scientific principles and experience, that there were opportunities to revise and improve some aspects of the guideline study, and that further research will be valuable in providing the scientific basis for guideline revisions in the future.

The Agency is currently considering the conclusions from the ILSI workshop, including the recommendations regarding guideline revisions. It must be emphasized, however, that the Agency's consideration of guideline revisions does not imply that either the Agency or the broader scientific community believes that the existing guideline is invalid or inadequate to detect the potential developmental neurotoxicity of a test chemical. The DNT guideline has been demonstrated to be a relevant and reliable test and produces information which is used in Agency risk assessments.

EPA has engaged in continuous, on-going scientific analysis and discourse regarding the conduct of DNT studies, the interpretation of the data from these studies, and their regulatory impact, and will continue such analysis in the future. A review of twelve developmental neurotoxicity studies evaluated by OPPTS pertaining to the assessment of the risks of pesticides and toxic substances was presented to the SAP in 1998 (Makris et al., 1998). This review indicated that the DNT protocol includes unique endpoints which are not examined in any other standard toxicity testing protocol, thereby enabling detection of neurobehavioral and neuropathological effects on offspring following exposure during sensitive periods of neurological development. A more recent review of 19 DNT studies submitted to OPP showed that in the case of some of the pesticides, DNT studies were more sensitive than other studies submitted to select doses and endpoints for risk assessment (and were therefore used for that purpose), demonstrating its relevance in risk assessment. (Makris, 2004).

Cross-laboratory comparisons of methodologies and results from DNT studies have been conducted by EPA scientists, in an on-going evaluation of OPP study submissions (Crofton et al., 2001; Crofton et al., 2004; Raffaele et al., 2003; Raffaele et al., 2004; Sette et al., 2004). Additionally, the ILSI Risk Science Institute is further examining the interpretation of DNT study data. A working group, consisting of scientists from government, industry, academic, and public health sectors, is currently addressing a number of critical issues (i.e., public health

considerations, overall data interpretation, data variability, positive control data, and statistical analysis), with the expectation that the results of this effort will be published in the peer reviewed literature in 2005.

III.    **Petition Response**

EPA is denying the petition because (1) the DNT guidelines were issued through legally correct procedures, and the protocol is reliable,[9] relevant, and validated for its intended purposes. Thus, EPA disagrees with petitioners' central arguments.

Testing for neurodevelopmental effects is, like all toxicological testing, an evolving science which deals with scientific and technical issues through continued efforts to increase scientific understanding. Some portions of the petition touch on those areas of uncertainty. Indeed, EPA and the broader scientific community are well aware of the issues petitioners identify in the petition, and many of petitioners' arguments are based on documents generated by EPA itself. But there is a significant difference between identifying and discussing scientific issues and petitioners' conclusion that the existence of any such issues renders the DNT guidelines unsuitable for their intended purpose. Petitioners' suggested remedy   withdrawal of the guidelines   is unwarranted, for the following reasons:

_____

[9]Petitioners argue that, because DNT data are neither relevant or reliable, they should not serve as a basis for departing from the statutory 10X safety factor for infants and children in tolerance assessments under FFDCA section 408(b)(2)(C), 21 U.S.C. § 346a(b)(2)(C). Petition at 3. As discussed elsewhere in this petition response, FFDCA section 408(b)(2)(C) provides that EPA may use a different margin of safety for infants and children "if, on the basis of reliable data, such margin will be safe for infants and children." FFDCA does not define the term "reliable data," so EPA has considerable discretion in determining what kinds of data are sufficiently reliable to justify departure from the 10X safety factor.   In any event, this issue is largely irrelevant to the question of whether the guidelines should be revoked. Whether a lesser safety factor will be safe for infants and children is an issue that must be addressed in the context of a particular tolerance, based upon all the data pertaining to that tolerance. The guidelines serve much broader purposes than determining whether to depart from the FIFRA 10X safety factor. Moreover, if petitioners believe that a particular tolerance has been improperly issued, they can obtain review of the tolerance before EPA under section 408 of the FFDCA, 21 U.S.C. § 346a. by filing timely objections to the tolerance with the Agency. 21 U.S.C § 346a(g)(2) (authorizing any person to file objections with EPA concerning the promulgation of a tolerance, among other things). An EPA final order on such objections is reviewable in court. 21 USC 346a(h)(1). The relevant issue in the context of the instant petition is whether the DNT provides reliable scientific information. As discussed in detail below, EPA considers DNT data to be relevant and reliable in their ability to predict the potential for neurodevelopmental toxicity, and therefore rejects Petitioners' argument.

