## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE,** *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>**U.S. ENVIRONMENTAL PROTECTION AGENCY** and **STEPHEN L. JOHNSON,** Administrator, Environmental Protection Agency, )<br><br>Defendants. ) | Civil Action No. 05-1369 (RMU) |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ................................................................................3

I.    THE PRESENT LAWSUIT ................................................................3

II.    THE HELSTOSKY LAWSUIT ..........................................................4

III.    STATUTORY SCHEME FOR TENFOLD SAFETY FACTOR...................4

IV.    THE DNT GUIDELINES RESULT IN UNRELIABLE,
UNCERTAIN AND IRRELEVANT DATA THAT
CANNOT SUPPORT DEVIATION FROM THE TENFOLD
SAFETY FACTOR ............................................................................5

LEGAL ARGUMENT ........................................................................................9

I.    COLLATERAL ESTOPPEL DOES NOT APPLY TO
ISSUE OF STANDING ......................................................................9

    A.    Collateral Estoppel Does Not Apply Because the
Facts and Allegations Relevant to Plaintiffs' Standing in
the Present Complaint Differ Significantly From Allegations
in the *Helstosky* case ..............................................................10

    B.    Dismissal Without Prejudice for Lack of Standing in the
Prior Action Was a Curable Defect That Has Been Cured in
the Present Complaint Such That Case May Proceed........................13

    C.    In the Event That the Court Accepts EPA's
Collateral Estoppel Argument, Preclusive Effect Should Not
be Applied as to Individual Plaintiffs as They Are Not in
Privity with the Plaintiffs in the Prior Action ...........................14

II.    PLAINTIFF'S COMPLAINT IN THE PRESENT ACTION
MAKES ADEQUATE ALLEGATIONS OF STANDING ........................16

    A.    Plaintiff's Have met Burden of Proof for Pleading
Standing Under Rule 12(b)(1)................................................16

B.   Plaintiff's Complaint Meets Each of the Three
     Requirements For Standing ...............................................................................17

III.   PLAINTIFF'S COMPLAINT CHALLENGES FINAL
       AGENCY ACTION ...........................................................................................19

IV.   PLAINTIFF'S CLAIMS ARE RIPE FOR JUDICIAL REVIEW ..............................22

## TABLE OF AUTHORITIES

### CASES                                                          Page(s)

*Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967)....................................................23

*Bates v. Rumsfeld,* 271 F.Supp.2d 54 (D.D.C. 2002) ..................................................17

*Bennett v. Spear,* 520 U.S. 154 (1997) ...........................................................17, 18, 20

*California v. Sanders*, 430 U.S. 99 (1977) ....................................................................23

*Canady v. Allstate Insurance Co.,* 282 F.3d 1005 (8th Cir. 2002) ...............................11

*Coalition for Underground Expansion v. Mineta,*
333 F.3d 193 (D.C.Cir. 2003)..........................................................................................17

*Crosky v. United States Office of Special Counsel,*
132 F.3d 1480 (D.C.Cir. 1997)........................................................................................11

*Crown Coat Front Co. v. United States,* 386 U.S. 503 (1967).......................................22

*Ethnic Employees of the Library of Congress v.*
*Boorstin,* 751 F.2d 1405 (D.C. Cir. 1985) ......................................................................15

*Fulani v. Bentsen,* 862 F. Supp. 1140 (S.D.N.Y. 1994) .................................................15

*GAF Corp.,* 818 F.2d 901 (D.C. Cir. 1987)....................................................................14

*Gill and Duffus Service, Inc. v. Islam,* 675 F.2d 404 (D.C. Cir. 1982)..........................15

*Haase v. Sessions,* 835 F.2d 902 (D.C.Cir. 1987) ........................................................17

*Helstosky v. EPA,* 2001 WL 799950 (D.C.Cir. 2001) ....................................................12

*Impro Products, Inc. v. Block,* 722 F.2d 845 (D.C. Cir. 1983),
*cert denied,* 469 U.S. 931 (1984)...................................................................................22

*In re Swine Flu Products*, 880 F.2d 1439 (D.C. Cir. 1989).............................................4

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ........................................16, 17, 18

*Media Technologies Licensing, LLC v.*
*Upper Deck Co.,* 334 F.3d 1366 (Fed. Cir. 2003) .........................................................15

*McLaughlin v. Bradlee*, 803 F.2d 1197 (D.C. Cir. 1986) ................................................13

*Montana v. United States*, 440 U.S. 147 (1979) ............................................................10

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ..............................................23

*Picardi v. Chicago Truck Drivers*, 581 F.Supp. 794 (N.D. Ill. 1983) ...........................11

*Reynolds v. The U.S. Capitol Police Board*,
357 F.Supp.2d (D.D.C. 2004) ........................................................................................13

*Spannus v. U.S. Department of Justice*, 824 F.2d 52 (D.C. Cir. 1987) .........................22

*Stebbins v. Keystone Insurance Co.*, 481 F.2d 501 (D.C. Cir. 1973) .............................14

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional*
*Planning Agency*, 322 F.3d 1064 (9th Cir. 2003) .........................................................13

*United States v. Stauffer Chemical Co.*, 464 U.S. 165 (1984)....................................9, 12

## STATUTES, RULES AND REGULATIONS

21 U.S.C. § 346a(b)(2)..............................................................................................1, 4, 5

40 C.F.R. § 799.9630 .........................................................................................................3

42 U.S.C. § 2851 ...........................................................................................................6, 21

44 U.S.C. § 3516 ..............................................................................................................21

5 U.S.C. § 551(4) ...............................................................................................................3

5 U.S.C. § 553(b) ...............................................................................................................3

70 Fed. Reg. 12275, (2005) ...............................................................................................7

OPPTS 870.6300.........................................................................................................3, 21

FIFRA, 7 U.S.C. § 136a(c)(7)(B)(C).............................................................................8, 21

Fed. R. Civ. Rule 41(b)....................................................................................................13

**MISCELLANEOUS**

*ICCVAM Guidelines for the Nomination and Submission of New,
Revised, and Alternative Test Methods, NIH Publication No: 03-4508* (2003) ..............................6

