IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 05-1369 (RMU) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and STEPHEN L. JOHNSON, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**REPLY IN SUPPORT OF EPA'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**INTRODUCTION**

Plaintiffs contend that they are injured by EPA actions under the Federal Food, Drug, and Cosmetics Act ("FFDCA")[1] establishing maximum permissible levels of pesticide residues in food (*i.e.* "tolerances"). However, Plaintiffs do not challenge in this suit any EPA actions establishing such standards. Instead, Plaintiffs bring claims challenging EPA's denial of their administrative petition seeking EPA's repeal of non-binding guidelines setting forth a protocol for testing the effects of chemical substances on development of the nervous system (*i.e.*,

---

[1] Plaintiffs refer in their brief to the Food Quality Protection Act of 1996. *See* Opp. at 1, 4-5. The Food Quality Protection Act ("FQPA") of 1996 in relevant part amended section 408 of the FFDCA, 21 U.S.C. § 346a.

1

"developmental neurotoxicity testing" or "DNT testing").[2] EPA's publication of these DNT Guidelines does not establish tolerances for pesticide residues in food.  Rather, tolerances are established through judicially reviewable agency action under FFDCA section 408(d) or (e), 21 U.S.C. § 346a(d) or (e).  *See* EPA Opening Brief at 7.  The DNT Guidelines themselves have no legal effect whatsoever; they do not require anyone to engage in DNT testing, compel any particular methodology for DNT testing, or compel EPA to weight DNT testing in any particular manner in establishing FFDCA tolerances.  Regardless of whether DNT testing has been conducted pursuant to the DNT Guidelines, precisely the same statutory standards apply to EPA decisions regarding tolerances.  Even if EPA were to repeal its guidelines setting forth a DNT test protocol, manufacturers could still elect to submit DNT testing conducted pursuant to this protocol for EPA's consideration in establishing tolerances, and EPA would retain precisely the same discretion it currently has under the FFDCA to determine an appropriate tolerance.

To the extent Plaintiffs believe EPA has inappropriately relied upon or considered DNT testing in establishing tolerances for particular pesticides, their remedy is to challenge the final EPA actions that establish the particular tolerances they believe are inconsistent with the standards set forth in the FFDCA.  Plaintiffs concede in their opposition that "they have no intention in this suit to challenge" any EPA actions establishing tolerances.  *See* Opp. at 23 n.6.  However, the thrust of their allegations is that they are injured by EPA's actions in establishing

---

[2] Plaintiffs in this suit challenge two protocols for DNT testing: (1) "OPPTS 870.6300" (referred to by Plaintiffs as the "FIFRA Guideline"), which is a harmonized guideline intended for use by EPA in regulatory programs under a variety of statutes, and (2) a protocol ("the TSCA Guideline") that is based on and nearly identical to OPPTS 870.6300 and published at 40 C.F.R. § 799.9630 and is intended for use in EPA rulemakings under the Toxic Substances Control Act ("TSCA").  *See* EPA Opening Brief at 4-5, 10-11.  These protocols collectively will be referred to as "DNT Guidelines."

tolerances where DNT testing may have been considered.  This Court lacks jurisdiction to consider such challenges.  Challenges to actions establishing tolerances are permitted only in the United States Court of Appeals and only after administrative review provisions are exhausted.  *See* 21 U.S.C. § 346a(g) ; 21 U.S.C. § 346a(h)(1) and (h)(5).

The claims Plaintiffs actually bring in this suit challenging EPA's refusal to repeal non-binding DNT Guidelines cannot survive a motion to dismiss for a multitude of reasons, all of which stem from the fact that in this case Plaintiffs are not challenging the actual agency actions that they allege cause them injury.  First, neither EPA's publication of DNT Guidelines nor EPA's refusal to repeal its publication of such Guidelines constitutes judicially reviewable final agency action because the Guidelines do not determine rights or obligations or otherwise have any legal consequences.  Second, Plaintiffs lack Article III standing to challenge EPA's refusal to repeal its publication of DNT Guidelines because Plaintiffs cannot demonstrate any concrete and imminent injury attributable to EPA's publication of non-binding Guidelines that is redressable by this Court.  Third, a federal court has already determined that Plaintiffs lack standing to challenge these Guidelines, and therefore, Plaintiffs' Complaint is barred by the doctrine of collateral estoppel.  Fourth, Plaintiffs' generalized attacks on EPA's use of DNT testing in establishing food tolerances are not ripe for review.

