UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, TRULIE ANKERBERG-NOBIS, ROBIN HUMMEL, JENNIFER REILLY, | : : : : : : : : | Civil Action No.: | 05-1369 (RMU) |
| Plaintiffs, | : : | Document No.: | 8 |
| v. | : : | | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and STEPHEN L. JOHNSON, Administrator, United States Environmental Protection Agency, | : : : : : : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

GRANTING THE DEFENDANTS' MOTION TO DISMISS

**I.   INTRODUCTION**

The plaintiffs, Physicians Committee for Responsible Medicine ("PCRM"), People for the Ethical Treatment of Animals ("PETA"), and three individuals, bring suit against the Environmental Protection Agency ("EPA") and Administrator Stephen L. Johnson (collectively, "the defendants"), alleging that the defendants' adoption of a series of test protocols and guidelines violates the Administrative Procedure Act (APA) rulemaking requirements.

Specifically, the plaintiffs challenge the EPA's decision to deny their petition to repeal the Developmental Neurotoxicity Test Guidelines ("DNT Guidelines"). The DNT Guidelines are non-mandatory testing procedures which pesticide manufacturers may use in supporting an application to the EPA for a pesticide registration. This case is now before the court on the

defendants' motion to dismiss. Because the plaintiffs lack standing, the court grants the defendants' motion to dismiss.

## II.    BACKGROUND

### A.    The Parties

Plaintiff PCRM is a nonprofit organization based in Washington, D.C. Compl. ¶ 9. It is committed to "promoting a safe and healthful diet and to protecting consumers from food and drink that are dangerous or unhealthful." *Id.* PCRM has joined forces with PETA, a national nonprofit membership organization committed to "protecting animals from exploitation and suffering, and to promote a safe and healthful diet." *Id.* ¶ 12. According to the complaint, each of the three individual plaintiffs, Trulie Ankerberg-Noblis, Robin Hummel, and Jennifer Reilly, are pregnant (and may have additional children in the future), are vegetarians, and "advocate for a safe and healthy diet." *Id.* ¶¶ 15, 18, 20. The individual plaintiffs are concerned about the impact that pesticides may have had, and may continue to have, on their fetuses, on the breast milk they will use to feed their infants, and on their young children. *Id.* ¶¶ 15, 18, 20.

Defendant EPA, among other things, is tasked with the regulation and licensing of pesticides. Under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), the EPA is responsible for the regulation of pesticides in food. 21 U.S.C. §§ 301-394. Under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), the EPA is responsible for "impos[ing] a federal licensing scheme on the sale, distribution, and use of pesticides." 7 U.S.C. §§ 136-136y. Both the FFDCA and the FIFRA articulate how the EPA shall carry out these responsibilities.

Prior to any pesticide entering the marketplace, the pesticide manufacturer must obtain registration for that particular pesticide from the EPA. The EPA, in turn, evaluates data submitted by the pesticide manufacturer concerning the candidate pesticide. Defs.' Mot. at 5. The EPA may carry out this data evaluation in one of two ways. First, the EPA can require that the pesticide chemical residue pass a "tenfold margin of safety" for children and infants. 21 U.S.C. § 346a(b)(2)(C). In other words, the pesticide manufacturer must show that the pesticide is ten times safer than the typical exposure limits for adults. Second, in the agency's discretion, it may utilize a margin of safety other than the "tenfold margin of safety" only if "on the basis of reliable data, such margin will be safe for infants and children. *Id.* Toward this end, the EPA established DNT Guidelines. Under the DNT Guidelines, the EPA considers developmental neurotoxicity data – data pertaining to the neurological and behavioral effects of exposure to the pesticide.[1] Defs.' Mot. at 5. "The ultimate goal of DNT testing is to predict with confidence the neurotoxic potential (or lack thereof) of a test chemical in human infants and children by the extrapolation of data from laboratory experiments on animals." Compl. ¶ 41. Although developmental neurotoxicity data is not among the data required by the EPA to support a pesticide registration, the EPA has created the DNT Guidelines for pesticide manufacturers to use in collecting data on the safety of the pesticide. Defs.' Mot. at 6, 18. If the chemical manufacturer does not supply the EPA with developmental neurotoxicity data in support of a particular pesticide application, the EPA will apply the statutory default "Tenfold Margin of Safety." Compl. ¶¶ 4, 68.