The DNT guidelines represent the best available science regarding developmental neurotoxicology testing, and data generated from DNT guideline studies are reliable and relevant for assessing those endpoints. Multiple, independent, expert scientific peer reviews affirm this conclusion.

The DNT guideline provides an outline of behavioral domains and morphological endpoints that are relevant to human neurodevelopment that should be examined in appropriate circumstances to assess potential developmental neurotoxicity of a test compound.

The protocol has been developed and refined through extensive public processes over several decades. It has received extensive scientific review and public comment, including from PETA. As discussed above, this process is on-going, and the public review will continue to examine the full range of issues associated with the guideline, including issues identified in the petition. EPA is committed to continuing to work through this public process as it further evaluates and improves the science of DNT testing. EPA does not believe it is appropriate to withdraw these important guidelines.

The guidelines have no legal impact. Rather, as further explained below, they serve as a potential source for later, independent regulatory actions or decisions that might impose DNT testing. Where appropriate under law, petitioners would be able to raise their arguments in these more specific contexts.

The guidelines describe an approach to DNT testing. They do not create any authority for DNT testing, nor do they even provide guidance as to when or whether DNT testing might be appropriate. Thus, withdrawal of the guidelines would not prevent EPA from deciding to require or recommend DNT testing in any individual circumstance.

A.    Applicability of TSCA Section 21

The portion of the petition requesting withdrawal of the TSCA DNT guideline is styled as a petition under TSCA section 21. Petition at 1 . Although EPA believes that petitions for withdrawal of test guidelines are not authorized by section 21 (and that the whole petition should therefore be treated as filed in accordance with the Administrative Procedure Act), the Agency is nonetheless responding to the petition in 90 days, as requested by the petitioners.

Section 21(a) provides in part that a person may petition EPA "to initiate a proceeding for the issuance, amendment, or repeal of a rule under section 2603 [i.e., TSCA section 4] . . . of this title." 15 U.S.C. § 2620(a). Notwithstanding the references in section 21 to section 4 generally, EPA believes that section 21 is properly interpreted to apply only to chemical-specific legislative rules that have been or could be issued under the authority of section 4(a) (i.e., section 4 test rules). To adopt a broader interpretation would lead to internal inconsistencies within section 21. In particular, section 21(b)(4)(B) provides for *de novo* review of an EPA denial of a petition for

-10-

the issuance of a new rule under section 4.  To succeed in such a proceeding, the petitioner must
demonstrate by a preponderance of the evidence that:

> (I) information available to the Administrator is insufficient to permit a
> reasoned evaluation of the health and environmental effects of *the chemical
> substance to be subject to such rule*. . .; and

> (II) in the absence of such information, *the substance* may present an
> unreasonable risk to heath or the environment, or *the substance* is or will be
> produced in substantial quantities and it enters or may reasonably be anticipated to
> enter the environment in substantial quantities or there is or may be significant or
> substantial human exposure to it.

15 U.S.C. § 2621(b)(4)(B)(i) (emphasis supplied).  By its terms, section 21(b)(4)(B) can only
apply to review of EPA denials of petitions to issue new chemical-specific rules, such as section
4 test rules.  The factors that the court must consider in this *de novo* proceeding have no
relevance when the petitioner's requested rule does not pertain to specific chemical substances or
mixtures,[10] and Congress could thus not have intended that they apply.  Moreover, these factors
are nearly identical to certain findings that EPA must make when it issues a section 4 test rule on
its own initiative.  See 15 U.S.C. § 2603(a).

EPA's interpretation is also consistent with the legislative history of section 21.  In
explaining why it authorized *de novo* review (as opposed to record review) of EPA denials of
petitions for the issuance of new rules, Congress stated:

> The conference substitute provides different treatment for review of
> petitions for amendment or repeal of rules or orders, because the Administrator
> already will have addressed the general subject matter in an existing rule or order
> and the Administrator's determination will have been subject to review under
> section 19 of this Act.  Therefore, the conferree's main interest is to make certain
> that any such petitioner receive timely consideration of such petition. . . .[T]he
> conferrees do not intend that the Administrator be subjected to constant petitions
> challenging rules or orders for which adequate judicial review is provided under