*A Set of Scientific Issues being Considered by the Agency in
Connection with the Use of FQPA 10X Safety Factors to
Address Special Sensitivity of Infants and Children to Pesticides,
Final Report,* Washington, DC (1998) .....................................................................................6

*Environmental Health Perspectives* 109 (Suppl. 1), 77-78 (2001)...................................................7

*Combined Report of the Hazard Identification Assessment Review
Committee and the FQPA Safety Factor Committee"*
(HIARC/FQPA SFC) (1998) ..........................................................................................8, 9

*Scientific Frontiers in Developmental Toxicology and
Risk Assessment.* Washington, DC: National Academy Press (2000) ...........................................9

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO EPA'S MOTION TO DISMISS

## INTRODUCTION

This case is centered around the decision by Congress in enacting the Food Quality Protection Act ("FQPA" or "the Act") to impose a tenfold safety factor on the exposure level of pesticides to children, in recognition of a child's increased risk due to his/her still developing nervous system.  In order to ensure that the U.S. Environmental Protection Agency ("EPA" or "Agency") would not deviate from this highly protective standard without an excellent scientific basis for doing so, Congress imposed a limitation within the statute that such deviations could only be made if they would be "safe."  The Act then defines "safe" as a **reasonable certainty that no harm will result from aggregate exposure**." 21 U.S.C. § 346a(b)(2)(ii) (Emphasis supplied.)

The underlying issue presented to this Court in Plaintiffs' complaint is EPA's violation of the Administrative Procedure Act ("APA") in flaunting the requirements of this statute.  EPA has adopted a series of tests constituting its "DNT Guidelines" for the detection of developmental neurotoxicity in pesticides and other chemicals, and it has used the results of these unvalidated (i.e., unproven reliability and relevance to humans) tests to weaken or even eradicate the tenfold safety factor in the FQPA with respect to certain pesticides.  The horrifying truth is that the DNT testing that EPA has utilized to increase pesticide exposure to children does not remotely satisfy the congressional mandate that the safety of increased exposure be determined to a "reasonable certainty."  Instead, EPA has based its decisions on imprecise, subjective, inaccurate, and unvalidated animal tests.

1

While EPA defends its DNT guidelines by stating that they "represent the best available science regarding DNT testing," that assertion (even if true) is completely irrelevant. The statutory standard is "reasonable certainty." If DNT is the best available science but it does not provide an adequate degree of certainty in its results, then the proper action under the statute is absolutely clear: EPA must maintain the tenfold safety factor. This requirement is unequivocal. The standard for deviation from the tenfold safety factor in the FQPA is not a preponderance of the evidence or a weighing of the evidence. The reasonable certainty required in the Act is more akin to a "beyond a reasonable doubt" standard of proof.

As set forth in Plaintiffs' complaint and in their earlier petition to the Agency, EPA's application of the DNT Guidelines in a manner that violates the FQPA has injured and continues to injure Plaintiffs, their members and their members' born and unborn children, as well as the individual Plaintiffs and their born and unborn children. Plaintiffs have standing to challenge these illegal actions by Defendants, and their cause of action is both final and ripe. It is up to this Court to reign in an agency that is disregarding congressional mandates, to enforce the law of this land, and to protect Plaintiffs from Defendants' harmful conduct.

<u>**FACTUAL BACKGROUND**</u>

**I.      THE PRESENT LAWSUIT**

On July 11, 2005, Plaintiffs PETA, PCRM, Trulie Ankerberg-Nobis, Robin Hummel and Jennifer Reilly filed a complaint in this Court challenging EPA's January 3, 2005 denial of their petition requesting that the Agency repeal its Developmental Neurotoxicity Test Guidelines ("DNT Guidelines"). Plaintiffs' petition requested the repeal of two DNT Guidelines, each of which constitutes a rule as defined by the APA, 5 U.S.C. § 551(4). The DNT Guideline

2

established pursuant to 40 C.F.R. § 799.9630 and related to the Toxic Substances Control Act shall be referred to as the TSCA DNT. The DNT Guideline adopted under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), identified as OPPTS 870.6300, shall be referred to as the FIFRA DNT. Plaintiffs petitioned for repeal of the TSCA and FIFRA DNT on the following grounds: i) that they produce data of unproven reliability and relevance to humans, and therefore constitute unsound science, and ii) that they were adopted without notice and comment rulemaking in violation of § 553(b) of the APA.

Additionally, Plaintiffs' complaint sets forth in detail the injuries and risks of injury sustained by individual Plaintiffs and their born and unborn children, including their specific exposures, in the past and in the future, to unduly high levels of pesticides in agricultural and other environments. (See Complaint ¶¶ 9-21). For example Ms. Hummel alleges that she "grew up on a farm in Ohio where pesticides were used on crops such as soybeans, corn, and wheat, and she takes her family back to the farm two or three times a year," and that she "is concerned about the exposure to pesticides that she and her children have received and continue to receive at her family's working farm." (Complaint ¶ 18). Each individual Plaintiff made similar allegations.

## II. THE HELSTOSKY LAWSUIT

In 1991, PETA, PCRM and Carol Helstosky filed a complaint in the District of Columbia U.S. Court of Appeals. That complaint was different from the present complaint in many significant ways. For instance, the *Helstosky* complaint was not based on any previously filed petition, it did not challenge the application of the DNT Guidelines by EPA to deviate from the Tenfold Safety Factor, it did not challenge the FIFRA DNT Guidelines, but only the TSCA DNT Guidelines, and it made bare-bones allegations regarding the plaintiffs' injuries, the causation of

those injuries by EPA's challenged conduct and redressability.  Accordingly, the court dismissed

without prejudice[1] the *Helstosky* complaint for lack of standing.