Accordingly, EPA's motion to dismiss should be granted.

# DISCUSSION

I.  **BECAUSE THE DNT GUIDELINES DO NOT HAVE ANY LEGAL EFFECT, EPA'S REFUSAL TO REPEAL THESE GUIDELINES DOES NOT CONSTITUTE JUDICIALLY REVIEWABLE AGENCY ACTION**

The fact that no legal consequences flow from the DNT Guidelines is an important threshold consideration that underlies the D.C. Circuit's controlling decision on standing in *Helstosky v. EPA*, No. 01-1069, 2001 WL 799950 (D.C. Cir. June 29, 2001) and that also is highly relevant to any discussion of finality and ripeness. Because this consideration is most inextricably linked to finality, we begin by addressing that issue.

As discussed in EPA's opening brief, the DNT Guidelines set forth a protocol that can, but need not be, used for testing the effects of chemicals on nervous system development. While the Guidelines are intended to be available for use in regulatory programs to evaluate the potential effects of a chemical on neurodevelopment, the DNT Guidelines themselves do not create any regulatory requirements or otherwise have any legal consequences. Because the Guidelines do not have legal consequences, EPA's decision not to repeal these guidelines does not constitute judicially reviewable final agency action. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997); *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426-28 (D.C. Cir. 2004).

Plaintiffs' opposition applies an incorrect standard of review in attempting to establish that the DNT Guidelines have some legal effect and are therefore judicially reviewable. Specifically, Plaintiffs rely on the erroneous position that they can establish the reviewability of DNT Guidelines simply by alleging in their Complaint that the Guidelines have legal consequences. *See* Opp. at 19-21. Upon considering a motion to dismiss, the Court may construe *factual* allegations in a Complaint in favor of Plaintiffs, but *legal* conclusions are

treated differently and are not presumed to be correct. *Liberty Fund v. Chao*, No. 04-0915JDB 2005 WL 2450189, at *5 (D.D.C. Sept. 30, 2005). *See also Ashley v. United States Department of Interior*, 408 F.3d 997, 1000 (8th Cir. 2005) (discussing difference between factual allegations and legal conclusions and concluding legal conclusions should be examined and resolved upon filing of motion to dismiss raising jurisdictional issues). Whether the DNT Guidelines in and of themselves have any legal consequence is a question of law. Thus, the Court cannot simply accept Plaintiffs' allegations regarding the legal significance of these Guidelines.

Beyond simply alleging that EPA's publication of DNT Guidelines has some legal effect, Plaintiffs' opposition does not, and cannot, identify any actual legal consequences associated with publication of the Guidelines. Contrary to Plaintiffs' contention *(see* Opp. at 8, 19-20), EPA's publication of DNT Guidelines does not create any regulatory requirements or otherwise have any legal consequences. Regardless of whether DNT testing has been conducted pursuant to the Guidelines, EPA establishes tolerances through rulemaking under 21 U.S.C. § 346a(d) or (e), and EPA in such rulemaking must determine a "safe" level of pesticide residue in food, or the level at which "there is a reasonable certainty that no harm will result from aggregate exposure." *See* 21 U.S.C. § 346a(b)(2)(A)(ii). Regardless of whether DNT testing has been conducted, EPA makes a specific regulatory determination regarding whether, on the basis of reliable data, a different margin of safety for infants and children other than the presumptive tenfold ("10X") margin of safety is appropriate. *See* 21 U.S.C. § 346a(b)(2)(C). Thus, the Guidelines do not determine what EPA's tolerance decisions under the FFDCA will be.[3]

---

[3] Challenges to EPA tolerance decisions under the FFDCA must be brought in the courts of appeals. *See* 21 U.S.C. § 346a(h)(1) and (h)(5).