---

[1] In assessing the neurological and behavioral effects of a pesticide, the manufacturer tests the substance on groups of pregnant animals during gestation and early lactation, and then observes the effects on the offspring. Defs.' Mot. at 5.

3

**B.    The Plaintiffs' Claims**

In carrying out its regulatory responsibilities and in determining whether a particular pesticide is safe to enter the marketplace, the EPA must pay particular attention to the health and well-being of children, and must "ensure that there is a reasonable certainly that no harm will result to infants and children from aggregate exposure to the pesticide chemical residue." 21 U.S.C. § 346a(b)(2)(C).  The plaintiffs claim that the DNT testing procedures and protocols set up by the EPA to monitor the margin of "safety" for children and infants are marginally or no safer than the standards for adults and thus violate the FFDCA.  Compl. ¶ 3.  The FFDCA requires that any alternative to the "Tenfold Margin of Safety" must be based on reliable data, 21 U.S.C. § 346a(b)(2)(C), and the plaintiffs allege that the EPA's DNT testing procedure "barely qualifies as 'scientific,' and is fraught with so many uncertainties and problems that its use to establish 'reasonable certainty' is, beyond reasonable dispute, arbitrary, and capricious," Compl. ¶ 3.

On July 11, 2005, the plaintiffs filed suit in this court seeking reversal of the EPA's regulatory decisions regarding child exposure to chemical residue.  First, the plaintiffs challenge the defendants' rejection of the plaintiffs' petition requesting that the EPA repeal its DNT Guidelines.  The plaintiffs claim that the rejection was arbitrary and capricious or otherwise not in accordance with law in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(a).  Compl. ¶¶ 78-79.  Second, the plaintiffs allege that the defendants violated the APA's

procedural requirements by issuing final rules without first providing public notice or an opportunity for public comment.[2]  *Id.* ¶¶ 23, 80-82.

### C.  Procedural Background

The legal debate concerning the EPA's use of DNT Guidelines is not a new one. Plaintiffs PCRM and PETA previously brought suit challenging the EPA's DNT Guidelines in the United States Court of Appeals for the District of Columbia Circuit.[3]  *Helstosky v. EPA*, No. 01-1069, 2001 WL 799950 (D.C. Cir. June 29, 2001).  The plaintiffs in *Helstosky* alleged that the EPA's DNT Guidelines under the Toxic Substance Control Act was not scientifically valid.  *Id.*, 2001 WL 799950, at *1.  The D.C. Circuit granted the EPA's motion to dismiss, ruling that the plaintiffs lacked standing.  *Id.*

In the present action, the defendants move to dismiss the plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. at 1.  The defendants make four specific arguments in support of their motion: (1) that the plaintiffs are collaterally estopped from bringing the current action; (2) that the plaintiffs lack standing; (3) that the plaintiffs' claims are not ripe for judicial review; and (4) that this court does not have jurisdiction to

---

[2]  The plaintiffs allege that DNT Guidelines established by the EPA under the Toxic Substance Control Act ("TSCA DNT Guidelines"), and under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA DNT Guidelines"), are unsatisfactory because neither conform to the "tenfold safety standard" under 21 U.S.C. § 346a(b)(2)(C).  Compl. ¶ 2.  Additionally, the plaintiffs claim that there is no reasonable certainty that the pesticides approved under the TSCA DNT Guidelines or the FIFRA DNT Guidelines are "safe" as defined and required by the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 346a.  *Id.*

[3]  It is important to note that the plaintiffs in *Helstosky v. EPA* brought their case directly to the D.C. Circuit, invoking the circuit court's original jurisdiction under 21 U.S.C. § 346a(h)(1).

entertain the plaintiffs' complaint. *Id.* at 13-27. Because the defendants are correct that the plaintiffs lack standing, the court grants the defendants' motion to dismiss.