---

[10]  For example, section 4 authorizes EPA to promulgate rules providing for fair and
equitable reimbursement from manufacturers or processors who are granted exemptions from test
rule requirements to manufacturers or processors who actually conduct the testing.  15 U.S.C. §§
2603(c)(3)(A), (4)(A).  Under petitioner's reasoning, a denial of a petition for a new
reimbursement rule  would entitle a petition to *de novo* review under section 21(b)(4)(B).
However, the factual demonstrations a petitioner is required to make in a *de novo* proceeding
could not be reconciled with a review of fair and equitable reimbursement.  Thus petitioner's
assumption that any rule or g   uidance issued pursuant to TSCA section 4 is subject to petition
under section 21    renders section 21's *de novo* review provision nonsensical.

section 19.  Therefore, if the Administrator denies a petition to amend or repeal an action under section 4, 5(e), 6, or 8, the conference substitute permits review of such denial only under the Administrative Procedure Act.

S. Rep. No. 94-1679, at 98-99 (1976).  The Conference Report clearly indicates Congress' intent that section 21 apply only to those rules that are also subject to judicial review under section 19.  With respect to section 4, section 19 authorizes judicial review only of specific actions under section 4(a).  15 U.S.C. § 2618(a)(1)(A).  It does not authorize judicial review of rules that have been issued pursuant to other section 4 authorities.

This interpretation of section 21 makes sense from a policy perspective.  EPA believes that Congress enacted section 21 in order to ensure expedited consideration of petitions related to chemical-specific rulemakings, in view of the potentially urgent need for EPA to address chemical risk issues and the direct impacts such rules have.  Issues relating to testing guidelines which, as EPA explains below, have no legal impact on either EPA or the regulated community are not similarly urgent, and it is reasonable to think that Congress would have intended them to be addressed through the APA petition process.

B.    Notice and Comment Rulemaking

The petition asserts that the TSCA and FIFRA DNT guidelines are rules as defined by the APA, 5 U.S.C. § 551(4).  Petition at 2.  However, the fact that an agency statement may be a rule as defined by the APA does not mean that it must have been promulgated through the informal rulemaking procedures of section 553(b) of the APA.  To the contrary, such procedures apply only to legislative rules.  They do not apply to interpretative rules, general statements of policy, or rules of agency organization, procedure or practice.  5 U.S.C. § 553(b)(A).  Nor do they apply when an agency for good cause finds that notice and opportunity for comment are impracticable, unnecessary, or contrary to the public interest.  5 U.S.C. § 553(b)(B).  The FIFRA and the TSCA DNT guidelines are at most general statements of policy rather than legislative rules, and therefore, they need not have been promulgated through notice and comment rulemaking.  Further, when EPA published the TSCA DNT guideline in the Federal Register, it properly found that there was good cause not to provide an opportunity for comment and adequately explained its reasons therefor (see 65 FR 78746, 78750, Dec. 15, 2000).

1.    FIFRA DNT Guideline

As discussed above, EPA published a notice in the Federal Register announcing the availability of a draft of the current FIFRA DNT guideline for public comment.  61 FR 31522 (Jun. 20, 1996).  After considering comments received, EPA announced the availability of the final harmonized FIFRA DNT guideline, which is the subject of the Petition.  63 FR 41845 (Aug. 5, 1998).  Although EPA solicited and considered public comments on the FIFRA DNT

guideline, the petitioners are correct that EPA did not promulgate the guideline as a legislative rule or publish it in the Code of Federal Regulations.[11]  Petition at 13.

The FIFRA DNT guideline is not a legislative rule, and therefore the APA does not require that it be promulgated or codified in the Code of Federal Regulations.  The guideline itself does not require anyone to do anything, and it does not otherwise establish any rights or obligations.  It is important to note in this regard that FIFRA does not require EPA to promulgate regulations specifying pesticide testing protocols.  Rather, Congress directed EPA to "publish *guidelines* specifying the kinds of information which will be required to support the registration of a pesticide." 7 U.S.C. § 136a(c)(2)(A) (emphasis supplied).

Nor does citation of the guideline within a DCI notice make the guideline a rule. Incorporation of some or all of a document into a later regulatory document does not convert the earlier document into a legislative rule.  Moreover, there is no statutory requirement that EPA issue DCIs through notice and comment rulemaking when it determines that additional data are required to maintain in effect an existing pesticide registration, food tolerance or food tolerance exemption.  See 7 U.S.C. § 136a(c)(2)(B).  EPA need only "notify all existing registrants of the pesticide to which the determination relates and provide a list of such registrants to any interested person."  Id.   Thus, there is no statutory requirement that pesticide testing protocols like the FIFRA DNT guideline be promulgated as a legislative rule.