## III.    STATUTORY SCHEME FOR TENFOLD SAFETY FACTOR

The Tenfold Safety Factor was established by Congress under the Food Quality

Protection Act of 1996 ("FQPA")(PL 104-170, August 3, 1996, which in relevant part amended

21 U.S.C. § 346a).  Prior to enactment of the FQPA, the Federal Food, Drug, and Cosmetic Act

at 21 U.S.C. § 346a required EPA to set tolerances for pesticides residues on food, but mandated

no special treatment for infants and children.  Congress enacted the FQPA in recognition of the

fact that children (*in utero*, nursing, or at any stage before their nervous systems are fully

developed) may be more susceptible than adults to chemical insult.  Thus, as amended,

§ 346a(b)(2)(A)(i) provides that:

> The [EPA] Administrator may establish . . . a tolerance for a pesticide
> chemical residue in or on food only if the Administrator determines that the
> tolerance is safe.

§ 346a(b)(2)(C) provides that:
Exposure of infants and children

> In establishing, modifying, leaving in effect or revoking a tolerance or
> exemption from a pesticide chemical residue, the Administrator—

> (ii) shall—
> (I) ensure that there is a **reasonable certainty that no harm will result to
> infants and children from aggregate exposure to the pesticide chemical
> residue; and**

> * * *

> In the case of threshold effects, for purposes of clause (ii)(I) **an additional
> tenfold margin of safety for the pesticide chemical residue shall be applied**

---

[1] *See In re Swine Flu Products,* 880 F.2d 1439, 1442 (D.C. Cir. 1989) (*citing* C. Wright & A. Miller, *Federal Practice and Procedure* §2373 at 237 (1971 & 1988 Supp.) ("dismissals that do not reach the merits as for want of jurisdiction . . . must be **without prejudice**").

**for infants and children** to take into account potential pre- and post-natal toxicity and completeness of data with respect to exposure and toxicity to infants and children. Notwithstanding such requirements for an additional margin of safety, the Administrator may use a different margin of safety for the pesticide residue only if, on the basis of reliable data, such margin will be safe for infants and children. [Emphasis supplied.]

The statute defines "safe" at 346a(b)(2)(ii):

> [T]he term "safe," . . . means the Administrator has determined that there is a **reasonable certainty that no harm will result** from aggregate exposure. [Emphasis supplied.]

Thus, EPA is required by this statutory scheme to set exposure limits for children that are ten times stricter (hereinafter the "Tenfold Safety Factor") than adult levels, unless the Agency could determine to a "**reasonable certainty that no harm will result**."

## IV.    THE DNT GUIDELINES RESULT IN UNRELIABLE, UNCERTAIN AND IRRELEVANT DATA THAT CANNOT SUPPORT DEVIATION FROM THE TENFOLD SAFETY FACTOR

The testing methodology set forth in EPA's DNT Guidelines leads to test results that are uncertain and of dubious reliability and relevance to the real-world effects in the species of concern (i.e., human beings). In order to prevent these types of unvalidated tests from being used by federal agencies, Congress specifically mandated, through creation of the permanent Interagency Coordinating Committee on the Validation of Alternative Methods (ICCVAM), that:

> [E]ach federal agency . . . shall ensure that any new or revised acute or chronic toxicity test method, including animal test methods and alternatives, is determined to be valid for its proposed use prior to requiring, recommending, or encouraging the application of such test method.

42 U.S.C. § 285l-4(c). "Validation" is defined by ICCVAM and its international counterparts as "the process by which the reliability and relevance of a procedure are established for a particular purpose" (*ICCVAM Guidelines for the Nomination and*

5

*Submission of New, Revised, and Alternative Test Methods – NIH Publication No: 03-4508*. Research Triangle Park, NC, USA: ICCVAM/ NICEATM. (2003)).  EPA's own Scientific Advisory Panel (SAP) has likewise emphasized:

> [T]hat any new test guideline adopted by the Agency requires validation. This entails producing reproducible results among laboratories and selection of endpoints in test animals that are applicable to humans.

SAP. *A Set of Scientific Issues being Considered by the Agency in Connection with the Use of FQPA 10X Safety Factors to Address Special Sensitivity of Infants and Children to Pesticides – Final Report*. Washington, DC (March 1998).

Despite these requirements of validation, EPA has chosen to use unvalidated tests in its DNT Guidelines.  As a result, the DNT Guidelines have produced and continue to produce flawed results for the following reasons, among others: (1) the extreme variability that has been found in different laboratories attempting to replicate testing, (2) the relevance problems of relating animal-based tests to human risk assessment due to differences between species in chemical processing, strain sensitivity, developmental-pattern-dependent exposure, toxicokinetics, (3) dosing methods that induce maternal toxicity and impair maternal care and the inability to determine the amount of a chemical actually reaching a fetal or nursing pup, (5) lack of specificity in behavioral tests, (6) subjectivity of behavioral tests, and (7) a limited understanding of the morphological basis of neurobehavioral disorders.

In an attempt to overcome some of these well-known and serious limitations, EPA turned to the International Life Sciences Institute (ILSI) for assistance.  ILSI's Risk Science Institute responded by convening a working group of experts from government, industry, academia and the public interest sector to review these issues (Mileson BE and Ferenc SA. Methods to identify and characterize developmental neurotoxicity for human health risk assessment: overview.

6

*Environmental Health Perspectives* 109(Suppl. 1), 77-78 (2001)).  The report of the ILSI

working group on behavioral effects was particularly enlightening, noting, among other things,

that "…there are numerous examples of the misuse of these methods and misinterpretation of

results derived from these methods" (Cory-Slechta DA, Crofton KM, Foran JA, Ross JF, Sheets

LP, Weiss B and Mileson B. Methods to identify and characterize developmental neurotoxicity

for human health risk assessment: Behavioral effects. *Environmental Health Perspectives*

109(Suppl. 1), 79-91 (2001)).  Clearly, the DNT Guidelines do not produce results that could be

considered "reasonably certain."