Plaintiffs' case is not advanced by reliance on the specific allegation that "EPA has taken the position that unless DNT testing is performed for a selected chemical, a 'gap' exists in the toxicity database and the Agency will apply the Tenfold Safety Factor." *See* Complaint ¶ 4; Opp. at 19.  As an initial matter, Plaintiffs do not identify any EPA rule or guidance document in which EPA has actually adopted this position, and in fact, EPA has not adopted this position.[4/] However, even assuming, solely for the sake of argument, that Plaintiffs could identify some EPA rule compelling it to adhere as a matter of law to this "position," it is not that rule, but the non-binding DNT Guidelines, that Plaintiffs challenge here.  The DNT Guidelines merely set forth a method for conducting DNT testing.  The DNT Guidelines do not require DNT testing nor do they address the circumstances under which DNT testing might be appropriate.[5/]

---

[4/] In support of this allegation, Plaintiffs cite in their Complaint to a report of an internal EPA committee, the Hazard Identification and Assessment Review Committee ("HIARC").  *See* Complaint ¶ 4 (citing to "HIARC/FQPA SFC, 1998").  As part of the EPA's risk assessment process for pesticides, the HIARC generally reviews existing toxicity studies on a pesticide, or group of pesticides, and selects toxic endpoints and dose levels that will be used for characterizing the risks posed by the pesticide.  The HIARC is but one of several internal EPA committees that make recommendations to EPA's Office of Pesticide Programs regarding the appropriate safety factor for use in risk assessments.  These recommendations are pesticide-specific and do not bind the agency.  *See*, *e.g.*, 69 Fed. Reg. 30,042, 30,056-57 (May 26, 2004).  In particular,  contrary to Plaintiffs' allegations (*see* Opp. at 8), recommendations of HIARC do not constitute final agency actions establishing FFDCA tolerances.  HIARC's recommendations with respect to 37 organophophate pesticides (cited by Plaintiffs in Opp. at 8) are part of an ongoing process to reassess the safety of tolerances for these pesticides pursuant to a requirement to reassess all tolerances by August 2006.  *See* 21 U.S.C. § 346a(q).  EPA has not yet completed the reassessment of organophosphate tolerances.

[5/] Plaintiffs further reliance (*see* Opp. at 7, 20) on allegations that EPA has with respect to some particular pesticides exercised its authority under FIFRA's "data-call-in" provision, 7 U.S.C. § 136a(c)(2)(B), to require submission of DNT testing to support pesticide registrations under FIFRA is also misplaced.  *See* EPA Opening Brief at 3-4 for relevant statutory background discussion on FIFRA and pesticide registrations.  To the extent EPA has exercised its authority under FIFRA's data-call-in provision to require submission of DNT testing for particular chemicals, the legal requirement to submit testing stems from EPA's data-call-in action, not from

In short, the DNT Guidelines that are the subject of this suit set forth a non-binding protocol for conducting DNT testing. The DNT Guidelines themselves do not create any regulatory requirements or otherwise have any legal consequences. Therefore, applying the test set forth in *Bennett v. Spear*, EPA's publication of the protocol did not constitute a judicially reviewable agency action. Likewise, EPA's refusal to repeal this protocol does not constitute a judicially reviewable agency action. *See* EPA Opening Brief at 22.

## II.     PLAINTIFFS DO NOT HAVE STANDING

Plaintiffs make clear in their opposition that they premise their standing to maintain suit on allegations that they are injured by EPA actions establishing FFDCA tolerances (*i.e.,* maximum permissible levels of pesticide residues on food). *See* Opp. at 1. However, they do not bring any claims challenging the actions that they allege cause them injury; instead, they bring claims challenging EPA's publication of DNT Guidelines.[6/] As discussed above, EPA's

---

EPA's mere publication of a DNT test protocol. Plaintiffs do not allege any injury flowing specifically from EPA's use of the data-call-in provision to submit DNT testing (as opposed to EPA actions establishing tolerances); however, to the extent Plaintiffs believe EPA has acted improperly and injured Plaintiffs in requiring DNT testing in conjunction with registration of a particular pesticide, Plaintiffs' remedy is to challenge EPA's action in issuing the data-call in (to the extent the constitutional and statutory requirements for such a challenge can be met), not to challenge the mere publication of a DNT test protocol.