### III.    ANALYSIS

#### A.    Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a

Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### B. The Plaintiffs Lack Article III Standing

According to the defendants, the plaintiffs lack standing to challenge the EPA's denial of their petition to repeal the DNT Guidelines. Defs.' Mot. at 17. For the reasons set forth below, the plaintiffs' claims, while more detailed and developed than the claims in *Helstosky* regarding their injuries and the causal relationship between the alleged harm and the EPA actions challenged, suffer the same Article III problems fatal to the claims dismissed in *Helstosky*. For this reason, the court dismisses the plaintiffs' complaint for lack of standing.

#### 1. Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Put slightly differently, "Article III standing must be resolved as threshold matter."

*Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co.,* 523 U.S. at 96-102.

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Id.* On a motion for summary judgment, however, the "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (citing Federal Rule of Civil Procedure 56); *accord Florida Audubon*, 94 F.3d at 666.

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001). Nor is there standing where the court "would have to accept a number of very speculative inferences

8

and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

The test for standing shifts focus when a plaintiff challenges an agency's failure to comply with a procedural requirement. *Florida Audubon*, 94 F.3d at 664 (citing *Defenders of Wildlife*, 504 U.S. at 572 n.7). In such cases, as long as the procedural requirement is designed to protect a threatened, concrete interest of the plaintiff, the violation is sufficient to grant the plaintiff standing. *City of Waukesha*, 320 F.3d at 234. To ensure that the plaintiff's interest is more than a general interest common to all members of the public, however, the procedural-rights plaintiff must show "that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* (citing *Florida Audubon*, 94 F.3d at 664).

If the plaintiff is an association, it may demonstrate standing as long as "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. Fed. Communications Comm'n*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Finally, if the plaintiff is suing under the APA, the plaintiff must show that the alleged injury falls within the zone of interests that the statute on which the plaintiff bases the complaint seeks to protect. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996).

## 2. The Corporate Plaintiffs[4] and Plaintiffs Ankerberg-Nobis, Hummel and Reilly Lack Standing

The plaintiffs appear to be under the impression that the complaint in *Helstosky* was dismissed for lack of standing solely because it "made bare-bones allegations regarding the plaintiffs' injuries [and] the causation of those injuries by EPA's challenged conduct."[5]  Pls.' Opp'n at 3-4.  In an attempt to "cure" this defect, the plaintiffs point to two important differences between their complaint and the complaint dismissed in *Helstosky*: (1) that the injuries suffered have been alleged in greater detail and specificity, and (2) that these alleged injuries are now "fairly traceable" to the DNT Guidelines because the EPA has used the FIFRA and TSCA DNT Guidelines in specific regulations to "increase to unlawfully high levels the amount of pesticides permitted on the very foods that Plaintiffs consume."  *Id.* at 17.

---

[4]    The corporate plaintiffs (Physicians Committee for Responsible Medicine ("PCRM") and People for the Ethical Treatment of Animals ("PETA")) join this action on behalf of the interests of their members, Compl. ¶¶ 11, 14, alleging injuries which mirror the injuries complained of by the individual plaintiffs.  Although both PRCM and PETA also assert that they are suing on behalf of their own organizational interests, neither has alleged a "concrete and demonstrable injury to [their] activities – with a consequent drain on the organization's resources – constituting more than simply a setback to the organization's abstract social interests[.]" *Id.* (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  PCRM and PETA, for example, allege only a "broad interest . . . [in safeguarding] its own organizational interest in procuring the healthiest and safest possible diet in the United States." Compl. ¶¶ 11, 14.  Accordingly, the court will focus on the injuries alleged by individual plaintiffs Ankerger-Nobis, Hummel, and Reilly, each of whom is a member of either PCRM or PETA.  *See Common Cause v. FEC*, 108 F.3d 413, 417 (D.C. Cir. 1997) (citing *Hunt v. Washington State Adver. Comm'n*, 432 U.S. 332, 343 (1977)) (stating that where an organization sues on behalf of its members, it must demonstrate that its members would "otherwise have standing to sue in their own right").