It is also clear that EPA did not intend the FIFRA DNT guideline to have the binding effect of a legislative rule.  First, the FIFRA DNT guideline is generally written in permissive, non-binding terms rather than mandatory, discretion-limiting language that typifies legislative rules.[12]  See generally, OPPTS 870.6300(d), (e) (using terms like "recommended," "should," and

---

[11] With respect to the FIFRA DNT guideline, the petition argues that even though the FIFRA DNT guideline was not promulgated as a rule, EPA has "[n]onetheless . . . on multiple occasions required pesticide registrants to conduct DNT studies, both through a 1999 data call-in (DCI) initiative . . . and as a condition of registration under FIFRA §3(c)(7)(B) and §3(c)(7)(C)." Petition at 13.  It is not clear how the Petitioners' concerns in this regard relate to the request to repeal the FIFRA DNT guideline, and in any event they are unfounded.  As discussed above, EPA has broad authority and discretion under FIFRA and part 158 to require registrants to support their requests for pesticide registrations and tolerances. FIFRA does not require that test methods used to generate such data be promulgated after notice and opportunity for public comment.  See *supra*. Moreover, there is no requirement under the APA that the content of a DCI order first be subject to notice and comment rulemaking before it can be incorporated into the order.

[12] The FIFRA DNT guideline does include some discretion-limiting language, usually associated with statements related to good laboratory practices (GLP).  This language is intended to emphasize the fact that if GLPs are not followed, the resulting data may be highly questionable, if not useless.  Cf.  GLP regulations at 40 C.F.R. § 160.17.  For example, paragraph

"preferred" to describe testing protocols and data collection, reporting, and evaluation
procedures). Second, the regulatory structure of part 158 indicates that EPA does not intend
pesticide testing protocols, whether or not they are actually referenced in part 158,[13] to be binding
on the Agency or the public. Part 158 emphasizes that there may be any number of appropriate
protocols to generate required data. 40 C.F.R. § 158.70. As EPA explained in the preamble to
the part 158 regulations:

> [I]t was inappropriate to set forth . . . test protocols and provisions for
> evaluating and reporting data . . . as regulations since there may be several
> acceptable or even preferable protocols.... Moreover, due to the vast diversity of
> pesticide products subject to regulation and due to the rapidly advancing state of
> the art in chemical testing and evaluation, it is impractical to attempt to specify
> detailed testing regulations that will adequately address each situation.

49 FR 42856 (Oct. 24, 1984). In discussing the differences between the TSCA and FIFRA DNT
guidelines EPA further explained:

> Under FIFRA, test guidelines are used in an interactive process between
> the Agency and registrants seeking registration of pesticides or food residue
> tolerances. Flexibility to tailor required testing to individual circumstances is
> critical, and the Agency has considerable discretion to determine whether
> submitted test results are adequate to support the requested action. Under this
> scheme, registrants have an intrinsic motivation to conduct well-grounded testing.

65 FR 78748 (Dec. 15, 2000).

Finally, the FIFRA DNT guideline allows for flexibility in use and has in fact been
utilized flexibly in practice, consistent with part 158 and the Agency's views noted above. The
petition itself acknowledges that EPA has not required rigid adherence to the FIFRA DNT
guideline. See Petition at 13 (observing that EPA's organophosphates DCI departed from the
testing protocol recommended in the FIFRA DNT guideline). Departure from the FIFRA DNT

---

(d)(2) of the guideline states that a "concurrent control group is required." This is not a legal
requirement, but as a practical matter, EPA would likely not be able to effectively evaluate the
data on the test group if it did not also have data on a concurrent control group. Accordingly, a
control group is "required" when conducting DNT studies only to the extent that it would be
extremely difficult to evaluate results of a DNT study conducted without a control group with
any degree of confidence. EPA acknowledges that this distinction might not be recognized by all
applicants and registrants. Accordingly, the Agency intends to review the guideline and revise it
if necessary to further clarify that it is a recommended protocol for generating data pertaining to
developmental neurotoxicity.

[13]The FIFRA DNT guideline is not among the testing protocols referenced in part 158.