Notwithstanding the significant flaws in this test method, EPA is requiring DNT testing

with ever increasing frequency as a condition of registration and re-registration, and possibly as a

new "conditional requirement" for all conventional pesticide chemicals (70 Fed. Reg. 12275,

March 11, 2005)).  For example, in 1991, EPA issued a data call-in ("DCI") for organophosphate

pesticides ("OP") which made DNT testing requirements over and above those previously

required.  (Footnotes and Key Definitions for Guideline Requirements, DCI Number: GDCI-

059301-NNNNN).  More recently, EPA has required DNT studies as a specific condition of

conditional pesticide registrations under FIFRA §§ 3(c)(7)(B) and 3(c)(7)(C) (See PETA and

PCRM's Petition  Exhibit 9).  Further, EPA has used DNT test results to justify allowing

children (those in the womb, nursing infants, and growing children) to be exposed to pesticide

levels many times higher than the statutory Tenfold Safety Factor.

Congress' mandate to EPA was to set exposure limits for children that were ten-times

stricter than adult levels, unless the Agency could determine to a "**reasonable certainty that no**

**harm will result**."  In practice, EPA has used the DNT and the results of other non-validated

animal tests to set pesticide tolerances and other permissible exposure levels for children that are

marginally or no safer than the adult standard.  For example, the August 6, 1998 "*Combined Report of the Hazard Identification Assessment Review Committee and the FQPA Safety Factor Committee*" (HIARC/FQPA SFC) recommended, with respect to 37 organophosphate pesticides, that the Tenfold Safety Factor be removed entirely for 18 substances, retained for 9 substances, and reduced to three-fold for 10 substances.  EPA takes these actions though it is well aware that DNT testing barely qualifies as "scientific," and is fraught with so many uncertainties and problems that its use to establish "reasonable certainty" is, beyond reasonable dispute, arbitrary and capricious.

The DNT Guidelines and the data gathered through their use are inextricably linked to EPA's decision-making in connection with the Tenfold Safety Factor.  EPA has taken the position that unless DNT testing is performed for a selected chemical, a "gap" exists in the toxicity database and the Agency will most likely apply the Tenfold Safety Factor (i.e., "the uncertainty related to the absence of a developmental neurotoxicity study makes it appropriate to apply a FQPA safety factor for acute and chronic dietary and non-dietary risk assessments for the general population including infants and children" (HIARC/FQPA SFC, 1998)).  **Thus, in the absence of the DNT Guidelines, EPA would require compliance with the FQPA, and Plaintiffs would be far better protected from the developmental neurotoxic effects of pesticides.**

The DNT Guidelines, as employed by EPA, expose America's children and adults to substantially higher levels of pesticides—and potentially increased health risks—than Congress intended when enacting the FQPA.  Since the DNT Guidelines have not been proven to reliably predict developmental neurotoxicity in humans, EPA is, in truth and in fact, allowing adverse developmental outcomes to be identified through chemical exposure to human children.  This is

8

unacceptable—particularly in light of the National Research Council's (NRC) recent finding

that "3% of developmental disabilities are the direct consequence of neurotoxic environmental

exposures, and that another 25% arise out of the interplay of environmental factors and

individual genetic susceptibility" (NRC. *Scientific Frontiers in Developmental Toxicology and*

*Risk Assessment.* Washington, DC: National Academy Press (2000)).  By means of this lawsuit,

Plaintiffs attempt to protect themselves and their children from these dangers.

## LEGAL ARGUMENT

## I.    COLLATERAL ESTOPPEL DOES NOT APPLY TO ISSUE OF STANDING

While Defendants are correct in reciting the general rule that collateral estoppel applies to

prevent relitigation of the same issue that has already been litigated against the same party in

another case involving virtually identical facts, *see United States v. Stauffer Chemical Co.,* 464

U.S. 165 (1984) (defining collateral estoppel); *see generally* EPA's Motion to Dismiss at 13,

Defendants err in their attempt to squeeze the current case into that rule for several reasons.

First, the facts related to the Article III standing of the five plaintiffs in the current case are

significantly different than the standing allegations made by the three plaintiffs in the previous

*Helstosky* case.  Not only do the three new, individual plaintiffs in this action set forth their own

unique allegations of standing and injury that are completely different from any allegations in the

prior complaint, but also the crucial facts surrounding the DNT Guidelines themselves have

changed.

Secondly, collateral estoppel does not apply to the present case, as the jurisdictional

defect that led to a dismissal **without prejudice** in the *Helstosky* case was a curable defect, and

that defect has been cured.  Thirdly, even if the Court agrees that collateral estoppel should apply

to PETA and PCRM because they were plaintiffs in the prior case, the court cannot dismiss this

case on the grounds of collateral estoppel against the individual plaintiffs, as they were neither

plaintiffs in the prior action nor in privity with the prior parties.

**A.    Collateral Estoppel Does Not Apply Because the Facts and Allegations Relevant to Plaintiffs' Standing in the Present Complaint Differ Significantly From Allegations in the *Helstosky* Case**

The Supreme Court has held that in determining whether collateral estoppel should apply

to an issue presented in one litigation that is in substance the same as an issue resolved in a prior

litigation, a court must determine whether controlling facts or legal principles have changed

significantly since the prior litigation. *See Montana v. United States,* 440 U.S. 147, 155 (1979);

*see generally* Restatement (Second) of Judgments § 28 (1982) (listing change in controlling facts

and legal principles as exceptions to issue preclusion).  As stated above, the facts set forth in

Plaintiffs' complaint in the instant action that relate to the issue of standing are significantly

different than the standing allegations dismissed in the *Helstosky* case.  Despite EPA's exclusive

focus in their Memorandum in Support of their Motion to Dismiss on the allegations made by

PETA and PCRM in the complaint in the *Helstosky* case, the Court must do more than look at

those prior allegations and determine that the *Helstosky* Court did in fact rule that standing was

inadequately pled.  Instead, the Court must look at those prior allegations and compare them to

the allegations made in the present complaint and determine whether they are the same in all

legally and factually significant ways.  If they are not, collateral estoppel should not apply.  *See*

*Crosky v. United States Office of Special Counsel,* 132 F.3d 1480 (D.C.Cir. 1997) (unpublished)

(holding that two actions are sufficiently different such that collateral estoppel should not apply

after conducting detailed comparison of factual allegations and legal issues in first and second

actions); *Canady v. Allstate Insurance Co.,* 282 F.3d 1005, 1015 (8th Cir. 2002)(holding that

collateral estoppel should apply to issue of standing only after "side-by-side review" of first and

10

second complaints revealed that parties, factual allegations and causes of action in two cases were identical).