[6/] Plaintiffs, moreover, do not allege with any specificity (*see* Complaint ¶¶ 9-20), much less in "great detail," how particular FFDCA tolerance decisions have allegedly injured them, *See* Opp. at 17. For example, Plaintiff Robin Hummel alleges only very generally that she is "concerned" about the exposure to pesticides that she and her children have received or will receive at her family's working farm on their visits a couple times a year. Opp. at 3. Ms. Hummel's general "concern" about exposure to pesticides does not include any concrete and particularized allegation as to: (1) what pesticides she and her children are actually exposed to on their occasional visits to the family farm, (2) what tolerances were established by EPA for these pesticides; (3) why Plaintiffs believe these tolerances are insufficiently protective; and (4) how EPA's publication of non-binding DNT Guidelines bears any relationship to the tolerances established for the pesticides Ms. Hummel alleges she and her children have been exposed to.

DNT Guidelines do not require or even recommend that anyone submit DNT testing, much less bind in any respect EPA's discretion under the FFDCA to determine what is an appropriate tolerance for a particular pesticide. But even in the event DNT testing is conducted for a particular pesticide pursuant to the Guidelines and made available to EPA, nothing in the DNT Guidelines determines what particular weight EPA will give to DNT testing (or whether the Agency will necessarily give the testing any weight at all) in establishing, modifying, or revoking, a tolerance for that pesticide, much less compels EPA to make regulation of that pesticide any less stringent.[7]

Because neither obligations nor legal consequences on FFDCA tolerance decisions flow from publication of non-binding DNT Guidelines, Plaintiffs cannot demonstrate that EPA's refusal to repeal its publication of non-binding DNT Guidelines causes their alleged injury. As noted in EPA's opening brief, Plaintiffs essentially ask the Court to speculate that in each and every tolerance decision involving DNT testing: (1) manufacturers will conduct and submit to EPA testing entirely consistent with the DNT Guidelines to support a pesticide tolerance; (2) the testing will show that the pesticide in question will not cause harm to nervous system development, (3) EPA will rely upon this testing and set a tolerance for the pesticide allowing exposure to the pesticide that is greater than EPA would otherwise have permitted in the absence of such testing, and (4) Plaintiffs (or their members) will be exposed to the pesticide in question at an unsafe level. This speculative scenario is much too attenuated to establish standing. *See*

---

[7] Indeed, Plaintiffs do not refute that the availability of DNT testing for a particular pesticide might support more stringent, not less stringent, regulation of a particular pesticide, where such testing reflects that exposure to a pesticide at certain levels will have adverse effects on development. *See* EPA Opening Brief at 20.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs also fail to demonstrate that their alleged injury is redressable by a favorable decision. Plaintiffs cannot refute that even if EPA were to repeal its guidelines setting forth a DNT test protocol, manufacturers could still elect to submit DNT testing conducted pursuant to this protocol for EPA's consideration in establishing tolerances. Plaintiffs also cannot refute that even in the absence of published DNT Guidelines, EPA would retain precisely the same discretion it currently has under the FFDCA to determine an appropriate tolerance in the event DNT testing were submitted for EPA's consideration. In other words, regardless of the outcome of this lawsuit, EPA will retain precisely the same discretion it currently has, using the identical statutory test, to determine what is a "safe" level of exposure to a pesticide residue on foods.

Plaintiffs have also failed to demonstrate standing to assert their procedural challenges to the DNT Guidelines. *See* Opp. at 16 n.8. A party has standing to challenge an agency's failure to abide by a procedural requirement only if the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff. *See Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (*en banc.*) (cited in *Helstosky* Order at 2). Because petitioners have not adequately demonstrated that the testing guidelines cause a risk of harm, they lack standing to assert their procedural claims. *See American Petroleum Inst. v. EPA*, 216 F.3d 50, 66-68 (D.C. Cir. 2000) (cited in *Helstosky* Order at 2).

Finally, Plaintiffs offer no argument at all as to how the TSCA DNT Guidelines specifically cause them injury. The TSCA DNT Guidelines are intended to be available only for use in regulatory programs under TSCA. Plaintiffs do not even offer a purported explanation as

9

to how regulatory programs under TSCA are related to EPA pesticide tolerance decisions under the FFDCA, the source of their alleged injury.