[5]    For this reason, the plaintiffs choose to construe the D.C. Circuit's dismissal of the complaint in *Helstosky* as one "without prejudice."  Pls.' Opp'n at 4.  The D.C. Circuit did not qualify its dismissal with this term of art.

The plaintiffs' alleged injury in *Helstosky* stemmed from individual plaintiff Helstosky's (pregnant at the filing of that case) concern "with the adverse effects of chemicals on her developing child." Defs.' Mot., Att. 1 ("*Helstosky* Complaint"), ¶ 3. In the present complaint, the individual plaintiffs elaborate on exactly how such an injury might manifest itself: each individual plaintiff is pregnant and a vegetarian, and each alleges that she may have been and may continue to be exposed to (1) harmful pesticides in fruits and vegetables that have undergone DNT testing, *e.g.*, Compl. ¶¶ 15, 19, 21; and (2) harmful pesticides used on farms and orchards, where all three individual plaintiffs grew up and continue to visit, *e.g.*, *id.* ¶¶ 16, 18, 20. All three women plan to breast feed their children and to take them to their family farms for visits and they fear that their children may therefore be exposed to "potential risks of developmental impairment as a result of EPA's failure to apply the full Tenfold Safety Factor for pesticide exposure to children[.]" *Id.* ¶ 21.

The individual plaintiffs have also alleged in greater detail the causal relationship between the DNT guidelines and the potential risk of developmental impairment from the individual plaintiffs' exposure to pesticides on their unborn children. *See id.* ¶¶ 37-60. The plaintiffs' argue in detail that the DNT guidelines are not reliable because DNT testing cannot "predict with confidence the neurotoxic potential . . . of a test chemical in human infants and children by the extrapolation of data from laboratory experiments on animals."[6] *See id.* Whereas

---

[6] The plaintiffs allege several bases for doubting the reliability of DNT testing as a predictor of the effects of pesticides on humans, including differences in the way that various animal species process chemicals, that DNT testing is not "sensitive" to the different genetic makeups of different animal species, and that the oral dosing methods specified by the Guidelines may deliver chemicals at an artificially high rate and prevent an accurate determination of the amount of a chemical actually reaching a target animal. Compl. ¶¶ 41-54.

the *Helstosky* complaint challenged the DNT Guidelines immediately after they were promulgated and before they were utilized in any specific pesticide tolerance decisions by the EPA, the plaintiffs assert that DNT testing data has been requested (pursuant to the Guidelines) by the EPA "in dozens of instances via 'data call-ins' and as a condition of pesticide registration and reregistration[.]"[7]  Pls.' Opp'n at 12.

    The D.C. Circuit, however, dismissed the plaintiffs' complaint in *Helstosky* not because Dr. Helstosky's alleged injuries or their causal connection to the DNT Guidelines were plead with insufficient specificity.  *See Helstosky*, 2001 WL 799950.  Rather, the court determined that the causal relationship between the DNT Guideline and any injuries caused by exposure to pesticides was "too attenuated" because the challenged DNT Guideline had no binding effect on the EPA.  Even assuming that the use of DNT testing data was traceable to the guidelines, the alleged injury "depends upon the premise that the use of the test protocol will wrongly indicate that certain chemicals are safe, which will result in a future decision by [the EPA] not to impose stricter regulations on these chemicals, which in turn will lead to Helstosky's continued exposure."  *Id.* at *1.  For these reasons, the plaintiffs in *Helstosky* could not demonstrate an

---

[7]     The plaintiffs provide no support for their assertion that DNT testing data is required by the EPA as a necessary condition of pesticide registration.  In instances when DNT testing data is submitted to or requested by the EPA, the DNT Guidelines do not bind in any way the EPA's discretion to determine whether a particular pesticide is "safe" as a result.  DNT testing data is currently not among the data required to support a pesticide registration.  *See* 40 C.F.R. § 158.340.  Although the EPA recently proposed a requirement of DNT testing data for certain pesticides under certain circumstances, it has not yet issued a final rule on this proposal.  EPA Proposed Rules re Pesticides; Data Requirement for Conventional Chemicals, 70 Fed. Reg. 12,276, 12,294-95 (Mar. 11, 2005).

injury fairly traceable to the challenged rule, or demonstrate that such an injury would be redressable by a favorable decision. *Id.* (citing *Friends of the Earth*, 528 U.S. at 180-81).