-14-

guideline when it is appropriate to do so does not, as the petition suggests, mean that EPA has established a new legally binding norm. Rather, EPA's departure from the FIFRA DNT guideline in the organophosphate DCI and elsewhere[14] merely reinforces that the FIFRA DNT guideline is not a legislative rule and that EPA does not regard it or apply it as such. EPA's approach to DNT testing in the organophosphate DCI also indicates that adherence to the FIFRA DNT guideline will not ensure that the testing conducted in accordance therewith will always be acceptable to EPA. The data developer must have flexibility in testing in order to address those circumstances when, e.g., the properties or intended uses of a particular pesticide mean that different testing procedures are necessary in order to generate the data necessary to support registration under FIFRA. That is why EPA encourages applicants and registrants to consult with EPA to resolve data requirement and testing issues prior to initiating testing. See 40 C.F.R. § 158.35(a).

The FIFRA DNT guideline is intended to be non-binding. Although the Agency believes that its intent has been clear, the Agency will review the guideline to ensure that it accurately communicates this intent. EPA will make clarifying revisions to the guideline as appropriate.

In sum, DNT testing under the FIFRA program is used as the basis for EPA to make regulatory decisions regarding pesticide registrations and tolerances. The FIFRA DNT guideline provides guidance regarding how to conduct a DNT test. Neither the guideline itself nor EPA regulations require use of the DNT guideline,[15] and, when it is used to support registration or a tolerance action, it can be modified. In any decision the Agency makes regarding eligibility for registration, a tolerance, or a tolerance exemption, the standards that EPA applies are those in FIFRA, the FFDCA, and regulations, not those found in the DNT guideline or any other guidance document, and registrants are free to use any testing approach they choose, so long as the test results enable EPA to make the relevant findings.

2.    TSCA DNT Guideline

The TSCA DNT guideline was published in the Federal Register on December 15, 2000. 65 FR 78746. It differs from the FIFRA DNT guideline in two key respects. First, unlike the FIFRA DNT guideline, EPA codified the TSCA DNT guideline. See 40 C.F.R. § 799.9630. Nevertheless, like the FIFRA DNT guideline, it does not itself require anyone to do anything, and does not otherwise establish any rights or obligations. It is therefore not a legislative rule.

---

[14]Some additional instances where pesticide DNT protocols that have been customized to address chemical-specific toxicological issues include trichlorfon, flufenacet (which has been shown to alter thyroid function in adult rats) (USEPA/OPP, 2003), and tetrachlorvinphos.

[15]Although, as discussed elsewhere in this response, DCI's can require specific testing protocols, regardless of whether they are compiled as a FIFRA testing guideline.

-15-

The primary reason for codifying the TSCA DNT guideline was administrative convenience. See 65 FR 78746, 78747. The Office of the Federal Register (OFR) disfavors incorporation by reference of an agency's own publications in its rules. 1 C.F.R. § 51.7(b). Thus, if the TSCA DNT guideline were not codified, the entire DNT guideline would have to be published in the C.F.R. each time EPA promulgated a new section 4 test rule that required DNT testing (except to the extent that the provisions are codified in an earlier rule). In contrast, an agency's rules may cross-reference previously-codified material by properly citing to it. 1 C.F.R. § 21.21. Given these publication requirements, it made sense to codify the TSCA DNT guideline at the outset and then cross-reference it where appropriate in each subsequent test rule that requires DNT testing. As the Agency explained, "this approach [i.e. codification] would eliminate the need to repeat the same test specifications for each substance-specific test rule." Id. at 78747. Cross-referencing the TSCA DNT guideline in a final TSCA section 4 test rule would indeed bind those persons subject to the rule, but it is the test rule, not the guideline, that establishes a legally binding requirement for manufacturers and/or processors of the test substance to conduct testing. Moreover, the test rule would be promulgated using notice and comment procedures, during which the public could comment on the content of the guideline and its application in the rule.

The TSCA DNT guideline also differs from the FIFRA DNT guideline in that it is written in a mandatory style. However, the mandatory language used in the TSCA DNT guideline does not make it any more legally binding on the Agency or the public. Mandatory language is used in the TSCA DNT guideline because it is intended that the guideline can be cross-referenced in appropriate TSCA section 4 rules that establish legally binding DNT testing requirements. Given that the TSCA DNT guideline has no binding effect in and of itself, and that it is intended to be cross-referenced in future test rules or regulatory actions that will have binding effect, its use of mandatory language is irrelevant to whether the notice and comment rulemaking is required under the APA.