A comparison of the two complaints at issue here reveals that there are many factual and legal differences relevant to the issue of standing.  For example, there are three new individual plaintiffs who set forth a great variety of standing allegations related to their personal risks of harm and how those injuries are caused by the DNT Guidelines.  (See Complaint at ¶¶ 15-21).  Meanwhile, the *Helstosky* complaint set forth only a skeletal assertion regarding the single individual plaintiff in that case (who is not a plaintiff in the instant litigation).  In *Picardi v. Chicago Truck Drivers,* 581 F.Supp. 794, 799 (N.D. Ill. 1983), the court concluded that two causes of action were not the same for preclusion purposes because of the inclusion of a new party.

> [T]he inclusion of Peter Shannon and Co. brings in a new set of facts not present in the [prior] litigation.  These facts are necessary to the [plaintiffs'] claim and must be addressed.  Thus, under the classic tests for . . . *res judicata* purposes, the claims in the [prior] suit do not address the entire scope of the claims in the *Picardi* case and, therefore, the causes of action are not the same.

*Id.*

Moreover, in the *Helstosky* complaint, the plaintiffs only challenged the TSCA DNT Guidelines.  In the current complaint, Plaintiffs also challenge the FIFRA DNT Guidelines.  Additionally, at the time of the *Helstosky* case, the DNT Guidelines had not been used by the EPA.  The plaintiffs in the prior case simply challenged the harm that they anticipated would result from the Guidelines, and the *Helstosky* court determined that the alleged injuries were not "traceable" to the Guidelines and were "too attenuated" to establish standing.  *See Helstosky v. EPA,* 2001 WL 799950 (D.C. Cir. 2001) (Attachment 2 to EPA's MTD).  However, in the over four years since the earlier suit, the EPA has implemented the FIFRA DNT Guideline in dozens

of instances via "data call-ins" and as a condition of pesticide registration and reregistration and, as alleged in Plaintiffs' present complaint, application of the DNT Guidelines has brought about very real and traceable injuries. (See Complaint at ¶¶ 3, 5, 9-21). Importantly, these factual differences are of legal significance in resolving the issue of standing. *See United States v. Stauffer Chemical Co.,* 464 U.S. at 172 (stating that factual differences of legal significance in resolving the issue presented in both cases prevents application of collateral estoppel). The very elements that were found missing (and fatal to plaintiffs' suit) on the issue of standing by the *Helstosky* court—the attenuated nature of any link between the Guidelines and the plaintiffs' claims of harm and the resulting uncertainty of redress from a favorable decision—are the very facts that are newly present and asserted in the instant complaint. It is this distinction between potential harm that may, but has not occurred from an enacted rule that has yet to be applied, and the actual harm that flows after implementation that often prevents the issue preclusion of an "as-applied challenge" to a regulation by an earlier "facial challenge." *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 322 F.3d 1064, 1080 (9th Cir. 2003).

**B.      Dismissal Without Prejudice for Lack of Standing in the Prior Action Was a Curable Defect That Has Been Cured in the Present Complaint Such That Case May Proceed**

While the complaint in the *Helstosky* case was dismissed for lack of standing, this dismissal was properly made without prejudice. This is because a jurisdictional basis for dismissal, such as standing, is a curable defect. The dismissal is made without prejudice so that the parties may refile their action should the relevant facts change and cure the defect. That is precisely what has happened in this case, and collateral estoppel cannot be used to prevent Plaintiffs from having their day in court now that that day has properly arrived. Defendants are

12

correct in pointing out that "[w]here there is mutuality of parties . . . a dismissal for lack of jurisdiction will . . . preclude litigation of the precise issues of jurisdiction that lead to the dismissal in the previous case . . . [w]here the jurisdictional issue was 'actually litigated' . . . and then 'actually and necessarily determined by a court of competent jurisdiction' . . .." *Reynolds v. The U.S. Capitol Police Board,* 357 F.Supp.2d 2, 10 (D.D.C. 2004) (quoting Fed. R. Civ. P. Rule 41 and *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201-02 (D.C. Cir. 1986)).

It is unfortunately the case, however, that Defendants disclose only part of the rule governing the preclusion of jurisdictional issues. The court in *Reynolds* continues:

> However, a claim of jurisdiction will not be precluded if subsequent to the initial dismissal there are developments tending to cure the identified jurisdictional deficiency. The 'curable defect' exception may apply where a precondition requisite to the court's jurisdiction in the previous suit was not alleged or proven, and is raised in the second suit.

*Id.* (citing *Fed. R. Civ. P. Rule* 41(b)).

Moreover, the preclusive effect of the first jurisdictional judgment does not include matters that **could have been raised but were not**, as would the preclusive effect of a judgment on the merits. *See GAF Corp.,* 818 F.2d 901, 913 (D.C. Cir. 1987). Therefore, any new allegations made in Plaintiffs' instant complaint must be considered in determining whether the prior standing defects have been cured (or changed in a legally significant way), even if those allegations could have been made in the *Helstosky* complaint.

Furthermore, if there are multiple grounds upon which the prior court dismissed the action and any one of them was a curable defect, then none of the grounds can be given preclusive effect in a later action. *See Stebbins v. Keystone Insurance Co.,* 481 F.2d 501, 508 (D.C. Cir. 1973). This is because of the settled rule that collateral estoppel applies only to matters that have been actually litigated. If this were not the case, a party to a suit who knows

13

that it might easily remedy a defect in its case, such as by exhausting a non-judicial remedy or

waiting until an alleged uncertain chain of events actually happens, would have to fully litigate

each and every issue in the case solely for the purpose of avoiding collateral estoppel as to those

issues. *See id.* (holding that collateral estoppel is not applicable where one ground of judgment

does not finally adjudicate a case on its merits but acts like plea in abatement, to permit further

litigation upon appropriate refiling).