## III. PLAINTIFFS' SUIT IS BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL

Not only do Plaintiffs lack standing to challenge the DNT Guidelines, but the D.C. Circuit has already determined in previous litigation that Plaintiffs lack standing to challenge these Guidelines. *See Helstosky* Order (attachment 2 to EPA's opening brief). Accordingly, the doctrine of collateral estoppel bars the instant suit.

Plaintiffs' position that the issue of standing presented in this case is materially different than the issue of standing litigated in *Helstosky* is mistaken. The standing issue in this case remains whether Plaintiffs can challenge these non-binding Guidelines on "the premise that the use of the test protocol will wrongly indicate that certain chemicals are safe, which will result in a future decision by [EPA] not to impose stricter regulations on these chemicals, which in turn will lead to [Plaintiffs'] continued exposure" *See Helstosky* Order at *1. Because the D.C. Circuit has already answered this precise question and concluded Plaintiffs lack standing, the D.C. Circuit's judgment has preclusive effect.

In an effort to avoid application of collateral estoppel, Plaintiffs allege that they fit within the "curable defect" exception to collateral estoppel. Opp. at 10-14. The "curable defect" exception may apply "where a precondition requisite to the court's proceeding in the previous suit was not alleged or proven, and is raised in the second suit." *Reynolds v. United States Capitol Police Bd.*, 357 F. Supp. 2d 2, 10 (D.D.C. 2004). Plaintiffs do not point to any "precondition" requisite to the jurisdiction that has now been supplied, and do not fit within this exception.

10

Although Plaintiffs point to some differences between the instant Complaint and *Helstosky*, the allegations in the instant Complaint are not materially different from the allegations in *Helstosky*, and do not lead to any different conclusion vis-a-vis their standing to maintain suit. Accordingly, the D.C. Circuit's prior judgment should be given preclusive effect. *See* 18 Charles A. Wright *et al.*, *Federal Practice and Procedure* § 4417 at 428 (2002) ("where the changed circumstances are not material, and therefore do not amount to *controlling facts*, collateral estoppel remains applicable.") (citation omitted).[8]

The specific differences between the instant Complaint and *Helstosky* relied upon by Plaintiffs and their lack of materiality are addressed further below.

### A.    There is no Material Difference Between the TSCA DNT Guidelines and OPPTS 870.6300 ("The FIFRA DNT Guideline")

Plaintiffs point to the fact that they challenged the TSCA DNT Guidelines only in *Helstosky*, whereas in this suit, they also challenge OPPTS 870.6300 (referred to by Plaintiffs as the "FIFRA DNT"). *See* Opp. at 3, 11. While OPPTS 870.6300 was not the subject of Plaintiffs' prior suit, there is no material difference whatsoever between the test protocol set forth in the TSCA DNT Guideline and OPPTS 870.6300. The TSCA DNT Guideline is based upon OPPTS 870.6300 and is nearly identical – word-for-word – to OPPTS 870.6300. Like the TSCA DNT Guideline, OPPTS 870.6300 is a non-binding protocol intended to be available for

---

[8] Plaintiffs' reliance (*see* Opp. at 10) on *Canady v. Allstate Insurance Co.*, 282 F.3d 1005, 1015 (8th Cir. 2002), is misplaced because in *Canady*, the Eighth Circuit affirmed that an issue of standing was the same in two cases despite factual differences. In *Canady*, appellants argued that collateral estoppel should not apply because they were raising state law claims in the second suit as opposed to federal law claims and because their state law claims covered a different time period. The Eighth Circuit, however, held that the standing issue raised in both cases was the same despite these differences and therefore it was appropriate for the earlier decision to be given preclusive effect. 282 F.3d at 1016-17.

use in regulatory programs, but a protocol does not by itself establish any regulatory requirements.