Although in the present suit the plaintiffs attack the EPA's denial of its petition seeking repeal of DNT Guidelines rather than the guidelines themselves, the guidelines remain non-binding on the EPA, and the plaintiffs do not attack any specific tolerance decisions by the EPA made in reliance of DNT testing.[8] Simply put, had the EPA granted the plaintiff's petition and repealed the Guidelines, or should this court order such a result, the EPA could still request and consider DNT testing data from manufacturers when making pesticide tolerance decisions. *See id.* The injury-scenario alleged by the plaintiffs, albeit propounded in greater detail, depends on precisely the same premises that the D.C. Circuit rejected as "too attenuated" in *Heltosky*: that DNT testing data will wrongly indicate that certain pesticides are safe, and that the EPA will fail to impose sufficiently strict regulations on those pesticides as a result of its reliance on the testing data, which in turn will lead to the individual plaintiffs' and their unborn children's continued exposure to harmful pesticides. *Id.* Pretermitting the plaintiffs' characterizations to the contrary, the EPA could conceivably request or consider DNT testing data and as a result impose a *higher* margin of safety for a particular pesticide, refuse to consider such data in certain circumstances when voluntarily supplied, or request and consider such data but choose not to rely on it when

---

[8] The plaintiffs assert that they have "no intention in this suit to challenge EPA tolerance decisions[.]" Pls.' Opp'n at 23 n.6. The plaintiffs presumably limit their claims in this respect to avoid the jurisdictional requirement that such claims be brought in the United States Court of Appeals. *See* 21 U.S.C. § 346a(h)(1).

making final tolerance decisions for particular pesticides.[9]  Accordingly, the plaintiffs' injuries are not "fairly traceable" to the EPA's denial of their petition to repeal the DNT Guidelines, and a favorable decision from this court would not redress their injuries.

Neither this court's decision, nor the D.C. Circuit's opinion in *Helstosky*, expresses any opinion regarding the plaintiffs' standing to bring future claims against the EPA should it decide to exclusively require DNT testing data for registration of particular pesticides, or to challenge particular tolerance decisions made by the EPA employing DNT testing data to utilize a margin of safety other than the "tenfold" margin.  *See* 21 U.S.C. § 346a(b)(2)(C).  The potential standing the plaintiffs may have in such future and speculative scenarios, however, does not entitle them to a second bite at the juridical apple with regard to their standing to attack the DNT Guidelines themselves.  The litigation process is not a testing ground for claims, and parties are not permitted to repeat arguments previously made and rejected by courts.  Accordingly, the court dismisses the plaintiffs' claims for lack of standing.[10]

---

[9]  The D.C. Circuit in *Helstosky* cited *Nat'l Law Ctr. on Homelessness and Poverty v. Kantor*, 91 F.3d 178, 182 (D.C. Cir. 1996), in which the court rejected as conjectural the claim that the Census Bureau's alleged undercount of homeless persons would lead Congress to provide less support for the homeless, as an example of the speculation required in such an attenuated scenario.  *Helstosky v. EPA*, No. 01-1069, 2001 WL 799950, at *1.  The court in *Kantor* noted that "how the American people would react to a census count that would arguably show more homeless people than [the challenged count] is surely imponderable . . . [i]t is by no means inevitable or even likely that Congress would respond by *increasing* resources for the homeless." *Kantor*, 91 F.3d at 182 (emphasis in original).

[10]  Because the plaintiffs lack standing to challenge the EPA's denial of its petition for the same reasons the plaintiffs lacked standing in *Helstosky*, they also lack standing to assert their procedural challenges to that denial. *Helstosky*, 2001 WL 799950, at *1 (finding that the petitioners lacked standing to assert procedural claims regarding adoption of the DNT Guidelines because they had not "adequately demonstrated that the testing guidelines cause a risk of harm").

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 11th day of September, 2006.

RICARDO M. URBINA
United States District Judge