The difference in the Agency's treatment of the FIFRA and TSCA DNT guidelines (i.e., language differences and publication in the C.F.R.) reflects the differences inherent in the regulatory approaches that Congress established under FIFRA on the one hand, and TSCA on the other. Under FIFRA, the Agency has considerable interaction with individual pesticide registrants, and there is ample opportunity and flexibility in that context for EPA and the registrant to explore, informally and on a case-by-case basis, appropriate testing protocols that will satisfy the Agency's data needs. See generally 40 C.F.R. § 158.35(a) (encouraging applicants to consult with EPA to resolve data requirement and testing issues prior to initiating testing); 40 C.F.R. § 158.40 (discussing consultations between EPA and registrants). The FIFRA DNT guideline serves as guidance to both EPA and applicants or registrants in discussions on appropriate testing protocols.

In contrast, EPA must follow an informal rulemaking process when it issues TSCA section 4 test rules, and those rules are of general applicability. In this regulatory environment, EPA does not, and as a practical matter cannot, develop individualized approaches. It is

-16-

therefore necessary to specify a test standard in the proposed rule, and, as noted above, it is more efficient to do this by cross-referencing a previously-codified test guideline that is written in mandatory terms, which is consistent with the legally binding nature of the test rule. EPA is not required to cross-reference the DNT guideline in a proposed section 4 rule imposing DNT testing. Moreover, where EPA does so, the public is free to comment on any aspect of the proposed test rule, including the cross-referenced test guideline. Based on the comments received and the testing circumstances for the particular chemical substance or mixture at issue, EPA may modify the referenced guideline if appropriate. 65 FR 78746, 78747.

Even if the TSCA DNT guideline was considered a legislative rule, it would be exempt from notice and comment requirements under the "good cause" provision of APA section 553(b)(B). As EPA explained in issuing the guideline:

The test guidelines codified in this document by themselves have no substantive effect on any person until and unless the test guidelines are incorporated in a test rule promulgated under section 4. Before any such test rule is promulgated, EPA will provide notice and an opportunity to comment on the incorporation of a particular test guideline into a specific test rule. In addition, the process for developing and amending the harmonized test guidelines includes broad public participation and extensive involvement of the scientific community. EPA therefore finds that there is "good cause" . . . to codify these test guidelines without prior notice and comment.

65 FR 78746, 78750.

C.    Science Issues

EPA disagrees with the assertions in the petition that the DNT protocol represents unsound science, that data generated using the protocol are unreliable and inapplicable to human

-17-

risk, and that the protocol has not been validated.[16]  On the contrary, the protocol has been well validated, and its soundness, reliability and applicability amply demonstrated.[17]

1.    Reliability and Relevance to Human Developmental Neurotoxicity

The use of mammalian data to predict potential hazard to humans is a common and accepted practice in the field of toxicology, including developmental toxicology.[18]  A report by the National Research Council of the National Academy of Sciences (NAS) states that "The most commonly available data in hazard identification are those obtained from animal bioassays.  The

---

[16]Petitioners additionally assert that EPA's DNT guidelines and data generated under these guidelines violate the Data Quality Act (DQA), 44 U.S.C. sec. 3516.  The DQA requires, in part, that the Office of Management and Budget (OMB) issue guidelines that, among other things, direct Federal agencies subject to the Paperwork Reduction Act (44 U.S.C. chapter 35) (such as EPA) to issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of the information they disseminate.  The DQA does not require EPA to adopt specific data quality standards.  In response to OMB's guidelines (see 67 FR 8452, 8458, Feb. 22, 2002), EPA issued its Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by the United States Environmental Protection Agency (i.e. EPA's Information Quality Guidelines (IQGs)), which describe EPA's policy and procedures for reviewing and substantiating the quality of information before EPA disseminates it.  EPA's IQGs function as guidance to the Agency and the public, rather than as mandatory requirements as suggested by petitioners.  In addition, despite petitioners' claim to the contrary, the Agency's DNT guidelines and data generated pursuant to these guidelines are consistent with EPA's information quality policy as described in its IQGs.  The discussion of the DQA in the petition is in essence a restatement of petitioners' general contention that the guidelines produce data of unproven reliability and relevance to humans, and therefore constitute unsound science.  As a result, petitioners' DQA-related claims require little separate discussion, as the substantive issues behind them are addressed in the response to petitioners' science issues.

[17]  Petitioners assert that the DNT method is inconsistent with the portion of OMB's definition for "objectivity" (in the context of the Data Quality Act) that relates to the substance of disseminated information, i.e. ensuring that disseminated information is accurate, reliable, and unbiased.  See 67 FR 8452 (February 22, 2002). As this claim is indistinguishable from the petitioners' general claim that the DNT protocol is unreliable, improperly based on subjective data, and is irrelevant to human developmental neurotoxicity, EPA's discussion in this section regarding the  reliability and relevance of the DNT protocol and the validity of its measurements adequately addresses the petitioners' issues regarding objectivity.