C.    **In the Event That the Court Accepts EPA's Collateral Estoppel Argument,**
      **Preclusive Effect Should Not be Applied as to Individual Plaintiffs as They Are Not**
      **in Privity with the Plaintiffs in the Prior Action**

      The individual plaintiffs in the instant action are not in privity with the plaintiffs in the

prior action, PETA, PCRM and Dr. Helstosky.  These plaintiffs do not meet the test for an

application of collateral estoppel based on privity, as they did not "participate[] in the control of

[the prior] action, individually or in cooperation with others, to establish and protect some

proprietary or financial interest of his own."  *Gill and Duffus Service, Inc. v. Islam,* 675 F.2d

404, 406 (D.C. Cir. 1982)(citation omitted).  The individual plaintiffs in the present action are

asserting different rights and interests than were asserted by the plaintiffs in the *Helstosky* action.

Further, there are different attorneys representing the plaintiffs in the first action and Plaintiffs in

the present action.  *Cf. Fulani v. Bentsen,* 862 F. Supp. 1140, 1148 (S.D.N.Y. 1994)(pointing to

fact that first and second groups of plaintiffs were represented by the same attorney as bolstering

conclusion that the interests represented in both actions was identical).

      Additionally, privity does not exist between the individual plaintiffs in these two cases as

it would not be fair and reasonable for Ms. Hummel, Ms. Reilly and Ms. Ankerberg-Nobis to be

precluded from asserting their rights in the instant action because organizations—that they were

not even members of at the time—were unsuccessful in asserting (for sake of this argument) the

14

same or similar right in a prior adjudication.  *See id.*  Generally, those cases that have based

preclusion on virtual representation, as EPA attempts to do here, "have involved special factors

such as 'substantial elements of participation in the first litigation, apparent consent to be bound,

apparent tacit maneuvering, or close relationships between parties,' such as that between family

members."  *Ethnic Employees of the Library of Congress v. Boorstin,* 751 F.2d 1405, 1411 (D.C.

Cir. 1985)(quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §4457

at 498-99 (1981).  The individual plaintiffs in the present case did not participate in the *Helstosky*

litigation in any way, as they were not even aware of the litigation or members of the plaintiff

organizations at the time of that case.  *Cf. Media Technologies Licensing, LLC v. Upper Deck

Co.,* 334 F.3d 1366, 1370 (Fed. Cir. 2003)(holding that it was impossible for two corporate

parties to have been in privity due to virtual representation at time of prior litigation because one

of the corporate parties did not even exist at that time).

## II.    PLAINTIFFS' COMPLAINT IN THE PRESENT ACTION MAKES ADEQUATE ALLEGATIONS OF STANDING

Defendants argue that even if collateral estoppel does not apply to bar Plaintiffs' suit, that

Plaintiffs' lack standing in the present case as well.  However, in making this assertion,

Defendants fail to actually address the legal and factual allegations in Plaintiffs' **current

complaint**.  Instead, Defendants assume that the complaint in this action is identical to the

complaint in the *Helstosky* case.  Defendants then quote from the court's decision in *Helstosky*

regarding the plaintiffs' lack of standing in that case.  As set forth above, there are significant

legal and factual differences between these two complaints.  An application of the standing

requirements to the present complaint will show that Plaintiffs have made more than adequate

allegations for a finding of standing.[2]

A.    **Plaintiffs Have Met Burden of Proof for Pleading Standing Under Rule 12(b)(1)**

In this case, Plaintiffs' complaint completely satisfies the standing requirements imposed

by the case or controversy provision of Article III because (1) Plaintiffs have suffered an injury

in fact—an invasion of a judicially cognizable interest which is (a) concrete and (b) actual or

imminent, not conjectural or hypothetical; (2) there is a causal connection between the injury and

the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable

decision. *See Bennett v. Spear,* 520 U.S. 154, 167 (1997)(*citing Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560-61 (1992)).  In evaluating whether Plaintiffs have adequately pled standing in

the instant case, the Court must consider the appropriate burden of proof upon a motion to

dismiss—"which is relatively modest at this stage of the litigation." *Id.* at 171.  Moreover, "[f]or

purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing

courts must accept as true all material allegations of the complaint, and must construe the

complaint in favor of the complaining party." *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.

1987)(citation omitted).

In appropriate circumstance, such as here, the court may "dispose of a motion to dismiss

for lack of subject matter jurisdiction under Fed. R. Civ. P 12(b)(1) on the complaint standing

---

[2] Furthermore, the Supreme Court has long-since established that there are different requirements for standing with respect to claims based on procedural rights.  "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 (1992).  Therefore, one living adjacent to the site for a proposed construction project has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though that person cannot establish that the statement will definitely defeat the construction project and even though the project will not be completed for several years *See id.*  Therefore, in the instant case, Plaintiffs do not have to show that EPA's reconsideration of their petition will definitely result in a repeal of the DNT Guidelines.

alone." *Coalition for Underground Expansion v. Mineta, 3*33 F.3d 193, 198 (D.C. Cir. 2003). If necessary, the court may consider the complaint as supplemented by undisputed facts evidenced in the record, as well as the court's resolution of disputed facts, *see id*., but "[t]he court should only consider such additional evidence 'to assure itself of the existence of standing.'" *Bates v. Rumsfeld,* 271 F.Supp.2d 54, 60 (D.D.C. 2002) (*quoting Haase,* 835 F.2d at 907). Thus, the Court's determination of the issue of standing in this case should be satisfied by an examination of the allegations in Plaintiffs' complaint, all of which should be accepted as true.

**B.    Plaintiffs' Complaint Meets Each of the Three Requirements for Standing**

Given Plaintiffs' allegations that they, individually, their children, or their members and their children have been exposed to unlawfully high levels of pesticides and that they will be adversely affected thereby, the complaint alleges the requisite injury in fact. As stated by the Supreme Court: "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife,* 504 U.S. at 561 (*quoting Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990)).