>    B.  **Plaintiffs' New Allegations Related to FFDCA Tolerance Decisions Do Not Provide a Basis for Standing.**

Plaintiffs further contend that the standing issue is distinguishable from *Helstosky* because they are alleging in this case that EPA has considered, or might consider, DNT testing in the specific context of making regulatory decisions concerning pesticide residue in foods, whereas Plaintiffs did not identify potential injury from tolerance decisions under the FFDCA specifically in *Helstosky*. *See* Opp. at 3, 7-8, 17-18. While FFDCA regulatory decisions were not identified as a source of injury in *Helstosky*, the inclusion of allegations concerning FFDCA regulatory decisions in the instant Complaint does not materially change the standing analysis. Plaintiffs' alleged injury remains in all material respects the same as the injury alleged in *Helstosky*, and remains equally speculative. In particular, Plaintiffs still rely on speculation that use of the DNT Guidelines in EPA regulatory decisions could lead them to be exposed to unsafe levels of harmful chemicals. As the D.C. Circuit noted in *Helstosky*, this theory of injury turns on speculation that: (1) use of the non-binding DNT test protocol will wrongly indicate that certain chemicals are safe, and (2) EPA will mistakenly rely on DNT testing as a basis for deciding not to impose stricter regulation on these chemicals. 2001 WL 799950 at * 1. The D.C. Circuit has already determined that this scenario is too attenuated to establish standing to challenge the merits of the DNT Guidelines. The fact that Plaintiffs now base their injury allegations on a particular type of regulatory decision – *i.e.*, the setting of a food tolerance – does not cure the defect the D.C. Circuit identified. The broad reasoning applied by the D.C. Circuit in *Helstosky* regarding the attenuated link between DNT Guidelines and EPA's regulatory

decisions encompasses resolution of Plaintiffs' new allegations regarding DNT testing and FFDCA regulatory decisions specifically.

In addition, EPA notes that contrary to Plaintiffs' suggestion (*see* Opp. at 11-12), Plaintiffs do not actually identify in their Complaint or their opposition *any* specific instances in which EPA has relied upon DNT testing, upon making final tolerance decisions, as a basis for departing from the presumptive tenfold safety factor for infants and children set forth at 21 U.S.C. § 346a(b)(2)(C). In support of their assertion that there are "dozens of instances" in which EPA has taken tolerance actions resulting in "real and traceable injuries" (*see* Opp. at 11-12), Plaintiffs cite only to the 1998 recommendations of HIARC, an internal EPA review committee, concerning organophosphates (*see* Complaint ¶ 3). As discussed in note 3, *supra*, HIARC's recommendations do not bind the Agency and EPA has not, in fact, taken any final action regarding organophosphates.

**C.     The Individual Plaintiffs are in Privity With the Organizational Plaintiffs**

The fact that the instant Complaint includes three new individual Plaintiffs also does not allow Plaintiffs to avoid application of collateral estoppel. For purposes of collateral estoppel, the new individual Plaintiffs are in privity with the organizational Plaintiffs of which they are members.

Federal courts have deemed several relationships sufficiently close to justify a finding of privity, and one of the relationships that has been deemed sufficiently close is that of an organization filing on behalf of its members. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1081-82 (9th Cir. 2003). In particular, privity exists between an association and its members where there is no conflict between the association and

its members, and the association adequately represents the interests of all its members. *Id.; Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 688 (10th Cir. 1992). *See also Western Coal Traffic League v. Interstate Commerce Comm'n*, 735 F.2d 1408, 1411 (D.C. Cir. 1984) (holding that collateral estoppel applied to party appearing in case that had not appeared in previous case, in view of fact that new party was member of trade association that had actively participated in the prior adjudication, and in view of fact that new party offered no argument distinct from other contentions). *Cf. Albert's Newspaper Delivery Incorporated v. New York Times*, 876 F.2d 266, 270 (2d Cir. 1989) (holding that collateral estoppel barred antitrust action by newspaper deliverers, where judgment had been entered against other newspapers deliverers, and both groups of newspaper deliverers were members of same organization).[9]