[18]TSCA explicitly authorizes animal testing in section 4 test rules.  15 U.S.C. § 2603(b)(2)(A).

inference that results from animal experiments are applicable to humans is fundamental to toxicologic research; this premise underlies much of experimental biology" (National Academy of Sciences-National Research Council, 1983). Agency risk assessment guidelines for developmental (USEPA, 1991), reproductive (USEPA, 1996), and neurotoxicology (USEPA, 1998) describe the interpretation of animal data in the assessment of human risk.

The 1989 Workshop on the Qualitative and Quantitative Comparability of Human and Animal Developmental Neurotoxicity Data (Kimmel et al.,1990) conducted a systematic and in-depth review of human and animal data to assess the ability of the developmental neurotoxicity testing battery, conducted in rats, to detect the effects of seven environmental agents that have been demonstrated to be developmentally neurotoxic in humans, as well as addressing the interpretation of developmental neurotoxicity endpoints. A critical conclusion of this workshop (Francis, et al., 1990) was that the degree of qualitative correlation between human and experimental data "lend strong support to the Agency's policy that experimental animals can and should be used to assess potential risk for developmental neurotoxicity in humans." There was agreement among the experts participating in the workshop that the DNT protocol would have identified each of the human developmental toxicants examined, although the effects in animals and the doses at which those effects were observed were often different in rodents than in humans.[19] This difference in response is compensated for by 1) the use of a broad range of tests that assess behaviors across multiple functional domains, and 2) the use of conservative uncertainty factors in risk assessment calculations. Subsequently, a series of retrospective reviews of DNT studies conducted by Agency scientists (Makris et al., 1998; Makris, 2004) demonstrated the method's potential value in risk assessment.

DNT results are appropriate for use to support acute and chronic dietary risk assessments and short and intermediate term occupational and residential risk assessments for pesticides (FIFRA SAP, 1998). The method provides important data on functional and morphological endpoints predictive of developmental neurotoxic effects not obtained in other test batteries. DNT endpoints have been shown to be the determining factor in the selection of endpoints and doses for risk assessment for some chemicals for which data have been called in by the Agency (USEPA/OPP 1998, 2000, 2002a, 2002b, 2003). As might be expected of a study that utilizes

---

[19]Indeed, the purpose of the DNT protocol reflects the intended use of the guideline in identifying potential for neurodevelopmental toxicity:

> In the assessment and evaluation of the toxic characteristics of a chemical substance or mixture (test substance), determination of the **potential** for developmental neurotoxicity is important. This study is designed to develop data on the **potential** functional and morphological hazards to the nervous system which may arise in the offspring from exposure of the mother during pregnancy and lactation.

OPPTS 870.6300(b) (emphasis supplied).

-19-

short term exposures (approximately 25 to 40 days) during development (where a single exposure during a critical period may result in developmental insult), the predominant use of the DNT study in pesticide risk assessment has been for acute (single dose) reference doses, and for short-term (1-30 days) and intermediate-term (1-6 months) non-occupational exposures, which are especially applicable to risk assessments for children.  While there is potentially a more limited use of the DNT study for chronic risk assessment (i.e., in calculating a chronic reference dose, or RfD, for lifetime exposure to a toxicant), the DNT study has also been used for this exposure scenario when it has been shown to be the most sensitive study in the toxicology data base (USEPA/OPP, 2003).  Therefore, assertions by the Petitioner that the DNT study has not been used to establish an RfD, and that its value in risk assessment has not been demonstrated, are incorrect (see discussion in section II.D., above regarding RfD's for lindane and flufenacet).

EPA finds many of the scientific assertions in the petition unconvincing.  Several portions of the petition selectively quote or misleadingly summarize source documents; when viewed in full context those documents support EPA's conclusions regarding the scientific relevance and reliability of the DNT study.  Other specific issues cited by petitioners as demonstrative of the inability of the DNT to predict toxicity in humans are, in fact, common considerations in the interpretation of experimental animal data.  In addition, many of these issues are derived from discussion papers on guideline specifications, endpoint-specific topics, or data analysis and interpretation. None of those papers, however, indicate that the DNT study is inappropriate for assessing potential developmental neurotoxicity hazard in human health risk assessment.