Plaintiffs also meet the second standing requirement of a causal connection between their injuries and Defendants' wrongdoing or, stated differently, that their injuries be "fairly traceable" to the challenged DNT Guidelines. Plaintiffs have set forth in their complaint in great detail how the DNT Guidelines and their inaccurate tests for developmental neurotoxicity have been used to increase to unlawfully high levels the amount of pesticides permitted on the very foods that Plaintiffs consume. As the Guidelines have now been used to reduce the congressionally-mandated tenfold safety factor for many pesticides, exposing the unborn, developing infants and

17

children, to developmental neurotoxicants, there is no longer anything hypothetical about the

causal connection between the improper DNT Guidelines and the injuries alleged by Plaintiffs.

Any argument by Defendants to the contrary would be to "wrongly equate[] injury "fairly

traceable" to the defendant with injury as to which the defendant's actions are the very last step

in the chain of causation.  While it does not suffice if the injury complained of is 'th[e] result [of]

the *independent* action of some third party not before the court,' that does not exclude injury

produced by determinative or coercive effect upon the action of someone else." *Bennett,* 520

U.S. at 168 *(quoting Defenders of Wildlife,* 504 U.S. at 560-61).  Just as in *Bennett*, Plaintiffs

have alleged (and at the appropriate time will prove) that while Defendants argue that the DNT

Guidelines serve an advisory function, "in reality [they have] a powerful coercive effect on the

actions" of the pesticide manufacturers in performing the tests and on EPA to raise tolerances for

certain pesticides.  *See id.* at 169.

In light of the direct link between the DNT Guidelines and the EPA's determinations to

increase the permissible level of certain pesticides in food, it is more than likely that Plaintiffs'

injuries (increased exposure to harmful pesticides) will be redressed by repeal of those

guidelines.  Accordingly, Plaintiffs satisfy the third standing requirement as well.  As Plaintiffs

allege in their complaint, the DNT test—as set forth in the guidelines—is unreliable and

definitely does not provide the "reasonable certainty" required by FQPA for reduction of the

tenfold safety factor for certain pesticides.  If EPA's response to PETA and PCRM's petition is

reversed by this Court, then EPA would be required to abide by the tenfold safety factor until a

test is conceived and validated that truly provides "reasonable certainty" as to the safety of a

different tolerance level.  These actions would, indeed, protect Plaintiffs from the risks of harm

that they assert in this suit, providing them with the redress necessary for a finding of standing.

18

Accordingly, the three requirements for standing have been met, and Defendants' motion to dismiss on the basis of standing should be denied.

## III.    PLAINTIFFS' COMPLAINT CHALLENGES FINAL AGENCY ACTION

In an effort to deny that the DNT Guidelines constitute final agency action, EPA attempts to characterize its FIFRA and TSCA DNT Guidelines as advisory or optional.  However, as Plaintiffs clearly allege in their complaint,[3] this is absolutely not the case: EPA requires DNT testing by means of the DNT Guidelines.  "EPA has taken the position that unless DNT testing is performed for a selected chemical, a 'gap' exists in the toxicity database and the Agency will apply the Tenfold Safety factor . . . ." (Complaint at ¶ 4).  Specifically, the DNT Guidelines are not only the "consummation" of the Agency's decisionmaking process on this issue, but also an action by which "rights or obligations have been determined" and from which "legal consequences will flow." *See Bennett v. Spear,* 520 U.S. 154, 178 (1997).  Much like the Biological Opinion challenged by the plaintiffs in the *Bennett* case, EPA's issuance and application of the DNT Guidelines has "alter[ed] the legal regime to which the [chemical companies and their pesticides] are subject." *Id.*  Thus, they constitute final agency action.

Defendants assert that while there are "cases where a particular kind of data is required, there is no particular testing protocol that must be used to generate such data." (Motion to Dismiss at 23)  In other words, EPA attempts to convince the Court that while DNT test results are required, and guidelines have been issued setting forth the protocol for DNT testing, there is no requirement that their DNT testing protocol be followed.  This assertion contradicts several allegations in the complaint, including allegations in paragraphs 1, 4, 5, 27 and 77.  For example,

---

[3] It is settled law that in considering an issue on a motion to dismiss, a court must accept the allegations in the complaint as true and must construe all material allegations in the complaint in favor of the plaintiff.

the complaint states that "EPA issued a data call-in for organophosphate pesticides, which imposed several new requirements for DNT testing over and above those prescribed in published DNT Guidelines . . .. Consequently, 'anyone who plans to conduct a DNT study really must address the requirements instituted via the DCI notice for the OPs because that represents the new standard.'"  (Complaint ¶ 27)  Further, Plaintiffs allege that "the Agency stated that the FIFRA DNT is intended to be non-binding and that the Guideline will be reviewed in order to assure that this intent is adequately communicated.  EPA further responded that while the TSCA DNT is written in mandatory language, this does not make it mandatory and that, in any event, public notice and comment was not required because it was 'unnecessary.' (EPA Response at 14-16).  EPA may not deviate from the APA by claiming that the DNT Guidelines are not rules, when the Agency makes use of them mandatory."  (Complaint ¶ 77)

Furthermore, Plaintiffs' complaint alleges that an EPA test rule, data call-in, or data requirement pursuant to FIFRA 7 U.S.C. § 136(a)(c)(7)(B) or (C) is inextricably linked to the methodology prescribed for generating the desired data (i.e., a test guideline).  It defies common sense—to say nothing of EPA's statutory obligations to control the quality and reliability of the data upon which it relies pursuant to both the Data Quality Act, 44 U.S.C. § 3516 and the ICCVAM Authorization Act, 42 U.S.C. § 2851— that EPA would order dozens of registrants to submit data on a highly complex toxicity endpoint without requiring them how to gather and report the desired data pursuant to a particular protocol.  This truth is borne out by EPA's repeated demands to chemical manufacturers for data compiled pursuant to the DNT Guidelines.[4]

---

[4] For example, a Data Call-In in 1999 on 39 Organophosphate pesticides made explicit reference to OPPTS 870.6300 as the methodology to be used (i.e., EPA's summary DCI table includes a column that asks: "Was GDLN

Moreover, EPA is completely wrong in suggesting that the DNT Guidelines are akin to the types of agency actions that the courts have determined not to be final. The Supreme Court has found that these types of actions serve "more like a tentative recommendation than a final and binding determination," or that they are "purely advisory." *See id.* (citations omitted). Much to the contrary, Plaintiffs have made numerous allegations regarding the obligations imposed by the DNT Guidelines, as well as the legal consequences that flow from them. (*See* Complaint ¶¶ 3-5, 27-29, 67-68). For example, as the very opening to Plaintiffs' complaint, they allege that "EPA is requiring DNT testing with ever increasing frequency (e.g., as a condition of registration and re-registration, and possibly as a new "conditional requirement" for all conventional pesticide chemicals." (Complaint ¶ 1).