Here, the individual Plaintiffs offer no arguments and assert no rights distinct from organizational Plaintiffs. Indeed, individual Plaintiffs are not suing independently of the organizational Plaintiffs, but are joining a suit in which organizational Plaintiffs are the lead Plaintiffs. In addition, individual Plaintiffs point to no inadequacy in organizational Plaintiffs' representation of their interests in the prior suit. The fact that the individual Plaintiffs might not have been members of the organizational Plaintiffs at the time of *Helstosky* is immaterial. *See* Opp. at 15. There is no reason to believe that the interests of these Plaintiffs was not adequately represented in the prior litigation. Furthermore, contrary to Plaintiffs' suggestion, it is entirely

---

[9] Plaintiffs' suggestion that the D.C. Circuit has adopted a narrow test for privity requiring a party to have "participate[d] in the control of the prior action" is incorrect. *See* Opp. at 14 (citing *Gill and Duffus Services, Inc. v. Islam*, 675 F.2d 404, 406 (D.C. Cir. 1982)). The D.C. Circuit made clear in *Western Coal* that collateral estoppel may bind a member of an association where a judgment is entered against the association. 735 F.2d at 1411.

reasonable to preclude individual Plaintiffs from pursuing claims that have already been rejected with respect to the organizational Plaintiffs. The doctrine of collateral estoppel would be eviscerated if an organization could avoid an adverse judgment by having new members repeatedly bring the same claim. As stated by the Tenth Circuit in *Murdock*:

> To hold otherwise would lead to an untenable result. If a judgment regarding an association's status did not bind its members, then each member could relitigate the association's status until the association obtained a favorable result. This situation would undermine the very purpose of collateral estoppel.

975 F.2d at 689.

In short, Plaintiffs' Complaint continues to have precisely the same standing defect identified by the D.C. Circuit in *Helstosky*, and Plaintiffs' have not cured this defect.

## IV.   PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW

Plaintiffs have further failed to demonstrate that their claims are ripe for judicial review. As discussed in EPA's opening brief, reviewing Plaintiffs' challenge to DNT Guidelines would require this Court to conduct an abstract analysis into potential application of the DNT Guidelines in FFDCA regulatory decisions without any specific factual context. It would be impossible for a court reviewing the Guidelines in the abstract to forecast all hypothetical factual scenarios in which DNT testing conducted pursuant to the Guidelines might be relied upon or to forecast how EPA might rely upon such DNT testing under these scenarios. As in *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998), "further [agency] consideration will actually occur before" DNT testing performed under the Guidelines is relied upon in any future regulatory action. The court of appeals reviewing the record of actual future EPA decisions considering DNT testing would be in a position to evaluate any final action EPA took relying

upon these Guidelines, in light of relevant statutory and regulatory standards.  Plaintiffs argue that "concrete facts" now exist (*see* Opp. at 23), but do not identify any "concrete facts" they might point to outside of those relating to the merits of particular agency regulatory decisions involving particular pesticides – decisions reviewable exclusively in the courts of appeals.  21 U.S.C. § 346a(h)(1) and (h)(5).

Plaintiffs do not demonstrate any hardship to withholding court consideration.  The DNT Guidelines, like the plan at issue in *Ohio Forestry Ass'n, Inc. v. Sierra Club,* does not "command anyone to do anything or refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority . . . they create no legal rights or obligations."  523 U.S. at 733.  Plaintiffs do not dispute that to the extent EPA actually relies upon DNT Guidelines in taking final regulatory action establishing a pesticide tolerance, Plaintiffs have a means for judicial review under the FFDCA.  Thus, just like plaintiffs in *Ohio Forestry Ass'n v. Sierra Club*, Plaintiffs "will have an ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."  *Id*.

## CONCLUSION

For the reasons set forth above and the reasons set forth in EPA's opening brief, EPA's motion to dismiss Plaintiffs' Complaint should be granted.

                    Respectfully submitted,

                    KELLY A. JOHNSON
                    Acting Assistant Attorney General
                    Environment & Natural Resources
                            Division


                    _____/s/_____
                    ERIC G. HOSTETLER
                    D.C. Bar # 445917
                    Environmental Defense Section
                    Environment & Natural Resources
                            Division
                    U.S. Department of Justice
                    P.O. Box 23986
                    Washington, D.C. 20026-3986
                    (202) 305-2326

<u>Of Counsel</u>

JEFFREY M. HERREMA
DONALD A. SADOWSKY
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

DATED: November 15, 2005