For example, the petitioners cite a statement by SAP questioning the sensitivity of the DNT guideline.  Petition at 13.  However, petitioners selectively cite that SAP discussion.  Although in the January 22, 1999 SAP report, panel members questioned why the data before them did not demonstrate that DNT is more sensitive than either developmental or reproductive studies, the SAP noted that the data before the Panel were insufficient for arriving at a broad conclusion regarding the relative sensitivity of the test.  Not only was the number of DNT studies submitted to EPA and reviewed at this panel meeting small, but many of the studies were inconsistent with the DNT protocol.  Nor did the studies provide an adequate sample of test substances representing multiple neurotoxic chemical classes.  Even with these limitations, some panel members concluded that the limited data set was sufficient to conclude that the DNT protocol can be a sensitive indicator of toxicity to the offspring, citing the fact that in some of the studies evaluated, DNT endpoints were more sensitive than those for systemic or developmental toxicity studies.  The majority of panelists stated that the DNT test method provides important qualitative data not obtained in other types of testing and should therefore be required to determine the presence or absence of developmental neurotoxic effects (FIFRA SAP 1999a).

The petitioners also selectively quote from the January 22, 1999 SAP report that the panel "was divided whether the  methods identified are reasonable for assessment of toxicity to the offspring."  This partial quote fails to cite the first part of the panel's statement: "While the panel agreed that the data adequately demonstrate effects on functional development  of behavior and structural development of the central nervous system,...."  In its assessment of the DNT

protocol's  performance based on studies of only 12 chemicals submitted  to EPA, panelists noted that the No Observed Effect Levels were in the range of those for such endpoints as chronic toxicity,  carcinogenicity, and neurotoxicity.  In the context of discussion of EPA's charge to the Panel regarding sensitivity of the test for some  human neurotoxic manifestations, length of postnatal exposure  relative to the period of brain development, or chemical levels in fetuses/pups, the consensus panel recommendation was that the DNT guideline should be used to support Agency risk assessments.  Moreover, the panel did not suggest any revisions to the 1998 protocol.

The petitioners cite the following statement by an EPA scientist:   "[l]ack of effect of the positive control chemical was a problem that occurred at least once in over 50% of the [16] test laboratories,"  (Crofton et al., 2004), to support the erroneous conclusion that "DNT results often cannot even be duplicated from one laboratory to another."  Petition at 5.  The petitioners have misrepresented these findings.  A critical characteristic of a positive control is reliability of effect both within and between laboratories. The fact that a specific laboratory cannot replicate findings from many other laboratories is not an indictment of the method.  Instead the problem is with the laboratory that fails to replicate what many other laboratories have repeatedly found.  There is nothing in the petitioners' statements that suggests lack of replicability of DNT testing.

Petitioners cite a 1989 EPA Workshop on the Qualitative and Quantitative Comparability of Human and Animal Developmental Neurotoxicity statement that with respect to "lead, PCBs, and radiation  the proposed [DNT testing] battery   probably would have underestimated human risk."  Petition at 6.  But for all of the agents assessed in the 1989 workshop, the developmental neurotoxicity test battery was shown to identify the hazard to humans, "absolutely and without exception "(Stanton and Spear, 1990).  For some of the chemicals (lead, PCBs, and radiation), the proposed battery was thought to probably underestimate risk, even when the use of uncertainty factors was considered.  Yet, while the sensitivity of a screening battery such as the DNT as an indicator of the effects on humans may vary according to the specific chemical tested, such variation does not invalidate the protocol.  It is also worth noting that none of the multiple subsequent scientific reviews of the DNT considered this a significant concern with regard to the DNT protocol.

Petitioners cite a 1999 SAP report which notes that the dosing regimen for the test animals does not correspond to exposures to humans.  Petition at 7.  The SAP was commenting on  the 1991 DNT study protocol  that specifies dosing the maternal animal only;  the dams' offspring would be exposed to  the test chemical *in utero* and through lactation,  terminating on lactation day 10, at which time the nervous system development of the rat pups would be approximately equivalent to a newborn infant.  Upon consultation with OECD,  the Agency decided to seek SAP review of a suggested revision to the 1991 protocol to extend the dosing period of the offspring to weaning age (i.e., postnatal day 21), in order to better characterize later stages of neurological development.  The Panel provided discussion on this topic, indicating the dosing paradigm should be customized based upon toxicokinetic information for the chemical under assessment (FIFRA SAP 1999a).  Thus, the SAP was not critical of the guideline-specified