Accordingly, as borne out by the facts, Plaintiffs' allegations in their petition to the Agency, and in their complaint, the DNT Guidelines determine rights or obligations, and they have legal consequences. This is true because DNT testing is conditionally required for registration of new pesticides, for reregistration of existing pesticides, and in order for a pesticide chemical to be used at levels that result in a deviation from the Tenfold Safety Factor. Thus, Plaintiffs' complaint challenges final agency action, and Defendants' motion to dismiss must fail on this ground.[5]

---

No 870.6300 or 870.3700 a requirement? Y or N"). Another example that the DNT Guidelines are mandatory are the conditions imposed on conditional registrations issued under FIFRA §§ 3(c)(7)(B) and 3(c)(7)(C), which often identify the OPPTS test guideline associated with a particular data requirement. Moreover, Reports of EPA's Hazard Identification Assessment Review Committee (Office of Pesticide Programs, Health Effects Division) has often recommended a DNT study according to 870.6300, but has also been called upon to "'rescind the requirement for a developmental neurotoxicity study of unproven design since the DNT is not designed to identify the endpoints mentioned"—a request that was ultimately granted. This action by EPA further reinforces the interconnectedness of the DNT test guidelines and EPA's data requirements.

[5] Defendants have placed a stray statute of limitations argument into their discussion of final agency action with respect to the FIFRA DNT Guideline. (Defendants' Motion to Dismiss at 23). This argument is without merit as Plaintiffs' cause of action did not accrue, and, therefore, the time period for the statute of limitations did not

IV.     **PLAINTIFFS' CLAIMS ARE RIPE FOR JUDICIAL REVIEW**

Plaintiffs' claims are clearly ripe for judicial review, and Defendants' assertions to the

contrary are without merit.  In order to evaluate Plaintiffs' claims for ripeness, one must first

look at the complaint to determine the dispute at issue.  Here, the underlying dispute is the use by

EPA of the unvalidated DNT testing as a basis for increasing pesticide exposure to children

without meeting the "reasonable certainty" standard in the FQPA.  A simple reading of

Plaintiffs' allegations reveals, without a doubt, that this adjudication is not "premature," nor does

it involve "abstract disagreements over policies." *Abbott Laboratories v. Gardner,* 387 U.S. 136,

148 (1967)(reversed on other grounds, *California v. Sanders*, 430 U.S. 99(1977)).  In fact, the

DNT test results have been used by EPA to reduce protections for children that were put into

place by Congress, whereas the Agency is much less likely to deviate from the statutory tenfold

safety factor in the absence of DNT data.  Nothing more needs to happen in order to make

Plaintiffs' claims ripe.  What Plaintiffs are complaining about has happened and is continuing to

happen at this time.  The factual context within which the Court will conduct its analysis is to

look at the reliability and relevance to humans of DNT test results, the way EPA has used the

DNT Guidelines, and whether DNT test results provide EPA with the "reasonable certainty" that

legally allows it to reduce congressionally-mandated protections against pesticides for

developing children.  As this case goes forward, records will be readily available regarding (1)

how many and what specific pesticides have been tested for DNT, (2) the results of those tests,

---

commence on the date the  FIFRA DNT guideline was issued, but at the time Defendants implemented the guideline in a manner that injured Plaintiffs.  *See Spannus v. U.S. Department of Justice,* 824 F.2d 52, 56 (D.C. Cir. 1987) ("cause of action against an administrative agency 'first accrues'   . . .  as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court.") (citing *Crown Coat Front Co. v. United States,* 386 U.S. 503, 510-11 (1967); *Impro Products, Inc. v. Block,* 722 F.2d 845, 850 (D.C. Cir. 1983), *cert denied,* 469 U.S. 931 (1984).

(3) expert analysis of the reliability of those results and their relevance to human beings, and (4) the Agency action taken because of those results. These concrete facts exist. These facts and others will provide the context for the Court's analysis, and they clearly indicate the "fitness of the issues for judicial decision." *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998)

Furthermore, Plaintiffs would suffer considerable hardship should the Court withhold its consideration of Plaintiffs' case at this time. Indeed, Plaintiffs are currently suffering from Defendants' wrongful actions that expose Plaintiffs' members, their born and unborn children, and individual Plaintiffs and their born and unborn children to levels of pesticides that have not been determined by a validated test and, therefore, to a degree of reasonable certainty, to be safe. Plaintiffs have attempted to convince Defendants by means of their administrative petition about this danger. However, Defendants arbitrarily and capriciously denied Plaintiffs' petition. Plaintiffs now turn to this court to protect them from Defendants' wrongful acts. Plaintiffs would suffer great hardship if the Court does not intervene. This is the very definition of a ripe case or controversy, and Defendants' motion to dismiss on this ground should be denied.[6]

DATED: October 25, 2005

Respectfully submitted,

_____
Daniel Kinburn
Karen Boyd Williams
PHYSICIANS COMMITTEE FOR

---

[6] In response to Defendants section V in their motion to dismiss entitled "EPA Tolerance Decisions Cannot Be Reviewed By This Court," Plaintiffs need only state that they have no intention in this suit to challenge EPA tolerance decisions under 21 U.S.C. § 346a(h).

23

RESPONSIBLE MEDICINE
5100 Wisconsin Avenue, N.W.
Washington, D.C. 20016
Attorneys for Plaintiff
(202) 686-2210 ext. 308
(202) 686-2155 (fax)

Attorneys for Plaintiff